IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
(Milwaukee Division)

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff, | |
| v. | |
| MARIAN UNIVERSITY, | Civil Action No. _____ |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

Plaintiff John Doe[1] files this complaint against Defendant Marian University for gender-based discrimination in violation of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*), negligence, breach of implied contract, breach of the covenant of good faith and fair dealing, and a declaratory judgment. In support of this complaint, John Doe states as follows:

## THE PARTIES AND JURISDICTION

1.      Plaintiff John Doe ("Doe") is, and at all times relevant to this Complaint has been, a resident of Wisconsin.

---

[1] "John Doe" is not the Plaintiff's real name. Due to the nature of the allegations in this lawsuit, Mr. Doe will promptly move this Court for permission to proceed under a pseudonym to protect his privacy because of fear of retaliation. Moreover, to protect the identity of his accuser, he identifies her as "Jane Roe." In using a pseudonym, Mr. Doe relies on *Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831 (7th Cir. 2013) because there are compelling reasons of personal privacy. *Id.* at 833.

2. Plaintiff was a Marian University (the "University") student from the fall of 2016 until he was suspended in December 2018.

3. Defendant University is a private not-for-profit corporation, with its principal place of business located in Fond du Lac, Wisconsin.

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and, (ii) the state law and common law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

5. Doe enrolled as a student at the University and matriculated in the fall semester of 2016. Beginning at that time, and continuing through the events giving rise to this action, Doe paid tuition to attend the University.

6. Doe expected to graduate in May 2020.

7. Doe initially expressed interest in the Reserve Officers' Training Corps ("ROTC") in Spring 2017 and was able to join ROTC in Fall 2017. Doe's association with the ROTC at Marian provided him with a substantial scholarship that was critical to funding his college education.

8. Doe planned to join the military after graduation from the University and eventually become a U.S. Marshall.

## THE INCIDENT

9.      In the Fall 2018 semester, Jane Roe ("Roe") falsely accused Doe of sexual misconduct that she alleged occurred in September 2017.

10.     Doe and Roe met each other in early 2017.

11.     Doe and Roe were both in the University's ROTC program.

12.     Doe admits that there was consensual sexual contact between Roe and him.

13.     That night, Doe and Roe were both at a party and were both drinking.

14.     A witness confirmed that Roe's mannerisms at the party, such as her body movements, speech, and ability to make rational decisions, show that she was sober and able to consent to sex.

15.     Doe and Roe were flirting. The flirting escalated when Roe asked Doe to come to her residence. Once there, she eventually propositioned Doe for sex. He accepted her invitation. Roe willfully engaged in sexual intercourse with Doe. The two took turns being positioned on top of the other during intercourse and they both performed oral sex on one another.

16.     Roe never told Doe that she was too incapacitated to consent to sexual intercourse. Indeed, Roe was perfectly able to consent and was sober enough to make rational decisions before and during their sexual activity. This is confirmed by a witness, Student A.

## THE INVESTIGATION

### I. The Disciplinary Proceeding

17. Over a year after their sexual interaction, on or about October 1, 2018, Doe was informed by Brian Brown of the University that he had been accused of violating the University's Code of Conduct.

18. The University conducted an investigation into the allegations.

19. The investigation lasted from on or about October 1, 2018 to November 12, 2018, when a decision regarding the investigation was made.

20. The investigation, which was conducted by Investigator Paul Krikau ("Investigator Krikau") and one other investigator, lasted approximately six weeks. Over the course of the investigation, the investigators interviewed witnesses, including Doe and Roe about the incident.

21. Investigator Krikau was a biased investigator.

22. The investigators chose to interview some witnesses and declined to interview others.

23. Investigator Krikau chose not to contact or interview many potential witnesses who could have exculpated Doe and/or provided evidence of Roe's credibility or lack thereof.

24. The investigators' decision to not interview certain witnesses is evidence of their bias. For instance, the investigators did not interview an ROTC official regarding whether Roe actually reported any sexual misconduct to him as she claimed.

25.     During his initial interview with Roe on October 1, 2018, before any other witnesses were interviewed, Krikau made the following statements:

      a.  We have established very clearly sexual misconduct;

      b.  At this time, this is clearly a policy violation; and

      c.  I would say we have a very clear case of harassment, victim intimidation, and stalking.

26.     Moreover, when another investigator questioned the legitimacy of Roe's claims against Doe, Investigator Krikau stated: Good news, we only need to prove the case more likely than not. Stating that it was "good" that they only have a low burden of proof is evidence of bias. Indeed, Krikau was acting as an advocate for Roe, rather than an investigator, from the very start of the process.

