IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
(Milwaukee Division)

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff, | |
| v. | Civil Action No. 2:19-cv-00388-JPS |
| MARIAN UNIVERSITY, | |
| Defendant. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S 12(b)(6) MOTION TO DISMISS PART OF PLAINTIFF'S AMENDED COMPLAINT

Last week the 7th Circuit made a significant decision regarding Title IX cases, reversing a district court's dismissal of a Title IX claim and clarifying the pleading standard.[1] That case, *Doe v. Purdue*, is strikingly similar to the present case. Both complaints allege Office of Civil Rights Investigations as a motivating factor to discriminate. Both complaints allege acts of bias on behalf of Title IX coordinators and investigators in the wake of contemporary Office of Civil Rights investigations. Both complaints allege a "he said/she said" situation whereby investigators and adjudicators credited the accuser without reason. Despite these similarities, there is one key difference – this complaint ventures beyond the allegations in *Doe v. Purdue* by alleging the University policy itself is biased against males and that the motivations to discriminate were further induced by the campus climate.

---

[1] *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *1 (7th Cir. June 28, 2019), a copy of this decision has been filed as Exhibit 1 to this brief in opposition.

Before the above Seventh Circuit case was decided, Defendant Marian University (the "University") moved to dismiss three of Plaintiff John Doe's ("Doe") five causes of action in his amended complaint, including violation of Title IX, breach of implied contract, and his claim for declaratory relief. The University's motion fails because Doe sets forth sufficient factual allegations that demonstrate: (1) gender bias by the University; (2) the University breached the terms of the contract; and (3) there is a justiciable controversy and threat of ongoing and future harm. The University's motion should be denied.

## FACTUAL BACKGROUND

Doe was a University student from fall of 2016 until he was wrongly accused by Jane Roe ("Roe") and subsequently suspended by the University in December 2018. Dkt. 17, ¶ 2. Doe participated in the University's Reserve Officer's Training Corps ("ROTC"), joining in the fall of 2017. Dkt. 17, ¶ 7. Doe's association with ROTC provided him with a substantial scholarship that was critical to funding his college education. *Id.*

In the fall semester of 2018, Roe falsely accused Doe of sexual misconduct that she alleged occurred in September 2017. Dkt. 17, ¶ 24. Doe admits he and Roe had consensual sex during the fall semester of 2017 after a party in which they were both drinking. Dkt. 17, ¶¶ 27-28. A witness confirms Roe's mannerisms that night show she was able to make rational decisions and able to consent to sex. Dkt. 17, ¶¶ 29, 31.

Over a year after their sexual interaction, on or about October 1, 2018, Doe was informed by the University that he had been accused of violating the University's

Code of Conduct. Dkt. 17, ¶ 32. The University conducted a biased and improper investigation that lasted from about October 1 to November 12, 2018. Dkt. 17, ¶¶ 34-35.

The main investigator, Paul Krikau ("Krikau"), was biased. Dkt. 17, ¶ 36. The investigators chose to interview some witnesses while arbitrarily declining to interview others, including many potential witnesses who could have exculpated Doe and/or provided evidence of Roe's lack of credibility. Dkt. 17, ¶¶ 37-38. Additionally, during his initial interview with Roe, before any other witnesses were interviewed, Krikau made the following statements: "We have established very clearly sexual misconduct"; "at this time, this is clearly a policy violation"; and "I would say we have a very clear case of harassment, victim intimidation, and stalking." Dkt. 17, ¶ 40. These statements demonstrate Krikau already made up his mind before the investigation began and support Doe's allegation alleging Krikau was acting as an advocate for Roe rather than an impartial investigator from the very start of the process. Dkt. 17, ¶ 41.

Doe's complaint alleges many facts regarding Roe's credibility, including how Roe's story changed over time. Dkt. 17, ¶¶ 42-51. The investigators, however, chose not to investigate any of the allegations by Roe or her changing story. Dkt. 17, ¶ 48. Instead, they accepted all of her allegations as true, further evidencing their bias. *Id.* As defined in the University's Code of Conduct, investigators are not advocates, rather they are charged with a duty to "commence thorough, reliable, and impartial investigation[s]." Dkt. 17, ¶ 52.

