UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN - MILWAUKEE DIVISION

JOHN DOE,

    Plaintiff,

v.    Case No. 2:19-cv-00388-JPS

MARIAN UNIVERSITY,

    Defendant.

## DEFENDANT'S PROPOSED FINDINGS OF FACT

NOW COMES the Defendant, Marian University, by its undersigned attorneys, and submit the following Proposed Findings of Fact in support of its Motion for Summary Judgment:

1. Plaintiff John Doe is a resident of the State of Wisconsin and was a student at Marian University from Fall 2016 to December 2018. [Dkt. 17, ¶¶ 1, 2.]

2. Marian University is a private University with its principal place of business in Fond du Lac, Wisconsin. [Dkt. 17, ¶ 3.]

3. At all times material to this lawsuit, Dr. Paul Krikau was the Dean of Students and Deputy Title IX Coordinator at Marian University. [Deposition of Paul Krikau, Ph.D. (Dkt. 30), 7:24-8:1.]

4. From approximately 2013 through November 5, 2018, Dee Harmsen was the Director of Community Standards at Marian University. [Deposition of Denise Harmsen (Dkt. 31), 8:3-4; 8:15-17; 9:18-22; 89:6-7.]

5. Complainant Jane Roe made a complaint to Marian University's Title IX Coordinator regarding sexual misconduct by Plaintiff in early October 2018 and subsequently gave a statement to Dr. Krikau and Ms. Harmsen regarding the incident. [Deposition of Jane Roe (Dkt. 32), 15:15-17; 31:10-11; 32:6-22.]

1

6. Specifically, Jane Roe alleged that Plaintiff had taken advantage of Jane Roe by having sexual intercourse with her when she was drunk. [Dkt. 32, 23:17-24:1; 31:23-32:5.]

7. During her first interview with Dr. Krikau and Ms. Harmsen, Jane Roe provided a timeline of events regarding her complaint. [Dkt. 32, 37:1-6.]

8. In early October 2018, Dr. Paul Krikau and Ms. Dee Harmsen met with John Doe to notify him that there was an allegation made against him that involved sexual intercourse without consent. [Deposition of John Doe (Dkt. 33), 6:21-7:12.]

9. During the meeting with John Doe, Dr. Krikau explained the process Marian University would follow for the investigation into the allegations against John Doe. [Dkt. 33, 7:1-7.]

10. Specifically, Dr. Krikau told Plaintiff that Plaintiff would have the opportunity to present evidence and witnesses to aid in Plaintiff's defense. [Dkt. 33, 7:13-16.]

11. Dr. Krikau told Plaintiff that Plaintiff would be permitted to ask questions during the process or request an advocate. [Dkt. 33, 7:17-20.]

12. Dr. Krikau told Plaintiff that Plaintiff would be advised if the investigators met with any witnesses or met with any parties. [Dkt. 33, 7:21-24.]

13. Dr. Krikau told Plaintiff that Plaintiff would be able to review all of the evidence collected in the case. [Dkt. 33, 7:25-8:2.]

14. Dr. Krikau told Plaintiff that Plaintiff could raise any questions about the evidence collected in the case. [Dkt. 33, 8:3-5.]

15. Dr. Krikau also told Plaintiff that he would have ten days before the investigation began to prepare for the investigation. [Dkt. 33, 8:6-8.]

16. Dr. Krikau told Plaintiff that some people may be interviewed multiple times or may be interviewed only once. [Dkt. 33, 8:9-12.]

17. Dr. Krikau told Plaintiff that, after the investigation was completed, Dr. Krikau and Dee Harmsen would compile a report that Plaintiff would be able to review. [Dkt. 33, 8:13-9:9.]

18. Dr. Krikau also told Plaintiff that Plaintiff would be able to submit cross-examination questions, in that Plaintiff would be able to provide questions to the investigators for the investigators to question certain pieces of evidence. [Dkt. 33, 9:10-18.]

19. Dr. Krikau told Plaintiff that, after the investigation was completed, the investigators would move into the deliberation stage for two days to form a conclusion. [Dkt. 33, 9:19-23.]

20. Dr. Krikau told Plaintiff that, after the deliberation stage, the parties would be notified in writing of the investigators' decision. [Dkt. 33, 9:24-10:2.]