27.     Additionally, Roe is not credible.

28.     For instance, Roe changed her story regarding when she first reported the alleged sexual misconduct. During her initial interview, she states that she first reported it to her ROTC captain (Captain Cortas). In her second interview on October 11, 2018, she says that she reported that Doe "raped" her to Captain Cortas about a week after the alleged incident. During her third interview, however, she says that she did speak to the captain, but did not say she was sexually assaulted. In reality, she never spoke to Captain Cortas about her allegations.

29.     Despite these conflicting statements and that a contemporaneous report of the alleged rape would have been good evidence, Investigator Krikau *never* spoke with Captain Cortas.

30.     Roe also gave conflicting reports regarding her reporting to the military. Roe claimed that she did not report it out of fear and because underage drinking would automatically disqualify her from ROTC. As shown above, however, this is directly in conflict with her statements that she did report it to Captain Cortas.

31.     Notably, an alleged victim of rape would not be "automatically disqualified" from ROTC for underage drinking. The military and the University have amnesty protections for alleged victims.

32.     An unbiased investigator would have investigated these allegations further due to the conflicting statements.

33.     Roe also stated that multiple people had contacted her fiancée and told him that Doe had confessed to raping Roe. Investigator Krikau accepted these allegations as true without contacting the fiancée and without attempting to gain the alleged witnesses' identities either from Roe or from her fiancée.

34.     Doe did not sexually assault Roe and did not "confess" to anyone.

35.     Roe also gave conflicting and unreliable statements regarding Doe's alleged intimidation of her. She initially stated that he confronted her in front of her manager. She changed this story several times. Ultimately, the manager did not corroborate any part of Roe's statements regarding the alleged intimidation.

36.     Roe also gave conflicting and seemingly impossible statements regarding receiving threatening text messages from unknown numbers. Specifically, she initially stated that she reported it to the Milwaukie Police Department who told her that the numbers were from "burner phones" and there was "no way to track

6

them." During her next interview, she changed her story and claimed instead that a friend "ran the numbers" and there was no way to track them. Investigator Krikau did not investigate these statements or ask any questions regarding the truth or accuracy. He merely accepted all of her allegations as true.

37.     Investigators are not advocates. Per the Code of Conduct, Investigators should "commence a thorough, reliable and impartial investigation."

38.     Investigator Krikau did not follow the University's own policy. His investigation was not thorough or reliable. More troubling, he was not impartial.

39.     In addition to the remarks made above, Investigator Krikau also stated to Roe, "we don't want any text messages from you going to [Doe] because it would destroy your case." This statement undoubtedly shows that Investigator Krikau was biased and not impartial because he did not want her case destroyed.

40.     Investigator Krikau was not just in charge of the investigation, he also adjudicated the dispute and made the decision regarding the findings and the sanction for Doe. His bias and impartiality was detrimental to the outcome for Doe.

41.     As part of University policy, Doe and Roe are not able to retain copies of any investigative materials. Each party is only able to view the documents at the University.

## II.     Change in Policy

42.     Initially, the University had a conduct policy that would have allowed Roe's accusations against Doe to be adjudicated at a formal hearing. During the investigation, Investigator Krikau sent an email to Doe containing new policies of

7

the University. At no time did Investigator Krikau explain to Doe that the University had retracted Doe's right to a formal hearing to determine whether he was responsible (*i.e.* guilty) for the alleged conduct.

43.     Due to the University's new policies, which went into effect *after* the allegations against Doe were made, the allegations against Doe were not decided by a hearing, as was policy under the former regulations of the Code of Conduct.

44.     Instead, the University incorporated the "investigator" model whereby investigators perform the investigation and also make the final decision regarding responsibility and sanctions. There was no live hearing to determine the facts.

45.     The changes in the University's policy also removed Doe's right to an appeals panel. The new policy provides that appeals are reviewed by the Director of Human Resources.

46.     The rules applicable to Doe's alleged conduct violation, specifically the rules defining sexual assault, should have been the rules that were in place at the time of the alleged violation. Instead, the University held Doe liable for rules that were in place *after* October 31, 2018. Consequently, Doe was held to have violated rules that were adopted a year after the alleged incident and at least one month after the allegations were made to the University.

### III.     Decision & Sanctions

47.     On November 12, 2018, Doe received a letter from Investigator Krikau informing him that he had been found responsible for sexual misconduct – non-consensual intercourse. The decision was made on the grounds that Roe was too

8

incapacitated to make the decision to have intercourse and that Doe knew or should have known she was too incapacitated. The findings are contrary to evidence from statements made by Doe and Student A.