3

During Doe's disciplinary proceeding, the University repeatedly failed to follow its policies and procedures, including changing its policy in the middle of its investigation into Doe's alleged actions. Dkt. 17, ¶¶ 57-58. When Doe was first accused of sexual misconduct in October 2018, the University's policies provided that allegations were to be adjudicated at a formal hearing. Dkt. 17, ¶ 59. After the new policies went into effect, approximately a month after the beginning of the investigation, formal hearings were no longer required under the Code of Conduct. Dkt. 17, ¶¶ 58-62. The new policy stipulated an "investigator model" whereby the same individuals who investigated the allegations were also the adjudicators regarding responsibility and sanctions. Dkt. 17, ¶ 60.

The University changed its policy due to a Resolution Agreement with the Department of Education's Office for Civil Rights ("OCR"), prompted by a complaint by a female student who claimed the University discriminated against her on the basis of sex by failing to provide her with a prompt and equitable response to her report of sexual assault. Dkt. 17, ¶¶ 21-22, 57. Feeling the pressure of the OCR investigation and campus events such as "Sexual Assault Awareness Week"[2], a "What

---

[2] Sexual Assault Awareness Week included events promoting Times Up (a gender based legal defense fund administered by the National Women's Law Center), the Clothesline Project, and a viewing of The Hunting Ground, a film presenting multiple female students who allege their own sexual assaults and criticize university administrations for their handling of sexual assault and harassment allegations. According to the Hunting Ground's website, The Hunting Ground is "ingeniously employing Title IX legal strategy to fight back and sharing [the female subjects'] knowledge among a growing unstoppable network of young women who will no longer be silent." Dkt. 17, ¶¶ 11-14.

Were You Wearing?" exhibit[3], and the joining of the "It's On Us" campaign, the University diluted the procedural protections of students accused of sexual harassment or misconduct at the behest of female accusers and female led movements. Dkt. 17, ¶¶ 11-18, 20. Naturally, these new policies favor female accusers over male accused students. Dkt. 17, ¶ 23.

Per the new University policy, investigators do not just investigate allegations, they also adjudicate the dispute and decide the findings and sanctions for accused students like Doe. Dkt. 17, ¶ 60. Investigators act as the investigator, judge, jury, and executioner, thus any bias and impartiality is detrimental to the outcome. Dkt. 17, ¶¶ 55, 60. There is no live hearing and no meaningful way for Doe to question his accuser or the evidence against him. Dkt. 17, ¶ 60.

On November 12, 2018, Doe was notified that the biased investigators found him responsible for the sexual misconduct and suspended him for two years. Dkt. 17, ¶¶ 63-64. Doe appealed the decision. Dkt. 17, ¶ 70. The University granted the appeal and remanded the case back to the investigators. Dkt. 17, ¶¶ 75, 77.

After remand, a "new" investigator was added, Kate Candee ("Candee"). Dkt. 17, ¶ 80. Candee is the Title IX coordinator, the Vice President for Student Engagement, and she reviewed and approved the previous investigation's findings.

---

[3] The "What Were You Wearing" exhibit was joined by the Fond du Lac Area Women's Fund and supported by Title IX Coordinator Kate Candee through her statements hoping the exhibit "will spark a conversation" and saying "[w]e need to talk about this community issue . . . and take a stand as a community." Further stating, "No more silence. No more silent bystanders. No more violence." These comments show that at its head, the Title IX department at the University was gender biased and wished to take action accordingly. Dkt. 17, ¶ 15-16.

Dkt. 17, ¶ 82. In truth, she was not a "new" investigator. Further, she is a supporter of the "What Were You Wearing Exhibit." Dkt. 17, ¶ 81.

The "new" investigation and finding began and ended on the same day – December 12, 2018. Dkt. 17, ¶ 79. This further demonstrates bias and impartiality – both in the personnel used to investigate the remanded case and the process which allows investigators familiar to the case to act on their confirmation biases. *Id.* Additionally, that the investigation began and ended on the same day arguably shows a mere rubber-stamping the initial finding.

The second appeal upheld the decision to find Doe responsible and suspend him for two years. Dkt. 17, ¶ 91. Included on this appeal panel was Dr. Sean Fitzpatrick, whose biases are indicated by his objections to proposed regulatory changes by the U.S. Department of Education to Title IX (these policies that would strengthen due process protections of accused students by providing them with access to evidence and some form of cross-examination). Dkt. 17, ¶ 19.