21. Dr. Krikau also informed Plaintiff of the appeal process. [Dkt. 33, 10:3-4.]

22. Specifically, Dr. Krikau told Plaintiff that the parties could file an appeal within two days. [Dkt. 33, 10:5-7.]

23. Dr. Krikau also told Plaintiff that a party could appeal because of new evidence that was not previously available, because of a process error that led to an erroneous conclusion, or because the outcome or sanction was not appropriate based on the finding. [Dkt. 33, 10:8-13.]

24. Dr. Krikau told Plaintiff that after an appeal was filed, it would be submitted to the Title IX Coordinator and then an appeal panel. [Dkt. 33, 10:14-17.]

25. Dr. Krikau told Plaintiff that both parties would have an opportunity to object to any member of the appeal panel for bias or potential bias. [Dkt. 33, 10:18-21.]

26. The information Dr. Krikau provided to Plaintiff during the initial meeting mirrored the written policy in place at Marian University (hereinafter the "2017 Policy"). [Declaration of Dr. Paul Krikau (Dkt. 37), ¶¶ 3, 8-11; Dkt. 37-1.]

27. Marian University used the 2017 Policy to investigate the complaint against Plaintiff. [Deposition of Kathleen Candee (Dkt. 34), 92:17-93:7.]

28. The 2017 Policy defines "sexual misconduct" to include "non-consensual sexual intercourse." [Dkt. 37, ¶ 5; Dkt. 37-1.]

29. Under the 2017 Policy, "non-consensual sexual intercourse" is defined as "any sexual intercourse, however slight, with any object, by one person upon another person, that is without consent and/or by force." [Dkt. 37, ¶ 6; Dkt. 37-1.]

30. Under the 2017 Policy, "[c]onsent is obtained through verbal assent from both parties prior to engaging in any sexual behaviors…" [Dkt. 37, ¶ 7; Dkt. 37-1.]

31. Section Five of the 2017 Policy, entitled "Overview of the Conduct Process," states that the "overview gives *a general idea* of how Marian University campus conduct proceedings work, but it should be noted that not all situations are the same severity or complexity. Thus, *these procedures are flexible, and are not exactly the same in every situation*…." (emphasis added). [Dkt. 37, ¶ 8; Dkt. 37-1.]

32. Plaintiff has no evidence the University policies regarding student conduct were utilized differently or negatively against Plaintiff because he was a male. [Dkt. 33, 93:10-15; 94:2-13.]

33. Plaintiff told Dr. Krikau during the initial intake interview that Plaintiff had reviewed the written policy that Dr. Krikau verbally explained to him. [Dkt. 33, 11:17-20.]

34. Plaintiff does not contend he was entitled to any different process than what Dr. Krikau explained to him. [Dkt. 33, 11:12-15.]

35. Dr. Krikau explained the investigation and appeal process to Plaintiff the same way that he explained the process to the female complainant. [Dkt. 33, 13:21-24.]

4

36. During the initial intake meeting with the complainant, Dr. Krikau's statements that "[f]rom what you are describing by our code of sexual misconduct, sexual intercourse without consent, that is also harassment, it's also stalking" and "[t]he code violations that we are seeing in your narrative at this time, there is a clear policy violation" were simply addressing the University's jurisdiction and whether the complainant's allegations – if true – would constitute a policy violation for the University to investigate. [Dkt. 30, 118:2-12; Dkt. 33, 38:3-39:3]

37. Dr. Krikau remained impartial during the investigation. [Dkt. 30, 119:18-25.]

38. Ms. Harmsen did not demonstrate any bias during the initial interview with the complainant and felt that she was being very fair. [Dkt. 31, 106:13-21.]

39. Dr. Krikau never told Plaintiff during the initial intake interview that Plaintiff was entitled to a hearing. [Dkt. 33, 11:25-12:3.]

40. The 2017 Policy had the option for Marian University to utilize a hearing to resolve investigations, but it was not mandatory to utilize a hearing model under the 2017 Policy. [Dkt. 37, ¶ 10; Dkt. 37-1.]

41. Specifically, the 2017 Policy stated that in a contested allegation, "additional investigation may then be commenced *and/or a hearing may be held* when there is reasonable cause to believe that a rule or rules have been violated." [Dkt. 37 ¶ 10; Dkt. 37-1 (emphasis added).]

42. Marian University uses a "preponderance of the evidence" standard for Title IX investigations, consistent with the 2017 Policy language. [Dkt. 34, 45:10-15; Dkt. 37-1 (p. 28).]