48.     Doe was suspended for two years from the University.

49.     There was no hearing before the decision was made. Indeed, the letter confirms that the University utilizes the "investigator model," meaning that the investigator assigned to the matter investigates, makes findings, and decides the sanction.

50.     The "Investigative Report" states that the contradiction relating to Roe's statement regarding the intimidation allegation only calls into question whether there was intimidation, but does not relate to Roe' claims that she was sexually assaulted. This contradicted evidence along with the other contrary evidence provided by Roe should have been used as evidence of her credibility.

51.     Importantly, Doe was never able to receive a copy of the "Investigative Report," but was only able to view it at the University by making arrangements with the University.

52.     The "Investigative Report" and "Findings Letter" are different. Both documents demonstrate bias and impartiality on the part of Investigator Krikau. This is contrary to University policy under the Code of Conduct.

53.     The notice also included information regarding the appeals process, including that students only have twenty-four hours to appeal any decision.

54.     Doe appealed the decision by the University.

## IV. Appeal of the Sanction

55.     According to the University's Code of Conduct, appeals are limited to the following grounds:

> a.  That a procedural error occurred that significantly impacted the outcome of the investigation;
>
> b.  That there is new evidence, unavailable during the original investigation, that could substantially impact the original finding or sanction; or
>
> c.  That the sanctions imposed are substantially outside the parameters or guidelines set by Marian University for the type of offense or the cumulative conduct records of the responding student.

56.     Doe appealed the finding of responsibility and the sanction on all three grounds.

57.     In his appeal, Doe emphasized: the biased investigation, including Investigator Krikau's bias, that the investigators were not neutral, and that the "Findings Letter" was biased; denial of properly trained advocate; appeal deadline not properly explained; improperly changed policies during the investigation state of his case; denial of access to Doe's interview; material misstatements in the "Findings Letter"; that the "Investigative Report" and "Findings Letter" erroneously equate memory loss with incapacitation; new evidence, including a photograph of the night in question; and that the sanctions imposed are substantially outside the parameters or guidelines set by the University for this type of offense.

58.     Due to the allegations of Investigator Krikau's bias, Investigator Krikau recused himself from Doe's appeal.

59.     On December 7, 2018, Doe received a letter from the University, informing him that his appeal had been granted on the grounds that there "was a procedural error that may have substantially altered the findings of the case."

60.     Specifically, it was determined that the lack of process for Doe and Roe to review and comment or question a complete transcription of or listen to the recording of Doe's third interview on November 5, 2018 may result in a different finding.

61.     The Appeal Panel remanded the case back to the investigation stage to correct this procedural error.

### IV.    Remand of Case

62.     Doe was notified that the new investigation began on December 12, 2018.

63.     Notably, the new investigation began and ended on the same date, December 12, 2018 – *i.e.* the decision to sanction Doe again was made on the same date the investigation began. This is further evidence of bias and partiality.

64.     After remand, a new investigator, Investigator Kate Candee ("Investigator Candee"), was added to the matter in addition to Investigator Krikau. Investigator Candee is the Vice President for Student Engagement and serves as the Title IX Coordinator.

65.     She was not new to the matter. Indeed, as Title IX Coordinator, she reviewed and approved the original investigation and findings.

66. At the time of remand, Doe objected to Investigator Candee as the new investigator as her bias and partiality was apparent. His objection was denied.

67. Notably, as the Title IX Coordinator, it was Investigator Candee who oversaw the implementation of the new Code of Conduct. She knew or should have known that its application in Doe's case substantially deviated from the University's policy.

68. Also, despite Investigator Krikau refusing himself from Doe's appeal, he did not recuse himself from the second investigation. The biases and partiality continued.

69. Doe and Roe were able to comment upon the transcript of Doe's third interview. Doe submitted comments. Roe did not.

70. Investigator Candee and Investigator Krikau, did no further investigation and ultimately found Doe responsible for the second time on December 12, 2018.

71. Specifically, they noted that the standard for their decision was "was it more likely than not that the responding party [Doe] knew or should have known that the reporting party [Roe] was incapacitated at the time? The "Decision Letter" then notes the "rationale for that decision was made in the original finding letter. We do not find anything in this review by the responding party of the final interview on November 5, 2018 that would alter that decision." In other words, Investigator Krikau did not change his mind regarding the original finding or sanction.