The investigation's findings have tarnished Doe's reputation and put his career and ROTC aspirations at risk. Additionally, there remains a mark on his University student record and he currently cannot attend the University. Dkt. 17, ¶ 119.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need contain "only a short and plain statement of the claim showing that the pleader is entitled to relief,

6

in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . ." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted). "[O]n a motion to dismiss we [the court] presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Wildlife Defenders*, 504 U.S. 555, 561 (1992). Courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

Further, a court weighs the plausibility of the claim. *Swanson v. Citibank*, 614 F.3d 400, 404 (7th Cir. 2010) ("'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the plausibility standard is not akin to a probability requirement."). As such, "the court will ask itself *could* these things have happened, not *did* they happen." *Swanson*, 614 F.3d at 404 ("[I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.").

The Court "must recount the facts as [plaintiff] describes them, drawing every inference in [plaintiff's] favor." *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *2 (citing *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 682 (7th Cir. 2013)) (noting that in analyzing a motion to dismiss the "story . . . is one-sided" and the determination turns on "whether [plaintiff] is entitled to relief if everything that [plaintiff] says is true."). When reviewed against these standards, Doe's complaint is plainly sufficient.

## ARGUMENT

Doe filed his complaint on March 17, 2019. Dkt. 1. The University filed a motion to dismiss that complaint on May 17, 2019, which Doe opposed. Dkts. 11 and 19. Doe filed an amended complaint to address many of the University's arguments in its original motion to dismiss. Dkt. 17. The present motion to dismiss followed. Not only does the University fail to address many of the new allegations set forward in the amended complaint, but it also fails to address any of the arguments made in the original opposition to the motion to dismiss. Since the University's motion was filed before the *Purdue* case was decided[4], it obviously utilizes the outdated Title IX standard instead of the new, mandatory authority as set forward in the Seventh Circuit's recent decision. The University's motion should be denied.

### I.   Doe pled facts to satisfy his Title IX claim.

Title IX prevents colleges and universities that receive federal funding from discriminating on the basis of sex. 20 U.S.C. § 1681(a). The Supreme Court has held that Congress gave the statute broad reach by intending for the term "discrimination" to cover "a wide range of intentional unequal treatment" on the basis of sex. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

---

[4] The University also cites, on multiple occasions, to the district court opinion that was reversed by the *Perdue* court. The district court decision is reported at 281 F. Supp. 3d 754 (N.D. In. 2017). That decision has now been superseded by the Seventh Circuit's reversal. 2019 U.S. App. LEXIS 19464, at 40.

8

In a Title IX claim, plaintiffs only need to allege facts that "if true, raise a plausible inference that the university discriminated against [plaintiff] 'on the basis of sex.'" *Purdue*, 2019 U.S. App. LEXIS 19464, at *33 (seeing "no need to superimpose" the "doctrinal tests" of "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions'" that other circuits use in analyzing Title IX claims). Doe supplies sufficient facts to support a plausible legal claim that the University discriminated against him "on the basis of sex."

To be successful on his Title IX claim, Doe must allege facts that raise a plausible inference that the University discriminated against him "on the basis of sex." *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *33. Merely providing a reason explaining why a university might have been motivated to discriminate against males accused of sexual assault is itself not enough to state a claim. *See id.*, at *37 (finding that the "Dear Colleague Letter" and accompanying pressure supply a sufficient reason as to why a university would be motivated to discriminate against males). When this motivation is combined with "other circumstantial evidence of bias in [a] specific proceeding," however, the result "gives rise to a plausible claim." *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *37 (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)).

The Seventh Circuit provided examples of facts which, when alleged, support an inference of bias, including: (1) allegations that a Title IX coordinator chose to believe the female accuser without hearing her in a "he said/she said" case; (2) allegations that hearing panelists credited the accuser based on her accusation alone,

made up their minds before hearing from the accused, and refused to hear from the accused's witnesses; and (3) allegations that Title IX coordinators believed the accuser because she is a woman supported by a contemporary social media posting by an organization, directed by a Title IX coordinator, that was advertised to the campus community. *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *39. Here, Doe successfully pled facts relating to the University's motivation discriminate against males accused of sexual misconduct as well as facts supporting an inference of bias.

### A. Doe alleges motivation of the University to discriminate against males accused of sexual misconduct.

A motivation to discriminate is not itself dispositive towards the sufficiency of a Title IX claim; however, a motivation "combined with other circumstantial evidence of bias . . . gives rise to a plausible claim." *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *37; *Baum*, 903 F.3d at 586. Doe alleges such motivation.

In his amended complaint, Doe adds the following facts in support of his Title IX claim:

- "The campus environment at the University has been directly and substantially affected by investigations by the U.S. Department of Education's Office of Civil Rights ("OCR") and a number of political and policy movements that focus on female victims of sexual harassment and sexual misconduct. As a result, the University changed its policies to favor female students over male students in University proceedings involving allegations of sexual harassment and sexual assault." Dkt. 17, ¶ 9.