43. Plaintiff acknowledges that the 2017 Policy language does not require a hearing. [Dkt. 33, 73:4-14.]

44. When the 2017 Policy was changed in October 2018, the changes regarding pre-investigation interviews and the number of days between pre-investigation and investigation stage

did not impact Plaintiff's investigation because Plaintiff's investigation had already passed those two stages. [Dkt. 33, 102:13-14.]

45. Another change to the 2017 Policy that was implemented in October 2018, the introduction of a 10-day deliberation process instead of a 2-day process, benefited Plaintiff because the investigators would have more time to consider the evidence of the investigation. [Dkt. 33, 104:9-20.]

46. Finally, the last change to the 2017 Policy that was implemented in October 2018, that appeals were no longer decided by an appeal panel, was not applied to Plaintiff because his two appeals were decided by an appeal panel. [Dkt. 33, 105:12-16.]

47. The last time Marian University utilized a hearing for a Title IX case was Fall 2013. [Dkt. 30, 57:1-9.]

48. Instead of the hearing model, Marian University employed the "investigator model," which is when two investigators conduct an investigation into a claim of sexual misconduct or Title IX violation by collecting data, allowing for rigorous review, allowing for questions to be asked by the parties, allowing for rebuttal by the parties, and then coming to a decision. [Dkt. 30, 22:3-12; 22:17-19.]

49. There are times when a party may submit questions for the investigators to pose to another party or witness and the investigators do not ask the questions, including when the questions are irrelevant, repetitive, or badgering. [Dkt. 30, 25:2-26:5.]

50. There is no dispute the Plaintiff and complainant engaged in sexual intercourse on the night in question or that, the next morning, the parties understood that the complainant was incapacitated by virtue of her drinking the night before. [Dkt. 30, 165:2-6; 165:8-10.]

51. The question for the investigators to resolve during the investigation was whether the Plaintiff knew or reasonably could have known that the complainant was not able to give consent. [Dkt. 30, 165:12-14.]

52. Plaintiff provided one witness's name to the investigators during the investigation - TJ McAdams. [Dkt. 33, 15:4-8.]

53. Plaintiff never asked the investigators to speak with any other potential witnesses (other than TJ McAdams). [Dkt. 33, 15:9-12.]

54. Plaintiff was never denied an opportunity to provide new evidence or additional witnesses during the investigation or appeal. [Dkt. 33, 18:14-22; 20:12-25.]

55. The University investigators met twice with Plaintiff's witness, TJ McAdams, and spoke with him about the alleged incident involving John Doe. [Dkt. 33, 15:13-15; Dkt. 30, 124:18-125:3.]

56. The University investigators also met with each of the three witnesses identified by the complainant, Jane Roe. [Dkt. 31, 69:20-70:18.]

57. Additionally, the University investigators met with witnesses not identified by either party in an attempt to ascertain more information about when Jane Roe initially made her complaint. [Dkt. 30, 124:13-17.]

58. The investigators also met with John Doe and the complainant a number of times. [Dkt. 30, 111:9-11; 123:13-15; 134:18-20.]

59. All interviews with the witnesses and parties were recorded and transcribed. [Dkt. 31, 48:21-23; 47:6-8.]

60. The investigators assessed the credibility of the witnesses and parties after conducting interviews. [Dkt. 30, 123:3-6; 123:18-22; 125:13-126:12; Dkt. 31, 64:20-25; 65:1-14.]

61. During the investigation, Plaintiff took advantage of his ability to challenge or question certain pieces of evidence or testimony provided by third-party witnesses and the complainant. [Dkt. 33, 21:10-19.]

62. Plaintiff had the opportunity to provide a rebuttal at the end of the investigation. [Dkt. 33, 21:17-19; 22:4-9.]

63. Plaintiff had an advocate present with him for all interviews with the exception of his third interview, and he did not request to reschedule the third interview to a time when his advocate could have been present even though he knew that interviews could have been rescheduled to a time when his advocate was present. [Dkt. 33, 27:16-18; 40:14-21; Dkt. 31, 88:2-12.]

64. During Plaintiff's third interview on November 5, 2018, Plaintiff was asked about his interaction with the complainant the day after the alleged assault. [Dkt. 33, 30:17-22.]