72. This "Decision Letter" was one page in length and was signed by Investigator Krikau.

73.     This finding highlights that the University, through its investigators, refused to change the finding despite Doe's statements explaining and correcting the errors from the initial findings.

74.     Again, the investigators suspended Doe from the University for two years.

75.     Doe appealed again.

### V.     Second Appeal

76.     The University provided Doe with the wrong appeal form on which to appeal the decision.

77.     In his second appeal, Doe argued that the University improperly changed its policies during the investigation of his case (i.e. denied him a formal hearing), that Investigator Krikau was biased, that Investigator Candee was biased, that he was given the wrong appeal form, and that the investigators improperly equated Roe's memory loss with incapacitation.

78.     On appeal, the investigation's findings and sanctions are presumed to have been decided reasonably and appropriately. Therefore, the burden is on the appellant to show by "clear evidence" why the findings should be overturned. The "clear evidence" standard is the same as the "clear and convincing evidence" standard.

79.     The appeals panel affirmed the findings and sanction.

### COUNT I – VIOLATION OF TITLE IX (20 U.S.C. § 1681 *et seq.*)

80.     Doe incorporates all other paragraphs in this complaint, as though fully set forth in this count.

81. The University receives federal funding, including in the form of federal student loans given to students and is therefore subject to the provisions of Title IX.

82. Title IX prohibits gender discrimination in the educational setting.

83. The University erroneously found Doe responsible for sexual misconduct. He is innocent of the allegation.

84. Investigator Krikau disregarded Doe's statements, failed to investigate evidence that would have exculpated him of the alleged offenses, and gave preference to the implausible and inconsistent statements of Roe because of gender bias.

85. Investigator Krikau also gave no weight to the apparent inconsistencies between Doe and Roe's recollections of the alleged incident, instead choosing to treat Roe's account as wholly accurate and reliable.

86. The serious and deliberate procedural shortcomings in the investigation and adjudication of the allegations against Doe, including but not limited to having no live hearing, prevented him from being able to adequately defend himself.

87. As previously explained, Krikau and Candee were biased against Doe and in favor of Roe. This bias was because Roe is female and Doe is male.

88. Moreover, The University initiated its investigation in the shadow of (1) Office of Civil Rights ("OCR") investigations into how colleges and universities handle allegations of sexual assault; and, (2) innumerable reports covered in the national media that suggest the pervasive nature of sexual assault committed by male students on college campuses throughout the nation. As a reaction to the

scrutiny of these OCR investigations and national stories, and in order to be perceived as aggressively addressing the perceptions that sexual assault against female students is rampant on college and university campuses, the University treats male students accused of sexual misconduct by female students more aggressively than it otherwise would, and more aggressively than it would treat similar complaints made by male students against female students.

89.    The University administrators, including Krikau and Candee, are impacted by these external factors. They are also impacted by a narrative in the news media, social media, and from political activists and leaders that implores people in their position to "believe victims (of alleged sexual assault)" and "believe women (who accuse men of sexual assault)." This narrative favors female accusers like Roe to the detriment of male respondents, like Doe.

90.    The University punishes males more severely than females for the same or similar offenses.

91.    The University has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female students.

92.    Here, Doe and Roe were both drinking and both engaged in consensual sexual activity with one another. Yet, only Doe was punished for the conduct.

93.    The decision erroneously finding Doe responsible for the alleged sexual misconduct was motivated by gender bias against accused male students.

WHEREFORE, plaintiff John Doe prays judgement as hereinafter set forth.

## COUNT II – NEGLIGENCE

94.     Doe incorporates all other paragraphs in this complaint, as though fully set forth in this count.

95.     In its interactions with Doe and in conducting its investigation and adjudication of Roe's complaint, the University owed a duty to Doe to exercise reasonable care, with due regard for the truth, established policies and procedures, and the important and irreversible consequences of its actions.

96.     The University also owed a duty to Doe to take care in hiring and providing proper training for all faculty and staff members who would interact with Doe, to ensure that they understood the requirements of Title IX and the University policies and procedures as they conducted an impartial investigation.

97.     Such duties arise from the obligations delineated in the University's own policies and procedures and directives issued by the U.S. Department of Education's Office for Civil Rights.

98.     Investigator Krikau negligently failed to fairly and adequately investigate the allegations and gather the information required to reach an informed conclusion concerning accountability.

99.     The University, acting through its agents and employees, breached a duty to Doe by carelessly, improperly, and negligently performing its assigned duties, mischaracterizing the truth, and facilitating a process that violated its own policies as well as Doe's protected rights and interests.