- "National political movements have affected the culture of University. Those movements include #MeToo and Times Up, both of which encourage people to presumptively believe females who accuse males of sexual harassment or sexual misconduct rather than promoting fair processes to determine whether such allegations are true." Dkt. 17, ¶10.

- "In 2017 and 2018, the University held "Sexual Assault Awareness Week." While seemingly gender-neutral, the week included events such promoting Times Up, the Clothesline Project, and a viewing of the film 'The Hunting Ground.'" Dkt. 17, ¶ 11.[5]

- "Times Up is a gender based movement; its legal defense fund is administered by the National Women's Law Center and was inspired by the media attention to the Harvey Weinstein scandal that overtook America." Dkt. 17, ¶12.

- "'The Hunting Ground' presents multiple female students who say that they were sexually assaulted at their college campuses, and say that college administrators either ignored them or required that they navigate a complex academic bureaucracy to have their claims addressed. The film states that many college officials were more concerned about minimizing rape statistics for their universities than for the welfare of the female students. It contains interviews with college administrators who state that they were pressured into suppressing rape cases. The film's focus was to criticize university administrations in the manner in which they adjudicated allegations of sexual harassment and sexual assault on campuses." Dkt. 17, ¶13.

- "According to its website, under "The Story," 'The Hunting Ground' is "ingeniously employing Title IX legal strategy to fight back and sharing [the female subjects'] knowledge among a growing, unstoppable network of young women who will no longer be silent.'" Dkt. 17, ¶ 14.

- "In early 2018, the University hosted an exhibit called "What Were You Wearing?" which showcased the clothing of those who had allegedly been the victims of sexual assault. The exhibit was joined by Fond du Lac Area Women's Fund, which also advertised their "Fond du Lac Says No More" initiative, which advocates on behalf of females who allege that they are victims of sexual violence or assault." Dkt. 17, ¶15.

- "In an article about the "What Were You Wearing?" exhibit Kate Candee, the Title IX Coordinator at the University, said that she hopes the exhibit "will

---

[5] Defendant further argues that "permitting liability based solely on an awareness week would open up almost every university and college across the nation to unfounded Title IX claims." Dkt. 22 at 10, n.8. This argument is a slippery slope and fails due to the circumstances of the allegations. Not only were there movements on campus favoring women's claims over men's due process, but these movements were supported at the upper echelons of the University's Title IX department that was meant to oversee such claims and these agents acted on these biases. Likewise, the allegations relating to Sexual Awareness week do not alone give rise to liability; however, when combined with other allegations relating to gender bias, these claims affirmatively give rise to a Title IX claim.

11

spark a conversation" and "[w]e need to talk about this community issue...and take a stand as a community." She further stated "No more silence. No more silent bystanders. No more violence."" Dkt. 17, ¶ 16.

- "The University also joined the national "It's On Us" campaign and began its own "It's On Us" movement in 2017. "It's On Us" is a social movement that was initiated and promoted by the White House Council on Women and Girls during the Obama administration that focused on allegations of sexual assault." Dkt. 17, ¶17.

- "In an email sent to students on April 17, 2017 from a University official, during Sexual Assault Awareness Week, students could participate in the "It's On Us" softball game by going to the "Women's Softball v. Alverno" game; "Its' On Us" banner signing; Employer Spotlight – Girl Scouts of America; the showing of 'The Hunting Ground (which included the language "ingeniously employing Title IX legal strategy to fight back and sharing their knowledge among a growing, unstoppable network of young women who will no longer be silent"); and attend the Marian Women's Chorale Spring Concert. Most events were targeted towards women and women's issues." Dkt. 17, ¶ 18.

- "On August 29, 2018, Dr. Sean Fitzpatrick, who was on the appeal panel for Doe and is on the Title IX team, tweeted his objections to proposed regulatory changes by the U.S. Department of Education to Title IX policies. Those changes would strengthen the due process protections of accused students by providing them with access to evidence and some form of cross-examination." Dkt. 17, ¶ 19.

- "These events and movements combined to put substantial pressure on the University to change its practices and procedures to favor female students who were accusing male students of sexual misconduct or sexual harassment in adjudications undertaken pursuant to Title IX." Dkt. 17, ¶ 20.