65. Specifically, Plaintiff told the investigators during his November 5, 2018, interview that the day after the incident with Jane Roe, he asked the complainant what she remembered about the night before. [Dkt. 33, 30:23-31:1.]

66. Plaintiff's question to the complainant about what she remembered from the night before was one primary piece of evidence that moved the investigators towards a finding of responsibility. [Dkt. 31, 87:6-13; 88:13-18; Dkt. 30, 164:18-21.]

67. When asked at his third interview about his question to complainant, Plaintiff stumbled and stuttered with his response, which also moved the investigators towards a finding of responsibility. [Dkt. 31, 87:6-17; 88:13-18.]

68. Ultimately, Plaintiff's inability to credibly explain to the investigators why the first thing he asked the complainant the next morning was "what do you remember" was the deciding factor of Plaintiff's case. [Dkt. 30, 178:23-179:1.]

69. It was Plaintiff's own admission regarding questioning Jane Roe about what she remembered from the night before that was the deciding factor for the investigation, not anyone else's credibility. [Dkt. 30, 178:1-179:2.]

70. Plaintiff now believes that at the conclusion of the investigation the investigators should have spoken with the complainant's friend about "burner phones" that allegedly were used to send threatening text messages to Jane Roe and her boyfriend. [Dkt. 33, 23:3-11.]

71. Plaintiff now believes that at the conclusion of the investigation the investigators should have spoken with ROTC Captain Cordis. [Dkt. 33, 23:3-11.]

72. Prior to this lawsuit being filed, Plaintiff never requested that the investigators investigate the friend about the burner phones or Captain Cordis. [Dkt. 33, 23:12-15.]

73. Prior to coming to a decision about Plaintiff's investigation, Dr. Krikau and Ms. Harmsen discussed the investigation and their findings. [Dkt. 31, 84:8-16.]

74. On November 12, 2018, Plaintiff received a copy of the findings letter drafted by Dr. Krikau with input from Ms. Harmsen which found Plaintiff responsible for sexual misconduct. [Dkt. 33, 24:1-3; 107:22-25; Dkt. 37, ¶ 12.]

75. The definition of sexual misconduct in the findings letter included non-consensual sexual intercourse, defined as "any sexual intercourse, however slight, with any object, by one person upon another person, that is without consent and/or by force." [Dkt. 37-2.]

76. As a result of the finding, Plaintiff was suspended from Marian University for 2 years. [Dkt. 34, 144:9-13; Dkt. 37-2.]

77. Plaintiff has no evidence that the investigators asked certain questions during the investigation, or omitted certain questions, because Plaintiff was male and/or because the complainant was female. [Dkt. 33, 49:12-23.]

78. Plaintiff has no evidence that the investigation process used in his investigation was different because he was a male respondent. [Dkt. 33, 108:12-14.]

79. In the November 12, 2018 letter, Plaintiff was advised that he had the opportunity to appeal the finding, although the letter contained the wrong appeal deadline. [Dkt. 33, 24:4-13]

80. Ultimately, Plaintiff was given until November 20, 2018, to file an appeal. [Dkt. 33, 24:14-19.]

81. Plaintiff has no personal knowledge as to what may have caused any perceived delays in communication between Plaintiff and Marian University regarding the appeal process. [Dkt. 33, 25:22-26:1.]

82. Plaintiff was given the benefit of any communication errors because his appeal deadline was extended from three days to almost a full week, when he filed the appeal on November 20, 2018. [Dkt. 33, 26:2-8.]

83. The appeal deadline was the same for both the Plaintiff and complainant. [Dkt. 33, 28:16-18.]

84. During his appeal process, Plaintiff discovered two additional potential witnesses and obtained statements from the witnesses. [Dkt. 33, 15:18-16:7; 16:23-17:5.]

85. Plaintiff chose not to submit the witness statements to the investigators during the appeal process or make the investigators aware of the potential new witnesses. [Dkt. 33, 16:8-20; 18:6-15; 18:19-22.]

86. Plaintiff's first appeal was decided by an appeal panel comprised of Ms. Redig, Dr. Briggs, and Dr. Fitzpatrick. [Dkt. 33, 29:17-18; 42:21-24.]

87. After Plaintiff filed his first appeal, he was given the names of the potential appeal panel members prior to the panel reviewing his case. [Dkt. 33, 33:1-7.]