16

100.   As a direct and proximate result of the University's negligence and breach of duty, Doe suffered loss of educational opportunities, loss of income, and other future financial losses caused by his suspension. Further, the mark on his student record will have a lasting impact on his ability to find employment in his field of choice.

101.   As a further direct and proximate result of the University's negligence, carelessness, and breach of duty, Doe suffered and will continue to suffer from mental and emotional injuries for which compensation is warranted.

WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

## COUNT III – BREACH OF IMPLIED CONTRACT

102.   Doe incorporates all other paragraphs in this complaint, as though fully set forth in this count.

103.   Doe paid the University sums of money for his education, and in return, the University contracted to provide Doe with access to its degree program.

104.   Doe's enrollment in, and attendance of, classes at the University created in Doe an expectation that he would be allowed to continue his course of study until he earned his degree from the University, provided that he maintained satisfactory grades and complied with University rules and polices.

105.   Additionally, Doe and the University were obligated to abide by the Code of Conduct.

106.   Accordingly, an implied contractual relationship existed between Doe and the University, under which each party owed the other certain duties.

17

107.   Under the implied contract between Doe and the University, the University

had a duty to follow the policies, procedures, and definitions as set forward in the

Code of Conduct, including but not limited to having a hearing for alleged violations

of student misconduct as well as using the definitions from the Code of Conduct at

the time of the alleged violation.

108.   As set forward above, the University breached these contractual obligations

by refusing to follow the policies, procedures, and definitions as set forward in the

Code of Conduct.

109.   As a direct and proximate result of this breach, an erroneous finding that Doe

committed sexual misconduct has been made part of Doe's educational records,

which may be released to educational institutions and employers to whom Doe

applies, substantially limiting his ability to gain acceptance to graduate school, or to

secure future employment.

110.   Accordingly, the University is liable to Mr. Doe for breach of contract and for

all damages arising therefrom.

WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

## COUNT IV – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

111.   Doe incorporates all other paragraphs in this complaint, as though fully set

forth in this count.

112.   Every contract implies a duty of good faith and fair dealing.

113. Under the implied contract between Doe and the University, the University had a duty not to suspend Doe for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith.

114. The University breached these contractual obligations by suspending Doe for sexual misconduct through an investigative and adjudicative process that—in the ways, and for the reasons, set out above—was arbitrary, capricious, malicious, discriminatory, and conducted in bad faith.

115. As a direct and proximate result of this breach, an erroneous finding that Doe committed sexual misconduct has been made part of Doe's educational records, which may be released to educational institutions and employers to whom Doe applies, substantially limiting his ability to gain acceptance to graduate school, or to secure future employment.

116. Accordingly, the University is liable to Mr. Doe for breach of the covenant of good faith and fair dealing and for all damages arising therefrom.

WHEREFORE, plaintiff John Doe prays judgment as hereinafter set forth.

## COUNT V – DECLARATORY JUDGMENT

117. Mr. Doe incorporates all other paragraphs in this complaint, as though fully set forth in this count.

118. The University violated Title IX when it conducted a biased investigation, disregarded Mr. Doe's witnesses and evidence, and allowed Ms. Roe's information and allegations, which were refutable and marred by alcohol blackout, to go virtually uninvestigated.

119.   Per the Code of Conduct, there is an implied contract between Doe and the University. Every contract implies a covenant of good faith and fair dealing.

120.   The University breached the implied contract as well as the covenant of good faith and fair dealing by not following the policies as set forward in the Code of Conduct and by allowing an impartial process to decide Doe's responsibility under the Code of Conduct to go forward.

WHEREFORE, plaintiff John Doe prays that judgement be entered in his favor for:

(1) compensatory and punitive damages in an amount to be determined at trial;

(2) a permanent injunction (a) restraining the University, and all those acting in consort with the University, from continuing to enforce any punishment against him and from making any notation on his transcript or keeping any record relating to his disciplinary hearing in Doe's education records, and (b) ordering that the University rescind and expunge the sanctions entered against him by the University;

(3) a declaration that the University's disciplinary actions against Doe were unlawful and violated his legal and contractual rights.

(4) costs, including attorneys' fees under Title IX and 42 U.S.C. § 1988, and such further relief as is just and equitable.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

DATED: March 17, 2019

Respectfully submitted,

By: _____

Harvey & Binnall, PLLC
Jesse R. Binnall
Lindsay R. McKasson
717 King Street, Suite 300
Alexandria, VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
Email: jbinnall@harveybinnall.com
        lmckasson@harveybinnal.com

*Attorneys for Plaintiff*