- "Then, on August 24, 2018, the University made a Resolution Agreement with OCR which included that it would change its procedures relating to investigations into sexual assault and that OCR will monitor the implementation of the Resolution Agreement." Dkt. 17, ¶ 21.

- "The Resolution Agreement was in response to a complaint by a female student who claimed that the University discriminated against her on the basis of sex by failing to provide her with a prompt and equitable response to her October 30, 2017 report of sexual assault by another student." Dkt. 17, ¶ 22.

- "Due to the Resolution Agreement, and the other pressures previously discussed, the University put new policies into place on October 18, 2018. Those procedures substantially diluted the procedural protections of students accused

12

of sexual harassment or misconduct. The new policies favor female accusers over male accused students." Dkt. 17, ¶ 23.

- "With the above background and just two months after the Resolution Agreement was made with OCR, in the Fall 2018 semester, Jane Roe ("Roe") falsely accused Doe of sexual misconduct that she alleged occurred in September 2017." Dkt. 17, ¶ 24.

- "In the middle of the investigation, Doe was notified via email that changes had been made to the Code of Conduct. These changes were a result of the Resolution Agreement the University entered into with OCR. The changes went into effect on October 18, 2018, subsequent to the initial complaint being filed." Dkt. 17, ¶ 57.
- "As stated above, Kate Candee is on record as being a supporter of the "What Were You Wearing?" exhibit, which was joined by the Fond Du Lac Women's Fund." Dkt. 17, ¶ 81.

- "There were also internal factors at the University including but not limited to its own OCR investigation, the "It's On Us" movement, Sexual Assault Awareness Week, including the showing of 'The Hunting Ground,' and various other factors described above." Dkt. 17, ¶ 107.

- "As a result of these external and internal pressures, the University punishes males more severely than females for the same or similar offenses." Dkt. 17, ¶ 108.

- "As an additional result of these external and internal pressures, the University engages in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female students." Dkt. 17, ¶ 109.

- "The University also employs a Title IX Coordinator with a pro-female agenda. Her biases invariably infiltrate all Title IX investigations into males." Dkt. 17, ¶ 110.

Defendant merely glosses over some of these claims by declaring them

"conclusory allegations" (Dkt. 22 at 11) or by attempting to minimize the effect of

the alleged facts (which is a matter of proof, not a question of law) (Dkt. 22 at 10).

Mostly, Defendant never addresses the allegations at all. Indeed, the OCR

investigation and resulting Resolution Agreement, which is a critical fact in this

analyzation, is never mentioned. Failing to analyze these allegations under the legal framework is fatal to Defendant's motion to dismiss as the Court must accept these allegations as true as well as make all reasonable inferences.

These additional facts undoubtedly show motivation for bias by the University. First, Doe alleges the University and its agents were motivated by external factors, namely "Office of Civil Rights ("OCR") investigations into how colleges and universities handle allegations of sexual assault," "innumerable reports covered in the national media that suggest the pervasive nature of sexual assault committed by male students on college campuses," and "national political movements" such as "#MeToo and Times Up, both of which encourage people to presumptively believe females who accuse males of sexual harassment or sexual misconduct." Dkt. 17, ¶¶ 10, 105. Doe alleges these external factors motivated the University, "in order to be perceived as aggressively addressing the perceptions that sexual assault against female students is rampant . . . [to treat] male students accused of sexual misconduct by female students more aggressively than it otherwise would." Dkt. 17, ¶ 105. Further, Doe alleges the University's agents, specifically Krikau and Candee, "are impacted by these external factors" to "believe victims" and "believe women." Dkt. 17, ¶ 106.

Second, Doe alleges the University and its agents were motivated by internal factors such as an OCR investigation into the University contemporaneous to the investigation, which culminated in a Resolution Agreement on August 24, 2018 "in response to a complaint by a female student who claimed that the University

discriminated against her on the basis of sex by failing to provide her with a prompt and equitable response to her October 30, 2017 report of sexual assault by another student." Dkt. 17, ¶¶ 21-22.[6] As a result, the University was motivated to put policies in place that diluted the procedural protections of students accused of sexual harassment. Dkt. 17, ¶¶ 23, 107. Further, Doe alleges that the campus environment motivated the University and its agents to favor female students over male students, Dkt. 17, ¶ 107.