88. Plaintiff never challenged or objected to any of the three appeal panel members. [Declaration of Sabrina Johnson (Dkt. 38), ¶ 5.]

89. Prior to hearing Plaintiff's appeal, the appeal panel members confirmed they did not have any conflicts of interest and then received training on the appeal process by Marian's attorney. [Deposition of Jeneise Briggs, Ph.D. (Dkt. 35), 19:11-20:1.]

90. Plaintiff now asserts that Dr. Fitzpatrick was biased against Plaintiff by relying upon a Tweet written by Dr. Fitzpatrick, wherein Dr. Fitzpatrick opposed proposed regulation changes to Tile IX. [Dkt. 17, ¶ 19; Dkt. 33, 34:8-11; 34:18-20.]

91. Plaintiff acknowledged that, had he done a search online prior to the appeal panel hearing his case, he could have discovered the Tweet that he now asserts demonstrates Dr. Fitzpatrick's bias. [Dkt. 33, 36:9-18.]

92. Further, Plaintiff has no evidence that Dr. Fitzpatrick's Tweet regarding his opposition to proposed regulation changes to Title IX demonstrated a bias that directly impacted or changed Plaintiff's investigation or subsequent appeals. [Dkt. 33, 91:8-25; Dkt. 17, ¶ 19.]

93. Plaintiff based his appeal on all three areas of review that Dr. Krikau had previously discussed with Plaintiff: alleged new evidence that was not previously available, an alleged process error which led to an erroneous conclusion, and that the outcome or sanction allegedly was inappropriate. [Dkt. 33, 26:16-27:2.]

94. In his appeal, Plaintiff also asserted that he was denied access to a copy of a transcript from his November 5, 2018, interview with investigators. [Dkt. 33, 29:6-10.]

95. Plaintiff's statements from his November 5, 2018, interview were considered by the investigators and were included in the investigator's November 12, 2018, findings letter. [Dkt. 33, 31:2-9.]

96. However, there was no copy of the written transcript in the investigator's file at the time of Plaintiff's first appeal. [Dkt. 33, 31:2-6.]

97. In his appeal, Plaintiff also argued that the November 12, 2018, findings letter was biased. [Dkt. 33, 31:20-22.]

98. Specifically, Plaintiff argued that the November 12, 2018, findings letter excludes a "statement on consent." [Dkt. 33, 31:23-25.]

99. The "statement on consent" that Plaintiff argued was missing from his November 12, 2018, findings letter was actually from the Non-Discrimination Policy adopted in October 2018 (the "2018 Policy"). [Dkt. 37, ¶ 13; Dkt. 37-3.]

100. The "statement on consent" that Plaintiff argued was missing from his November 12, 2018, findings letter was not part of the 2017 Policy. [Dkt. 37-1.]

101. Plaintiff objected to having the 2018 Policy apply to his investigation and appeal, so the "statement on consent" was properly omitted from the November 12, 2018, findings letter. [Dkt. 33, 31:32:4-8.]

102. Plaintiff received the appeal panel's decision on December 7, 2018. [Dkt. 33, 36:19-21.]

103. The appeal panel reviewed each and every single issue that Plaintiff raised and addressed Plaintiff's arguments, including those arguments that fell outside the scope of the appeal panel's scope of review. [Dkt. 33, 36:24-37:3.]

104. The appeal panel utilized the "clear and convincing evidence" standard on review, in accordance with the 2017 Policy. [Dkt. 33, 37:16-18; Dkt. 37-1 (p. 38).]

105. The appeal panel reviewed all materials from the investigation and all appeal submissions and then deliberated. [Deposition of Sean Fitzpatrick, Ph.D. (Dkt. 36), 33:10:-14; 34:6-15.]

106. Ultimately, the appeal panel rejected each and every argument raised by Plaintiff on appeal with the exception of his argument regarding the failure to include a written transcript of his November 5, 2018, interview. [Dkt. 36, 40:13-24; Dkt. 33, 43:2-4.]

107. After the first appeal decision was issued, the appeal panel directed that the investigation be reopened so that the November 5, 2018, interview could be evaluated in written form to determine whether or not the investigators' decision would be impacted or changed. [Dkt. 33, 59:12-17.]

108. Plaintiff has no evidence that the appeal panel came to the decision that it did because of Plaintiff's gender. [Dkt. 33, 52:23-53:8.]