The external and internal factors present and alleged by Doe (including threat of OCR investigations, national movements, an OCR investigation prompted by a female accuser, and a strident campus environment) are clearly more indicative of a motivation to discriminate against accused males than the facts cited as sufficient motivation in the Seventh Circuit. *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *33, 35 (the 2011 "Dear Colleague" Letter from the U.S. Department of Education and subsequent OCR investigations). Not only does Doe's amended complaint allege motivations that were deemed sufficient in *Doe v. Purdue*, it also alleges an even stronger motivation – the strident campus climate. Dkt. 17, ¶ 107.

B. **Doe alleges that the University and its agents acted on their alleged bias**.

The Seventh Circuit requires plaintiffs allege facts raising the inference that [defendant] acted at least partly on the basis of sex in [plaintiff's] particular case."

---

[6] Defendant does not refute the effects the Resolution Agreement had on the University, in fact the words "Resolution Agreement" do not even appear in the motion to dismiss. Dkt. 22.

*Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at \*37 (citing *Baum*, 903 F.3d at 586). Doe also satisfies this standard.

The Seventh Circuit found it dispositive in the "he said/she said" situation that the Title IX Coordinator chose to credit the female accuser's account without hearing directly from her, relying on an investigator's letter. *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at \*37. Similarly, in this "he said/she said" case, there is no evidence indicating Candee, the Title IX coordinator, ever discussed the incident with Roe and thus Candee had to rely on Krikau's determination of Roe's credibility. Yet, this case presents an even clearer inference of bias than *Doe v. Purdue*. Here, investigators had a reason to question Roe's credibility, *i.e.* Doe's allegations that: (1) Roe changed her story multiple times, Dkt. 17, ¶¶ 40, 50; (2) Roe made seemingly impossible statements, Dkt. 17, ¶ 51; and (3) Roe made false statements, Dkt. 17, ¶ 43. Whereas *Doe v. Purdue* found it dispositive that the Title IX coordinator simply *believed* the investigator's letter, here Candee *accepted* Krikau's determination even though there were reasons to question Roe's credibility.

Moreover, the Seventh Circuit found that a Title IX coordinator being a director of a biased organization supports a plausible inference that the Title IX coordinator himself acted on such a bias. *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at \*39. Here, similar and additional facts support such an inference. Candee is the Title IX Coordinator as well as one of the investigators and adjudicators in Doe's case. Candee commented in an article about the "What Were You Wearing?" exhibit, saying she hopes the exhibit "will spark a conversation" and "[w]e need to talk about this

16

community issue...and take a stand as a community." Dkt. 17, ¶ 16. She further stated "No more silence. No more silent bystanders. No more violence."" Dkt. 17, ¶16. These comments satisfy and surpass the finding of plausibility of bias in *Doe v. Purdue,* which merely stems from a Title IX coordinator being director of an organization, as these comments can be directly attributed to Candee.[7]

Doe further alleges that the appeal panelist, Dr. Sean Fitzpatrick, was biased due to his objections to proposed regulatory changes by the U.S. Department of Education to Title IX policies that would strengthen the due process protections of accused students by providing them with access to evidence and some form of cross-examination. Dkt. 17, ¶ 19.[8] Just as the allegation that the Title IX coordinator in *Doe v. Purdue* was biased due to his ties to a biased organization supported plausibility, Dr. Fitzpatrick's objections to Title IX policy that would strengthen the due process protections of accused students show his bias. *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *39.

---

[7] Defendant glosses over these statements by labeling them as "gender-neutral" and not indicative of a bias, despite allegations that the "What Were You Wearing?" exhibit was joined by the Fond Du Lac Women's Fund. Dkt. 22 at 8. The bases behind these factual statements is a matter of proof, not an issue of pleading. The facts pled here are sufficient to support a plausible allegation of gender bias.

[8] Defendant argues that Doe failed to allege Dr. Fitzpatrick's statements reveal that Dr. Fitzpatrick was biased. This argument fails because Doe alleged facts sufficient to plausibly claim that Dr. Fitzpatrick was against the strengthening of due process protections for students. This is indicative of the pressure put on the University and of its agents and plausibly shows that they succumbed to the pressure and/or supported these women-oriented movements. Dkt. 17, ¶ 20.