109. Plaintiff cannot point to any item in the appeal panel decision that would have been different but for the appeal panel members' alleged bias. [Dkt. 33, 56:5-8.]

110. At the time the appeal panel issued its decision, Plaintiff understood that the second investigation was limited to a review of the November 5, 2018, transcript. [Dkt. 33, 60:6-12.]

111. During the remand of the investigation, Dr. Krikau and Ms. Candee served as investigators, because Ms. Harmsen had left Marian University. [Dkt. 34, 129:10-12; Dkt. 31, 89:6-7.]

112. After a transcript of his November 5, 2018, interview was generated, Plaintiff reviewed the transcript and provided a written response to the investigators for consideration. [Dkt. 33, 62:4-10.]

113. Dr. Krikau and Ms. Candee reviewed the transcript of the November 5, 2018, interview and John Doe's response. [Dkt. 34, 128:5-8; 128:16-20.]

114. Ultimately, the investigators concluded that the rationale for the first findings letter was based upon Plaintiff's admission from the November 5, 2018, interview that, the day after the

13

alleged assault, Plaintiff asked the complainant "what do you remember from the night before?" [Dkt. 33, 64:3-10.]

115. In the second findings letter, the investigators found that a written transcript of the November 5, 2018, interview regarding the conversation between Plaintiff and the complainant was not substantively different than the audio recording that the investigators had previously relied upon. [Dkt. 33, 64:11-15.]

116. Therefore, the investigators concluded that the written transcript of the November 5, 2018, interview did not alter their decision that John Doe was responsible for sexual misconduct. [Dkt. 33, 64:11-15.]

117. The second findings letter was emailed to Plaintiff on December 13, 2018. [Dkt. 33, 62:14-20.]

118. In the December 13, 2018, email, Plaintiff was provided information regarding the appeal process. [Dkt. 33, 62:21-24.]

119. After Plaintiff received the second findings letter, Plaintiff inquired about the appeal process and was informed that the same appeal panel members would decide his second appeal. [Dkt. 33, 64:22-65:15.]

120. Plaintiff never challenged any of the three appeal panel members for the second appeal. [Dkt. 38, ¶ 5.]

121. Initially, Plaintiff was given the wrong form for his second appeal. [Dkt. 33, 66:17-19.]

122. Ultimately, Plaintiff was provided with the correct form for his appeal. [Dkt. 33, 66:20-22.]

123. Plaintiff has no evidence that he was given the incorrect form because he was a male and the complainant was a female. [Dkt. 33, 66:23-67:3.]

14
Case 2:19-cv-00388-JPS   Filed 10/15/19   Page 14 of 18   Document 40

124. Plaintiff filed his second appeal on December 18, 2018. [Dkt. 33, 67:7-8]

125. In his second appeal, Plaintiff raised some of the same issues that he raised in the first appeal, including that policies were changed, that the investigators were biased, that the wrong appeals form was provided, and that the investigative report and findings letter erroneously equated memory loss with incapacitation. [Dkt. 33, 67:11-24.]

126. In his second appeal, with regards to the change in policy argument, Plaintiff argued for the first time that he was entitled to a formal hearing. [Dkt. 33, 67:25-68:7.]

127. Plaintiff had never made a request for a formal hearing during his interviews, in any emails to the University or the investigators, or during his first appeal. [Dkt. 33, 68:1-11.]

128. Plaintiff has no evidence that he was denied a hearing because he was male and because the complainant was female. [Dkt. 33, 68:12-22.]

129. Plaintiff received the second appeal decision on January 8, 2019. [Dkt. 33, 71:9-11.]

130. As with the first appeal, the second appeal panel reviewed each item raised by Plaintiff in his appeal. [Dkt. 33, 71:12-16.]

131. The appeal panel reviewed all relevant materials to address the issues raised by Plaintiff in the second appeal. [Dkt. 35, 54:16-18.]

132. Ultimately, on the second appeal, the appeal panel concluded that there was no basis to overturn the original decision finding the Plaintiff responsible. [Dkt. 36, 41:6-10.]

133. Plaintiff has no evidence that the appeal panel came to the decision that it did in the second appeal because Plaintiff was a male and because the complainant was a female. [Dkt. 33, 74:18-75:4.]

134. Prior to the investigation involving John Doe, there was an investigation by the Department of Education Office of Civil Rights at Marian University during the 2017-2018 school year. [Dkt. 34, 83:2-18; 85:1-6.]