Additionally, Doe alleges that Krikau conducted a biased investigation and adjudication process by arbitrarily interviewing witnesses and acting as an advocate for Roe (rather than an investigator and impartial adjudicator). Dkt. 17, ¶¶ 40-41. These allegations are also sufficient to allege a bias. *Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *38 (finding that hearing panelists allegedly who made a decision concerning the accused plaintiff before the hearing began was sufficient to show bias). Here, Doe supports his conclusions of bias with contemporary statements made by Krikau, such as saying to Roe in his initial interview: "a. We have established very clear sexual misconduct; b. At this time, this is clearly a policy violation; and c. I would say we have a very clear case of harassment, victim intimidation, and stalking." Dkt. 17, ¶ 40. When questioned by a fellow investigator about the legitimacy of Roe's claims, Krikau stated that it was "good" that they only have a low burden of proof. Dkt. 17, ¶ 41. Moreover, Krikau told Roe "we don't want any text messages from you going to [Doe] because it would destroy your case." Dkt. 17, ¶ 54. These specific statements, when compared with the allegations alleged in *Doe v. Purdue*, sufficiently allege a plausible inference of bias on behalf of Krikau.

Finally, Doe surpasses *Doe v. Purdue* by alleging that the policy itself, which was changed to favor female accusers over male accused students in response to an OCR investigation, was biased towards accused males. Dkt. 17, ¶ 23. Under the previous policy, accused students were entitled to a hearing, whereas under the new policy they are not. Dkt. 17, ¶ 59. As a result of this policy change, Roe's accusations

18

were not adjudicated in a formal hearing.[9] The University's change in policy as a result of an OCR investigation and Resolution Agreement (in response to a previous female accuser alleging that the University failed to adequately investigate a Title IX accusation) is evidence of a strong motivation to dilute the process to favor female accusers. That the University changed its policy is a fact from which the Court can plausibly infer that the University was under pressure to appease the Department of Education, to secure its federal funding, and to garner support in the student community by showing that it aggressively responds to alleged sexual misconduct by male students. *See Doe v. Purdue*, 2019 U.S. App. LEXIS 19464, at *32 (finding an allegation of the threat of OCR investigations as a motivating factor to discriminate against males because a university could lose funding is well pled); *Doe v. Baum*, 903 F.3d at 586 (underlining the external pressure of OCR investigations and media attention on the university, revealing the lack of prosecution on accused males on behalf of female complainants, in combination with alleged adjudicator bias generates a plausible complaint). Moreover, the proximity of the Resolution Agreement (August 24, 2018) to the investigation and decision of this matter (October and November 2018, respectively) further supports plausible inferences relating to gender discrimination. Here, these facts go well beyond *Doe v. Purdue* and *Doe v. Baum* as there was an OCR investigation into the University itself that was close in

---

[9] Defendant argues that Roe's accusations were adjudicated under the prior policy. Dkt. 22 at 8 n. 6. It is Doe's position, however, that the previous policy required a hearing and the new policy did not. Regardless, a reasonable person standard is a question for the jury and cannot be dismissed as a matter of law.

time to the investigation and decision as well as in conjunction with statements made by University officials that show bias. These facts combined plausibly support an inference of the University's bias motivated by gender discrimination.

Doe has more than adequately alleged that the actions taken against him were motivated by gender bias as evidenced by the internal and external factors. Doe further alleged that the University and its agents acted on this gender bias by believing his accuser and disregarding evidence of her lack of credibility, acting as an advocate for his accuser, by being generally biased in the proceedings, and by implementing a biased policy. Doe's Title IX claim should not be dismissed.

## II. Doe plausibly pled facts to satisfy his Breach of Contract Claim.

Pursuant to Wisconsin law, whether an implied contract exists is a question of fact. *Theuerkauf v. Sutton*, 102 Wis. 2d 176, 183 (1981). The University does not dispute that the Code of Conduct created an implied contract. It merely argues that Doe did not properly plead any factual allegations relating to a breach of such a contract. To support this argument, the University only pointed to two allegations relating to the alleged breach in their original motion to dismiss, Dkt. 12 at 10, and then added a third allegation, quoted from Plaintiff's Opposition to the Motion to Dismiss, Dkt. 17, ¶¶ 52-53, without supplementing any new argument.

The third allegation listed is critical, "[p]er the Code of Conduct, Investigators should 'commence a thorough, reliable and impartial investigation.'" Dkt. 17, ¶ 52. As demonstrated above, Doe alleges the University did not commence a thorough, reliable, or impartial investigation and he specifically alleges this in the amended

20

complaint. Dkt. 17, ¶ 53. These allegations create a plausible breach of contract by the University because they did not follow the Code of Conduct.