135. The complaint to the OCR was based on process, not on the outcome of Marian University's investigation. [Dkt. 34, 85:24-25.]

136. Ultimately, OCR did not find any wrongdoing and Marian University was simply asked to provide documentation on specific areas of policy and trainings. [Dkt. 34, 86:10-19.]

137. Plaintiff has no evidence that the OCR investigation, the events on Marian University (including Sexual Assault Awareness week and the events held during that week), and the political and policy movements throughout the United States directly impacted or changed his investigation or subsequent appeals. [Dkt. 33, 90:14-91:1; 91:8-25; Dkt. 17, ¶¶ 9-19.]

138. Plaintiff has no evidence that political movements such as Me Too and It's On Us impacted his investigation or subsequent appeals. [Dkt. 33, 89:8-21.]

139. Plaintiff has no evidence that Ms. Candee's comment regarding an exhibit entitled "What Were You Wearing" demonstrated a bias that directly impacted or changed Plaintiff's investigation or subsequent appeals. [Dkt. 33, 91:8-25; Dkt. 17, ¶ 16.]

140. Plaintiff does not intend to return to Marian University after his suspension term is finished. [Dkt. 33, 128:25-2.]

141. Dr. Krikau did not provide TJ McAdams with information regarding Title IX resources and rights because notice was not given in TJ's report; there was not notice that TJ felt harassed, and the investigators did not observe threat, inability to get away from the situation, or severity and persistence of behavior. [Dkt. 30, 179:7-17.]

142. During the investigation of the complaint against John Doe, Dr. Krikau was not influenced or impacted by any external pressures including, but not limited to, prior OCR

16

investigations, political movements, or campus events regarding sexual assault awareness. [Dkt. 37, ¶ 14.]

143. Dr. Krikau's investigation was impartial, unbiased, and not influenced by the gender or sex of either the complainant or respondent. [Dkt. 37, ¶ 14.]

144. Plaintiff has no evidence that his November 5, 2018, interview was not transcribed during the first investigation because he was a male. [Dkt. 33, 127:23-128:24.]

145. Plaintiff has no evidence that Dee Harmsen was biased in any way during the investigation regarding the complaint against Plaintiff. [Dkt. 33, 109:16-21.]

146. In the article "Giving survivors power over their story, student opens 'What Were You Wearing?' exhibit, published in the Fond du Lac Reporter on February 6, 2018, Kate Candee is quoted, stating "We need to talk about this community issue…and take a stand as a community. No more silence. No more silence by bystanders. No more violence." [Declaration of Kate Candee (Dkt. 39), ¶ 4; Dkt. 39-1.]

147. When commenting on the "What Wear You Wearing" exhibit, Ms. Candee utilized information from various gender neutral bystander trainings and initiatives to encourage those who were aware of sexual harassment and sexual violence, committed by or against all sexes and genders, to report those actions, and also to make others aware of the educational opportunity presented by the exhibit. [Dkt. 39, ¶ 5.]

148. On August 29, 2018, Dr. Fitzpatrick Tweeted expressing concern regarding proposed changes to Title IX regulations that would have permitted parties in a Title IX investigation to cross-examine each other. [Dkt. 36, 23:20-25; Dkt. 33-1.]

149. In reference to the proposed regulatory language "and would add the ability for victims and their accused perpetrators to request evidence from each other and to cross-examine each other," Dr. Fitzpatrick Tweeted "[t]hough my knowledge of Title IX is still growing, through

what I do know, and my limited experience, I'm certain this would be a terrible change to current policies. There are several other ways to ensure due process without risking further trauma for victims." [Dkt. 36, 23:20-25; Dkt. 33-1.]

150. Dr. Fitzpatrick agreed with the proposed regulation that would allow for parties to request evidence from each other, but he disagreed with allowing the parties to cross-examine one another. [Dkt. 36, 24:9-23.]

Dated this 15th day of October, 2019.

*/s/ Danielle Baudhuin Tierney*
Lori M. Lubinsky, SBN: 1027575
Danielle Baudhuin Tierney, SBN: 1096371
Attorneys for Defendant
AXLEY BRYNELSON, LLP
P.O. Box 1767
Madison, WI 53701-1767
Telephone: (608) 257-5661
Fax: (608) 257-5444
Email: llubinsky@axley.com
      dtierney@axley.com