Relating to the other two allegations to which the University takes issue – 1) holding Doe responsible for rules in effect after the alleged sexual misconduct, Dkt. 17, ¶ 62, and 2) denying Doe the right to have Roe's allegations adjudicated by a formal hearing, Dkt. 17, ¶¶ 60-61, – these allegations are governed by the "reasonable expectation" of a contract doctrine as provided for under Wisconsin law. *See Weimer v. Country Mut. Ins. Co.*, 216 Wis. 2d 705, 719-20 (Wis. 1998); *Columbus Milk Producers' Coop. v. Dep't. of Agriculture*, 48 Wis. 2d 451, 463 (Wis. 1970); *Mgmt. Comput. Servs. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 186 (Wis. 1996). Therefore, it is a question of fact whether a reasonable college student would have the expectation of the rules in effect at the time of the alleged sexual misconduct as well as an entitlement to a hearing, and not a matter of law.

Additionally, once a contract is created (which the University does not dispute), it "implies a duty of good faith and fair dealing between the parties and a promise against arbitrary or unreasonable conduct." *Marquette Univ. v. Lapertosa*, 2000 Wisc. App. LEXIS 1197, at *13 (Wis. Ct. App., Oct. 17, 2000).[10] Doe alleges a breach of good faith and fair dealing in Count IV of his complaint. Dkt. 17, ¶¶ 130-135.

---

[10] A copy of this decision can be found in Dkt. 19, Exhibit 1, pursuant to Civil L.R. 7(j)(2).

The University can argue that it was not required to provide a hearing, but there remains a question of fact as to whether failing to provide such a hearing breached its duty of good faith and fair dealing under the implied contract. Here, the Court must accept all the plaintiff's allegations as true and decide if the facts alleged create a plausible breach. Doe has satisfied his obligation. His breach of contract claim should not be dismissed.

## III. <u>Declaratory Relief is Available.</u>

In order for a court to grant declaratory relief, there must be an "actual controversy." *Int'l Harvester Co. v. Deere & Co.*, 623 F.3d 1207, 1210 (7th Cir. 1980). Here, there is an "actual controversy" and a continuing wrongful action.[11]

Currently, Doe cannot attend the University due to the improper sanction he received from the University. Moreover, the finding of 'responsible' of sexual misconduct is presently on his student record resulting in obvious harm to Doe, including but not limited to negatively affecting Does' ability to transfer universities to finish his degree, apply to graduate universities, or find employment. Finally, his scholarship and admission in ROTC are in jeopardy.

The Supreme Court recognized the harm charges of misconduct can have on a student's record. *Goss v. Lopez*, 419 U.S. 565, 575 (1975) (charges of misconduct "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment"). A court in the Eastern District of Virginia also recognized the specific

---

[11] *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991).

harm charges of sexual misconduct could cause. *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 724 (E.D. Va. 2015) ("this stigmatizing label [of sexual misconduct] will impair his ability to seek further education or employment elsewhere.").

Doe is not merely seeking to adjudicate the propriety of past conduct. The wrongs by the University as alleged in his complaint and amended complaint are ongoing today and are still affecting Doe in his daily life. Prospective relief, through a declaration or injunction, will be necessary for Doe to save his future educational and career prospects by removing the finding from his student record as well as allowing him to return to the University should he choose. Doe also alleges a continuing violation of federal law[12] in his claims relating to Title IX. Doe's declaratory judgment and request for injunctive relief should not be dismissed.

## CONCLUSION

For the foregoing reasons, Doe's claim for Title IX, breach of contract, and declaratory judgment should not be dismissed.


DATED: July 3, 2019                    Respectfully submitted,


                                       By: /s/Jesse R. Binnall
                                       Jesse R. Binnall, VSB No. 79292
                                       Lindsay R. McKasson, CSB No. 293144
                                       Harvey & Binnall, PLLC
                                       717 King Street – Suite 300
                                       Alexandria, VA 22314

---

[12] *Kress v. CCA of Tenn., LLC.*, 694 F.3d 890, 894 (7th Cir. 2012).

Telephone: (703) 888-1943
Facsimile: (703) 888-1930
Email: jbinnall@harveybinnall.com
        lmckasson@harveybinnall.com

*Counsel for Plaintiff*

<u>Certificate of Service</u>

I certify that on July 3, 2019, the forgoing was filed with the Clerk of the

Court using the CM/ECF system, which will send notice of the filing to all counsel of

record who are registered with CM/ECF. There are no *pro se* parties in this matter.

By: <u>/s/Jesse R. Binnall</u>
Jesse R. Binnall, VSB No. 79292
Harvey & Binnall, PLLC
717 King Street – Suite 300
Alexandria, VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
Email: jbinnall@harveybinnall.com

*Counsel for Plaintiff*