JOHN DOE,

                Plaintiff,

      v.                                            Case No. 2:19-cv-00388-JPS

MARIAN UNIVERSITY,

                Defendant.

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

In 2017, Plaintiff John Doe allegedly engaged in nonconsensual sexual intercourse with another student, Jane Roe,[1] while both individuals were students attending Marian University (the "University"). After the University learned about the allegation in late 2018, it conducted an investigation to determine whether John Doe's alleged actions constituted sexual misconduct (which is prohibited by the 2017 Policy). The University appointed two employees to conduct the investigation, which included interviewing witnesses and reviewing documentary evidence submitted by John Doe and Jane Roe. The investigators ultimately concluded that John Doe was responsible and that he had committed sexual misconduct in violation of the 2017 Policy. John Doe appealed the finding and the appeals panel remanded the case to the investigators to add a missing interview transcript to the investigation file. After the investigation was re-opened and the transcript was included in the investigation file, the investigators again concluded that John Doe was responsible for the incident and had committed sexual misconduct. John Doe appealed a

---

[1] Both John Doe and Jane Roe are identified with pseudonyms in Plaintiff's Amended Complaint. [*See* Dkt. 17.] For ease of reference, Defendant will utilize the same pseudonyms in this brief.

second time and the appeals panel upheld the investigators' conclusions. As a result, John Doe was suspended from the University for two years.

Shortly after the second appeal, John Doe filed suit against Marian University. In his federal lawsuit, he claims that the University's disciplinary procedure and investigation were biased against him because of his gender and thus violated Title IX, that the University negligently investigated the alleged conduct violation, that the University breached an implied contract with him, and that the University breached its duty of good faith and fair dealing with respect to the implied contract. He also seeks a declaratory judgment that the University violated Title IX, breached the implied contract, and breached its duty of good faith and fair dealing.

The evidence in this case demonstrates that John Doe cannot prevail on his claims. First, as to his Title IX claim, Plaintiff has no evidence to support his claim that the investigation or subsequent appeals was impacted by gender bias. Plaintiff cannot provide a single example of how any of the events on campus, political movements, or prior OCR investigations actually altered the investigation or appeal – because these events *did not* impact the investigation or appeals. Plaintiff was given the same process and opportunities as all other students, regardless of his gender, and the investigation was conducted without regard for his gender.

Second, as to Plaintiff's negligence claim, there is no evidence the University, through the investigators assigned to this investigation, breached their duty and obligation to investigate impartially and thoroughly. The investigators spoke with witnesses named by both parties, contacted additional witnesses not identified by either party to attempt to gather more information, allowed each party the opportunity to review evidence submitted by the other party and witnesses, and each party had the opportunity to submit rebuttal questions. Plaintiff's dissatisfaction with the

outcome of the impartial investigation does not support a claim for negligence and the claim must be dismissed.

Third, as to Plaintiff's breach of implied contract claim, Plaintiff's claim fails for the same reasons his negligence claim fails. He has no evidence that the investigators failed to act impartially or that the investigation – which was approximately 6 weeks long – was not thorough. Additionally, Plaintiff admits that he was not entitled to a hearing. Finally, he has not established that the document he relies upon imposes a legal obligation on the University. Therefore, this claim must be dismissed.

Fourth, as to Plaintiff's claim that the University breached the covenant of good faith and fair dealing, Plaintiff has no evidence the University acted in an arbitrary, capricious, malicious, or discriminatory manner, nor that any actions taken by the University were done in bad faith. As with Plaintiff's negligence claim, his dissatisfaction with the outcome does not suddenly give rise to an inference of bad faith. His claim must be dismissed.

Finally, as to Plaintiff's request for declaratory judgment, his claim must be dismissed because a declaratory judgment is inappropriate when seeking a declaration for past actions. There is no ongoing controversy between the parties and, as such, the matter is not justiciable. Because the matter is not ripe for judicial determination through a declaratory action, his claim must be dismissed.

For these reasons, as set forth in more detail below, this Court should grant Defendant's Motion for Summary Judgment and dismiss Plaintiff's claims against the Defendant.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as Plaintiff has alleged civil actions arising under federal law. [Dkt. 17.] Venue is proper in the Eastern District of

Wisconsin, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and alleged acts and omissions giving rise to the claim occurred in the district, as Plaintiff claims he was injured by events or omissions that took place in Fond du Lac County, Wisconsin. [Defendants' Proposed Findings of Fact (herein referred to as "PFOF") ¶¶ 1, 2.]

## FACTS

### A.   THE INITIAL INVESTIGATION AND UNIVERSITY POLICIES

Plaintiff John Doe was a student at Marian University (hereinafter "Marian") from Fall 2016 through December 2018. [PFOF ¶ 1.] In early October 2018, Complainant Jane Roe made a complaint to Marian's Title IX coordinator regarding sexual misconduct by Plaintiff. [PFOF ¶ 5.] After first speaking with the Title IX coordinator, Jane Roe gave a statement to Marian employees Dr. Paul Krikau and Ms. Dee Harmsen. [PFOF ¶¶ 3-5.] Specifically, Jane Roe alleged that Plaintiff had taken advantage of Jane Roe by having sexual intercourse with her when she was drunk. [PFOF ¶ 6.] During her first interview with Dr. Krikau and Ms. Harmsen, Jane Roe provided a timeline of events regarding her complaint. [PFOF ¶ 7.]

Dr. Krikau and Ms. Harmsen subsequently met with John Doe to notify him that there was an allegation made against him that involved sexual intercourse without consent. [PFOF ¶ 8.] During the meeting with John Doe, Dr. Krikau explained the process the University would follow for the investigation into the allegations against John Doe. [PFOF ¶ 9.] Dr. Krikau explained the investigation and appeal process to Plaintiff the same way as he explained it to Jane Roe. [PFOF ¶ 35.]

Specifically, Dr. Krikau told Plaintiff that he would have the opportunity to present evidence and witnesses to aid in his defense; that Plaintiff would be permitted to ask questions during the process or request an advocate; that Plaintiff would be advised if the investigators met

with any witnesses or met with any parties; that Plaintiff would be able to review all of the evidence collected in the case; that Plaintiff could raise any questions about the evidence collected in the case; that Plaintiff would have ten days before the investigation began to prepare for the investigation; that some people may be interviewed multiple times or may only be interviewed once; that, after the investigation was completed, Dr. Krikau and Dee Harmsen would be compiling a report that Plaintiff would be able to review; that Plaintiff would be able to submit cross-examination questions; that Plaintiff would be able to provide questions to the investigators for the investigators to question certain pieces of evidence; that, after the investigation was completed, the investigators would move into the deliberation stage for two days to form a conclusion; and that, after the deliberation stage, the parties would be notified in writing of the investigators' decision. [PFOF ¶¶ 10-20.] During that same meeting, Dr. Krikau also informed Plaintiff of the appeal process. [PFOF ¶ 21.] Specifically, Dr. Krikau told Plaintiff that the parties could file an appeal within two days; that a party could appeal because of new evidence that was not previously available, because of a process error that led to an erroneous conclusion, or because the outcome or sanction was not appropriate for the finding; that, after an appeal was filed, it would be submitted to the Title IX Coordinator and then an appeal panel; and that both parties would have an opportunity to object to any member of the appeal panel for bias or potential bias. [PFOF ¶¶ 22-25.] During that initial interview, Plaintiff told Dr. Krikau that he had already reviewed the written policy that Dr. Krikau had verbally explained to him. [PFOF ¶ 33.]

The information that Dr. Krikau provided to Plaintiff during the initial meeting mirrored the written policy in place at Marian University (hereinafter the "2017 Policy"). [PFOF ¶ 26.] Marian University used the 2017 Policy to investigate and adjudicate the complaint against

Plaintiff.[2] [PFOF ¶ 27.] Marian University used a "preponderance of the evidence" standard for Title IX investigations, consistent with the 2017 Policy language. [PFOF ¶ 42.]

The 2017 Policy defined "sexual misconduct" to include "non-consensual sexual intercourse." [PFOF ¶ 28.] Under the 2017 Policy, "non-consensual sexual intercourse" was defined as "any sexual intercourse, however slight, with any object, by one person upon another person, that is without consent and/or by force." [PFOF ¶ 29.] Under the 2017 Policy, "[c]onsent is obtained through verbal assent from both parties prior to engaging in any sexual behaviors…" [PFOF ¶ 30.]

Section Five of the 2017 Policy, entitled "Overview of the Conduct Process," provided that the "overview gives *a general idea* of how Marian University campus conduct proceedings work, but it should be noted that not all situations are the same severity or complexity. Thus, *these procedures are flexible, and are not exactly the same in every situation*…." [PFOF ¶ 31 (emphasis added).] The 2017 Policy had the option for Marian University to utilize a hearing to resolve investigations, but it was not mandatory to utilize a hearing model. [PFOF ¶ 33.] Specifically, the 2017 Policy stated that in a contested allegation, "additional investigation may then be commenced *and/or a hearing may be held* when there is reasonable cause to believe that a rule or rules have been violated." [PFOF ¶ 41 (emphasis added).] Dr. Krikau never told Plaintiff during the initial intake interview that Plaintiff was entitled to a hearing. [PFOF ¶ 37.] Indeed, Plaintiff acknowledges that the 2017 Policy language does not require a hearing. [PFOF ¶ 43.] The

---

[2] The 2017 Policy changed in October 2018. [PFOF ¶ 44.] Despite the change, Marian still utilized the 2017 Policy for Plaintiff's investigation. [PFOF ¶ 27.] When the 2017 Policy was changed in October 2018, the changes regarding pre-investigation interviews and the number of days between pre-investigation and investigation stage did not impact Plaintiff's investigation because Plaintiff's investigation had already passed those two stages. [PFOF ¶ 44.] Another change to the 2017 Policy that was implemented in October 2018, the introduction of a 10-day deliberation process instead of a 2-day process, benefited Plaintiff because the investigators had more time to consider the evidence of the investigation. [PFOF ¶ 45.] Finally, the last change to the 2017 Policy that was implemented in October 2018, that appeals were no longer decided by an appeal panel, was not ultimately applied to Plaintiff because his two appeals were decided by an appeal panel. [PFOF ¶ 46.]

last time the University held a hearing for a Title IX case was Fall 2013. [PFOF ¶ 47.] Instead of the hearing model, the University employs the "investigator model," wherein two investigators conduct an investigation into a claim of sexual misconduct or Title IX violation of hostile environment based on gender or sex by collecting data, allowing for rigorous review, allowing for questions to be asked by the parties, allowing for rebuttal by the parties, and then the investigators come to a decision. [PFOF ¶ 48.]

During the investigation of the allegations against John Doe, the investigators met with John Doe and Jane Roe a number of times. [PFOF ¶ 58.] Plaintiff identified one witness for the investigators to meet with, and the investigators met with that witness twice. [PFOF ¶¶ 52; 55.] The investigators also met with each of the three witnesses identified by Jane Roe. [PFOF ¶ 56.] Additionally, the University investigators met with witnesses not identified by either party in an attempt to ascertain more information about when Jane Roe initially made her complaint. [PFOF ¶ 57.] All interviews with the witnesses and parties were recorded and transcribed. [PFOF ¶ 59.]

During the investigation, Plaintiff took advantage of his ability to challenge or question certain pieces of evidence or testimony that was provided by third-party witnesses and Jane Roe. [PFOF ¶ 61.] Plaintiff had the opportunity to provide a rebuttal at the end of the investigation. [PFOF ¶ 62.] Plaintiff also had an advocate present with him for all interviews with the exception of his third interview, although he did not ask to reschedule the third interview to a time when his advocate could have been present and Plaintiff acknowledged that he was told that interviews could have been rescheduled to a time when his advocate was present. [PFOF ¶ 63.] The investigators remained impartial and acted fairly during the investigation. [PFOF ¶¶ 37-38.]

Based on the information from Plaintiff and Jane Roe, there was no dispute that the Plaintiff and Jane Roe had engaged in sexual intercourse on the night in question or that, the next morning,

7

the parties understood that Jane Roe was incapacitated by virtue of her drinking the night before. [PFOF ¶ 50.] Rather, the only question for the investigators to resolve was whether Plaintiff knew or reasonably should have known that Jane Roe was not able to give consent. [PFOF ¶ 51.]

The investigators met with Plaintiff for a third interview on November 5, 2018. [PFOF ¶ 64.] During his third interview, Plaintiff was asked about his interaction with Jane Roe the day after the alleged assault. [PFOF ¶ 64.] Specifically, Plaintiff told the investigators during his November 5, 2018, interview that, the day after the incident with Jane Roe, Plaintiff asked Jane Roe what she remembered about the night before. [PFOF ¶ 65.] Plaintiff's question to Jane Roe about what she remembered from the night before was a primary piece of evidence that moved the investigators towards a finding of responsibility on the sexual misconduct allegation. [PFOF ¶ 66.] When asked at his third interview about his question to Jane Roe, Plaintiff stumbled and stuttered with his response, which also moved the investigators towards a finding of responsibility. [PFOF ¶ 67.] Ultimately, Plaintiff's inability to credibly explain to the investigators why the first thing he asked Jane Roe the next morning was "what do you remember" was the deciding factor for the investigators in their finding of responsibility. [PFOF ¶ 68.] The credibility of other witnesses and even Jane Roe were not dispositive; Plaintiff's admission was. [PFOF ¶ 69.]

Prior to coming to a decision about Plaintiff's investigation, Dr. Krikau and Ms. Harmsen discussed the investigation and their findings. [PFOF ¶ 73.] Ultimately, Plaintiff was found responsible for sexual misconduct. [PFOF ¶ 74.] Plaintiff received a copy of the findings letter on November 12, 2018. [PFOF ¶ 74.] As a result of the finding, Plaintiff was suspended from Marian for two years. [PFOF ¶ 76.]

### B.    THE FIRST APPEAL

In the November 12, 2018, findings letter, Plaintiff was advised that he had the opportunity to appeal the finding, although the letter contained the wrong appeal deadline. [PFOF ¶ 79.] Ultimately, Plaintiff was given until November 20, 2018, to file an appeal. [PFOF ¶ 80.] Plaintiff acknowledges that he was given the benefit of any communication errors regarding the appeal deadline[3] because his appeal deadline was extended from three days to almost a full week, when he filed his appeal on November 20, 2018. [PFOF ¶ 82.] The appeal deadline was the same for both Jane Roe and Plaintiff. [PFOF ¶ 83.]

After Plaintiff filed his first appeal, he was given the names of the potential appeal panel members prior to the panel reviewing his case. [PFOF ¶ 87.] Plaintiff never challenged or objected to any of the three appeal panel members. [PFOF ¶ 88.] Prior to hearing Plaintiff's appeal, the appeal panel members confirmed they did not have any conflicts of interest and then received training on the appeal process by the University's attorney. [PFOF ¶ 89.] Plaintiff's first appeal was decided by an appeal panel comprised of Ms. Redig, Dr. Briggs, and Dr. Fitzpatrick. [PFOF ¶ 86.]

Plaintiff based his first appeal on all three areas of review that Dr. Krikau had previously discussed with Plaintiff: he claimed that there was new evidence that was not previously available, that process error led to an erroneous conclusion, and that the outcome or sanction was inappropriate. [PFOF ¶ 93.] Plaintiff also specifically asserted that he was denied access to a copy of a transcript from his November 5, 2018, interview with investigators. [PFOF ¶ 94.] Plaintiff's statements from his November 5, 2018, interview were, however, considered by the investigators and included in the investigator's November 12, 2018, findings letter. [PFOF, ¶ 95; *see* Section A,

---

[3] Plaintiff has no personal knowledge regarding what may have caused any perceived delays in communication between the parties. [PFOF ¶ 81.]

*supra.*] However, there was no copy of the written transcript in the investigator's file at the time of Plaintiff's first appeal. [PFOF ¶ 96.] In his appeal, Plaintiff also specifically argued that the November 12, 2018, findings letter was biased. [PFOF ¶ 97.] Specifically, Plaintiff argued that the November 12, 2018, findings letter excluded the "statement on consent."[4] [PFOF ¶ 98.]

The appeal panel reviewed each and every issue Plaintiff raised and addressed Plaintiff's arguments, including those arguments that fell outside the scope of the appeal panel's scope of review. [PFOF ¶ 103.] The appeal panel reviewed all materials from Plaintiff's investigation and all appeal submissions before they deliberated. [PFOF ¶ 105.] On review, the appeal panel utilized the "clear and convincing standard," in accordance with the 2017 Policy. [PFOF ¶ 104.] Ultimately, the appeal panel rejected each and every argument raised by Plaintiff on appeal with the exception of his argument regarding the failure to include a written transcript of his November 5, 2018, interview. [PFOF ¶ 106.]

Plaintiff received the appeal panel's decision on December 7, 2018. [PFOF ¶ 102.] After the first appeal decision was issued, the appeal panel directed that the investigation be reopened so that the November 5, 2018, interview could be evaluated in written form to determine whether the investigators' decision would be impacted or changed. [PFOF ¶ 107.] At the time the appeal panel issued its decision, Plaintiff understood that the second investigation was limited to a review of the November 5, 2018, transcript. [PFOF ¶ 110.]

---

[4] The "statement on consent" that Plaintiff argued was missing from his November 12, 2018, findings letter was actually from the policy adopted in October 2018 (the "2018 Policy"). [PFOF ¶ 99.] The "statement on consent" that Plaintiff argued was missing from his November 12, 2018, findings letter was not part of the 2017 Policy. [PFOF ¶ 100.] Plaintiff objected to having the 2018 Policy apply to his investigation and appeal, so the "statement on consent" was properly omitted from the November 12, 2018, findings letter. [PFOF ¶ 101.]

## C. THE INVESTIGATION ON REMAND

During the remand of the investigation, Dr. Krikau and Ms. Candee served as investigators, because Ms. Harmsen had left the University. [PFOF ¶ 111.]

After a transcript of his November 5, 2018, interview was generated, Plaintiff reviewed the transcript and provided a written response to the investigators for consideration. [PFOF ¶ 112.] Dr. Krikau and Ms. Candee reviewed the transcript of the November 5, 2018, interview and John Doe's response. [PFOF ¶ 113.]

The second findings letter was emailed to Plaintiff on December 13, 2018. [PFOF ¶ 117.] In the second findings letter, the investigators concluded that the rationale for the first findings letter was based upon Plaintiff's admission from the November 5, 2018, interview (the day after the alleged assault, Plaintiff asked Jane Roe "what do you remember from the night before?"). [PFOF ¶ 114.] The investigators found that a written transcript of the November 5, 2018, interview regarding the conversation between Plaintiff and the complainant was not substantively different than the audio recording which the investigators had previously relied upon. [PFOF ¶ 115.] Therefore, the investigators concluded that the written transcript of the November 5, 2018, interview did not alter their decision that John Doe was responsible for sexual misconduct. [PFOF ¶ 116.]

## D. THE SECOND APPEAL

In the December 13, 2018, email with the findings letter, Plaintiff was provided information regarding the appeal process. [PFOF ¶¶ 117-118.] After Plaintiff received the second findings letter, Plaintiff inquired about the appeal process and was informed that the same appeal panel members would decide his second appeal. [PFOF ¶ 119.] Plaintiff never challenged any of

the three appeal panel members for the second appeal. [PFOF ¶ 120.] Ultimately, Plaintiff was provided with the correct form for his appeal.[5] [PFOF ¶ 121.]

Plaintiff filed his second appeal on December 18, 2018. [PFOF ¶ 124.] In his second appeal, Plaintiff raised some of the same issues he raised in the first appeal, including that policies were changed, that the investigators were biased, that the wrong appeals form was provided, and that the investigative report and findings letter erroneously equated memory loss with incapacitation. [PFOF ¶ 125.] In his second appeal, with regards to the change in policy argument, Plaintiff argued for the first time that he was entitled to a hearing. [PFOF ¶ 126.]

As with the first appeal, the appeal panel reviewed each item raised by Plaintiff in his appeal. [PFOF ¶ 130.] The appeal panel reviewed all relevant materials to address the issues raised by Plaintiff in the second appeal. [PFOF ¶ 131.] Ultimately, on the second appeal, the appeal panel concluded that there was no basis to overturn the original decision finding the Plaintiff responsible. [PFOF ¶ 132.] Plaintiff received the second appeal decision on January 8, 2019. [PFOF ¶ 129.]

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment should be granted when there are no genuine disputes of material facts and the moving party is entitled to judgment as a matter of law. A factual dispute is "material" if the dispute could potentially affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Factual disputes over irrelevant or non-dispositive issues will not preclude an otherwise proper motion for summary judgment. *Id*. (citation omitted). A factual dispute is "genuine" if the evidence presented by the party opposing summary judgment is such that a reasonable jury could return a verdict for the non-moving party. *Id*. A genuine factual dispute cannot rest on conclusory allegations or

---

[5] Plaintiff admitted that he has no evidence that he was given the incorrect form because he is male and the complainant is female. [PFOF ¶ 123.]

denials; instead, it must be supported by admissible evidence that sufficiently demonstrates a triable issue. *Id.* at 248-49 (citations omitted).

While the non-moving party is entitled to all reasonable inference to be drawn in their favor, inferences "that are supported only by speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Board of Trustees of University of Illinois,* 893 F.3d 397, 401 (7th Cir. 2018) (quoting *Design Basics, LLC v. Lexington Homes, Inc.,* 858 F.3d 1093, 1099 (7th Cir. 2017). Unsupported speculation, even labeled as an inference, "does not meet a party's burden of producing some defense to a summary judgment motion." *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995) (citations omitted). "Speculation does not create a **genuine** issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Id.* at 932 (emphasis in original).

Summary judgment should be granted "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In those situations, there is no issue as to any material facts, because "a complete failure of proof concerning an element essential of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. Stated more colloquially, "summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

## ARGUMENT

**I. PLAINTIFF CANNOT ESTABLISH A CLAIM FOR A TITLE IX VIOLATION BECAUSE HE HAS NO EVIDENCE HIS GENDER IMPACTED OR HAD ANY EFFECT ON THE INVESTIGATION OR SUBSEQUENT APPEALS.**

Plaintiff alleges that the University's investigation into the incident between John Doe and Jane Roe violated Title IX because (1) the University erroneously found John Doe responsible for the alleged sexual misconduct because he was male and (2) the University punished John Doe more severely for the alleged offense than it would punish females, because the University was biased against males. John Doe's assertions are devoid of any evidentiary support. In fact, the evidence demonstrates that the University conducted an impartial, fair, and thorough investigation into the allegations against John Doe. Further, John Doe admits he has no evidence that the investigation or subsequent appeals were impacted by gender or gender bias. Based on his admissions alone, his Title IX claim must be dismissed.

**A. Title IX claims challenging outcomes of disciplinary proceedings must demonstrate that the plaintiff's gender was a factor in the outcome or selected punishment.**

Title IX provides that "[n]o person…shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a). A Title IX discrimination claim requires that a plaintiff demonstrate that "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Doe v. Columbia College Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (citation omitted).

Plaintiffs can assert Title IX claims premised upon the imposition of gender-biased university discipline. *Doe v. Purdue University,* 928 F.3d 652 (7th Cir. 2019); *Yusuf v. Vassar*

14

*College*, 35 F.3d 709 (2nd Cir. 1994). Other circuits have adopted various tests and employed various labels for Title IX claims premised on university disciplinary proceedings, including "erroneous outcome" and selective enforcement. *Yusuf*, 35 F.3d at 715; *Doe v. Miami*, 882 F.3d 579, 589 (6th Cir. 2018) (internal quotation marks omitted; quoting *Doe v. Cummins*, 662 Fed.Appx. 437, 451-52 & n. 9 (6th Cir. 2016)[6] and *Mallory v. Ohio Univ.*, 76 Fed.Appx. 634, 638-39 (6th Cir. 2003)[7]). The basis of an "erroneous outcome" Title IX claim is that "the plaintiff was innocent and wrongly found to have committed an offense" because of their gender. *Yusuf*, 35 F.3d at 715. A plaintiff asserting a "selective enforcement" Title IX claim asserts "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715.

The Seventh Circuit's test for Title IX discrimination claims in university proceedings does away with the labels created by other circuits, noting that the labels for the various tests "simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Doe v. Purdue*, 928 F.3d at 668. The Seventh Circuit's test for Title IX discrimination claims poses the simple question: did the university discriminate against the plaintiff on the basis of sex? *Id*. at 668-69.

Under the Seventh Circuit case law, a plaintiff must prove that the university's "investigation or adjudication was tainted by [gender] bias" in order to maintain a Title IX claim. *Doe v. Columbia*, 933 F.3d at 856. Mere allegations of gender-biased events or political movements, without a specific impact on the particular facts of a plaintiff's case, do not demonstrate a violation of Title IX. *See, generally*, *id*. Courts have regularly held that "a general

---

[6] Pursuant to Civil L. R. 7(j)(2), a copy of this decision was previously filed as Exhibit C to the Affidavit of Danielle E. Baudhuin. [Dkt. 13-3.]
[7] Pursuant to Civil L. R. 7(j)(2), a copy of this decision was previously filed as Exhibit D to the Affidavit of Danielle E. Baudhuin. [Dkt. 13-4.]

reference to federal pressure, by itself, is insufficient to show gender bias" for a Title IX claim. *Doe v. St. Thomas*, 240 F.Supp.3d at 992 (citing *Cummins*, 662 Fed. Appx. at 453; *Doe v. Baum*, No. 16-13174, 227 F. Supp. 3d 784, 817–18, 2017 WL 57241, at *24 (E.D. Mich. Jan. 5, 2017)); *see also Doe v. Columbia*, 933 F.3d at 855-56. Conclusory allegations of bias or political pressures, without showing a direct impact on the investigation, are insufficient. *See Doe v. Columbia,* 933 F.3d at 855-56; *cf. Doe v. Columbia University*, 831 F.3d 46, 57-58 (2nd Cir. 2016) *and Doe v. Washington and Lee University*, 14-CV-52, 2015 WL 4647996, at *10 (W.D. Va. 2015). A plaintiff must demonstrate a causal link between alleged bias and the disciplinary proceedings in order to maintain a claim. *Doe v. Columbia*, 933 F.3d at 855. With causation, there is no claim. *Id.*

### B. Plaintiff cannot establish that gender bias affected the outcome of the disciplinary investigation.

The premise of John Doe's claim under Title IX is that he did not commit sexual misconduct and he was only found responsible for sexual misconduct because of his gender. According to John Doe, the only plausible way that he was found responsible for sexual misconduct is because the investigators and appeal panel members – all six individuals – were biased against him because of his gender. However, the only "evidence" that Plaintiff relies upon are conclusory allegations of political movements without any connection to his particular investigation. Under Seventh Circuit law, these allegations are insufficient to establish a Title IX violation and his claim must be dismissed. *See Doe v. Columbia*, 933 F.3d at 855-56.

John Doe does not and cannot dispute that the investigators reviewed the evidence presented and, based on that evidence (including a critical admission by Plaintiff), found by a preponderance of evidence that Plaintiff had committed sexual misconduct. That finding was ultimately upheld after three impartial members of the appeal panel reviewed the investigation materials and Plaintiff's appeal submissions. There is no evidence Plaintiff was denied the

16

opportunity to review materials,[8] present evidence, present witnesses, or submit questions to be asked during the investigation. *See, e.g., Doe v. Columbia*, 933 F.3d at 856. Further, there is no evidence any of the investigators or panel members failed to review evidence presented during the investigation or by Plaintiff or demonstrated any bias during the investigation. *See, id.* There is no evidence that the procedure used was impacted by gender bias. *Id*. Further, even to the extent that the Court disagrees with the investigators' findings, there is no evidence that the investigators weighed the evidence improperly **because of Plaintiff's sex**.[9] *See id.*

   i.   <u>The investigation was conducted pursuant to the policy in place at the time of the
        sexual misconduct, as requested by Plaintiff, without regard to Plaintiff's gender.</u>

The investigators applied the 2017 Policy[10] to investigate the complaint against Plaintiff. [PFOF ¶ 27.] The 2017 Policy was fully explained to Plaintiff during his first meeting with Dr. Krikau and Ms. Harmsen. [PFOF ¶ 26.] Indeed, Plaintiff does not claim he was entitled to any different process than what Dr. Krikau explained to him. [PFOF ¶ 34.] Further, Plaintiff admitted he has no evidence the University policies regarding student conduct were utilized differently or negatively against Plaintiff because he was a male. [PFOF ¶ 32.]

Although Plaintiff has asserted that the procedures utilized during his investigation changed mid-investigation, Plaintiff acknowledged that the procedural changes did not impact his investigation and, with regards to the length of time for deliberation, actually benefitted him. [PFOF ¶¶ 44-46.] Even assuming that the changes somehow impacted his investigation, Plaintiff

---

[8] When a written transcript of Plaintiff's November 5, 2018, interview was discovered to be missing, the appeal panel remanded the investigation so that Plaintiff could review a copy of the written transcript and provide a response for the investigators to consider. [PFOF ¶¶ 106-107; 112.] The investigators did consider the written transcript and Plaintiff's response during the second investigation. [PFOF ¶ 113.] Further, Plaintiff has no evidence that the interview was not transcribed during the investigation because he was a male. [PFOF ¶ 144.]

[9] Despite Plaintiff's argument that the investigators improperly weighed the credibility of the witnesses, the complaint against John Doe was ultimately decided against him because of his own admission. [PFOF ¶¶ 60; 65-69.]

[10] Plaintiff objected to having the 2018 Policy applied to his investigation. [PFOF ¶ 101.]

admitted he has no evidence that the investigation procedure was altered in any way because he was a male. [PFOF ¶ 78.]

As to Plaintiff's assertion that he was denied a hearing because he was a male, the University has not utilized a hearing model to adjudicate Title IX claims – for all students – since Fall 2013. [PFOF ¶ 47.] Additionally, the 2017 Policy language does not require a hearing (which Plaintiff admitted). [PFOF ¶¶ 40-41; 43.] So Plaintiff had no legitimate expectation that he would have a hearing. More importantly, Plaintiff admitted that he has no evidence that he was denied a hearing because he was a male and the complainant was female. [PFOF ¶ 128.]

    *ii.*    *<u>The investigators conducted a thorough, reliable, and impartial investigation without consideration for the gender of either the complainant or respondent.</u>*

Before the investigation began, Plaintiff was made aware of the allegations made against him and given information about the investigative process. [PFOF ¶¶ 8-25.] Plaintiff previously reviewed the policy and therefore knew what policies and procedures were being utilized. [PFOF ¶¶ 26-31; 33.]

Plaintiff had the opportunity to present evidence and witnesses in support of his defense during the investigation. [PFOF ¶¶ 52; 54; 61-62.] The investigators interviewed all witnesses identified by the parties (and some additional witnesses that they found on their own accord), solicited evidence and rebuttals from the parties, and discussed and reviewed all evidence. [PFOF ¶¶ 52-58; 61-62; 73.] Plaintiff had the opportunity to review and respond to the evidence against him, and he was given every procedural protection afforded to any student in a conduct investigation, regardless of gender. [PFOF ¶¶ 54; 61-63; 112.] Further, John Doe admitted that he has no evidence the investigation process used in his investigation was different because he was male. [PFOF ¶ 78] Additionally, John Doe admitted that he has no evidence that the investigators

asked certain questions, or omitted certain questions, during the investigation because John Doe was male.[11] [PFOF ¶ 77.]

Plaintiff has also asserted that the investigators prejudged his case because Dr. Krikau made statements to Jane Roe during her intake interview including "[f]rom what you are describing by our code of sexual misconduct, sexual intercourse without consent, that is also harassment, it's also stalking" and "[t]he code violations that we are seeing in your narrative at this time, there is a clear policy violation." [PFOF ¶ 36.] Dr. Krikau's statements, while inartful, were simply addressing the University's jurisdiction and whether Jane Roe's allegations – if true – would constitute a policy violation for the University to investigate. [PFOF ¶ 36.] Dr. Krikau remained impartial during the investigation and was not influenced by the gender or sex of either the complainant or respondent. [PFOF ¶¶ 37, 143.]

iii. *There is no evidence that external forces, including political movements or sexual assault awareness events, had any impact or effect on the investigation.*

Plaintiff has also alleged that various external forces – including an investigation by the Department of Education Office of Civil Rights during the 2017-2018 school year, national political movements, and sexual assault awareness week on campus – infiltrated the investigation and demonstrate that his investigation was tainted by gender bias. Notably, none of these concerns were raised by Plaintiff (or anyone else involved in the investigation) until Plaintiff filed suit. Regardless of when the allegations were made, Plaintiff admitted he has no evidence that the OCR investigation, the events on the University campus (including Sexual Assault Awareness week and

---

[11] When asked what else the investigators could have possibly done to conduct a more thorough investigation, Plaintiff testified that he believed the investigators should have spoken with Jane Roe's friend about "burner phones" that allegedly sent threatening text messages to Jane Roe and her boyfriend. [PFOF ¶ 70.] Plaintiff also believed that the investigators should have spoken with ROTC Captain Cordis. [PFOF ¶¶ 71.] However, Plaintiff never requested that the investigators investigate Jane Roe's friend about the burner phone, and he never asked the investigators to interview Captain Cordis. [PFOF ¶¶ 72; 53.]

the events held during that week), and the political and policy movements throughout the United States directly impacted or changed his investigation or subsequent appeals. [PFOF ¶ 137.] Further, Plaintiff has no evidence that political movements such as "Me Too" and "It's On Us" impacted his investigation or subsequent appeals. [PFOF ¶ 138.]

Plaintiff also has alleged that Ms. Candee's statement regarding an exhibit entitled "What Were You Wearing" and Dr. Fitzpatrick's Tweet regarding opposition to proposed regulation changes to Title IX demonstrate that the two individuals were biased against him because he was male. However, neither of these statements show any gender bias or demonstrate that Ms. Candee or Dr. Fitzpatrick were biased during Plaintiff's investigation. Specifically, In the article "Giving survivors power over their story, student opens 'What Were You Wearing?' exhibit, published in the Fond du Lac Reporter on February 6, 2018, Kate Candee is quoted, stating "We need to talk about this community issue…and take a stand as a community. No more silence. No more silence by bystanders. No more violence." [PFOF ¶ 146.] When commenting on the "What Wear You Wearing" exhibit, Ms. Candee utilized information from various gender neutral bystander trainings and initiatives to encourage those who were aware of sexual harassment and sexual violence, committed by or against all sexes and genders, to report those actions, and also to make others aware of the educational opportunity presented by the exhibit. [PFOF ¶147.] On August 29, 2018, Dr. Fitzpatrick Tweeted expressing concern regarding proposed changes to Title IX regulations that would have permitted parties in a Title IX investigation to cross-examine each other. [PFOF ¶ 148.] Dr. Fitzpatrick agreed with the proposed regulation that would allow for parties to request evidence from each other, but he disagreed with allowing the parties to cross-examine one another. [PFOF ¶ 150.] Neither Ms. Candee's statement nor Dr. Fitzpatrick's Tweet referenced gender or sex. [PFOF ¶¶ 146, 149.] Further still, Plaintiff has no evidence that Ms. Candee's comment

regarding an exhibit entitled "What Were You Wearing" demonstrated a bias that directly impacted or changed Plaintiff's investigation or subsequent appeals. [PFOF ¶ 139.] Plaintiff admitted he has no evidence that Dr. Fitzpatrick's Tweet regarding opposition to proposed regulation changes to Title IX demonstrated a bias that directly impacted or changed Plaintiff's investigation or subsequent appeals. [PFOF ¶ 92.]

Indeed, Dr. Krikau unequivocally denies he was influenced or impacted by any external pressures including, but not limited to, prior OCR investigations, political movements, or campus events regarding sexual assault awareness during the investigation. [PFOF ¶ 142.] His investigation was impartial, unbiased, and not influenced by the gender or sex of either the complainant or respondent. [PFOF ¶ 143.] Further, Plaintiff has no evidence that Ms. Harmsen was biased in any way during the investigation. [PFOF ¶ 145.]

Plaintiff may attempt to argue that he, as the non-moving party, is entitled to an inference that these external forces created pressure on the University and resulted in finding Plaintiff responsible. However, these unsupported and specious accusations are insufficient to raise a genuine issue of material fact for summary judgment because there is no factual support, and Plaintiff is not entitled to inferences premised on speculation alone. *See Carmody,* 893 F.3d at 401; *Hedberg*, 47 F.3d at 931-32.

iv. *There is no evidence that gender or sex bias impacted or altered the appeal proceedings or outcome.*

As to Plaintiff's first appeal, there is no dispute the appeal panel members reviewed all materials from the investigation and all appeal submissions before deliberating. [PFOF ¶ 105.] The appeal panel reviewed each and every issue raised by Plaintiff and addressed each argument. [PFOF ¶ 103.] Plaintiff admitted he has no evidence that the appeal panel came to its decision because of Plaintiff's gender. [PFOF ¶ 108.] Likewise, Plaintiff admitted that he could not point

to any single item in the appeal panel decision that would have been different but for the appeal panel member's alleged bias. [PFOF ¶ 109.]

As to Plaintiff's second appeal, there is no dispute that the appeal panel reviewed all relevant materials to address the issues raised by Plaintiff in his second appeal. [PFOF ¶ 131.] The appeal panel reviewed each item raised by Plaintiff in his appeal. [PFOF ¶ 130.] Like the first appeal, Plaintiff admitted that he has no evidence the appeal panel came to its decision because Plaintiff was a male and the complainant was female. [PFOF ¶ 133.]

Despite alleging that gender bias was the cause for finding him responsible for sexual misconduct, Plaintiff has no evidence to support his assertion. To the contrary, the evidence in this case demonstrates that Plaintiff was held responsible for sexual misconduct because the investigators concluded that he had, in fact, violated the policy. Because Plaintiff has no evidence demonstrating a causal link between actions or omissions in the investigation and his gender, Plaintiff's Title IX claim must be dismissed.

## II. THE UNIVERSITY DID NOT BREACH A DUTY OWED TO PLAINTIFF BY INVESTIGATING THE CLAIMS OF SEXUAL MISCONDUCT.

The University honored its duties to Plaintiff, as it would with all students, when it conducted the investigation regarding Jane Roe's complaint against John Doe. There is no evidence to suggest the University disregarded its duties to Plaintiff when it conducted the investigation into Plaintiff's sexual misconduct. As with his Title IX claim, Plaintiff's dissatisfaction with the outcome does not equate to a flawed process.

Trial courts have the authority to decide the "preliminary question of law of whether a jury question on the issue of negligence has been presented." *Morgan v. Pennsylvania General Ins. Co.*, 87 Wis. 2d 723, 732-33, 275 N.W.2d 660 (1979). A court may hold, as a matter of law, that a jury could not find, based on the facts presented, that a defendant failed to exercise ordinary care.

*Id.* at 933 (quoting *Ceplina v. South Milwaukee School Board,* 73 Wis. 2d 338, 342, 243 N.W.2d 183 (1976)).

Although Wisconsin courts have never expressly addressed a case of negligence involving Title IX or disciplinary investigations involving two students, Wisconsin law recognizes a duty of care of all persons to refrain from acts that will cause foreseeable harm to others. *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 484, 214 N.W.2d 764 (1974). Relying on that same legal duty, a Minnesota District Court held that private universities, like the University, "have a common law duty not to act arbitrary in handling disciplinary matters." *Doe v. University of St. Thomas*, 368 F.3d 1309, 1317 (D. Minn. 2019). As such, it can be inferred that such duty to refrain from arbitrary actions in disciplinary proceedings could apply with equal force in Wisconsin. Therefore, the negligence question to be answered by this Court is: did the University violate a duty to Plaintiff by acting arbitrarily during the disciplinary investigation? Based on the evidence in this matter, no reasonable jury could conclude that the University violated that duty because it did not act arbitrarily when adjudicating Jane Roe's complaint against John Doe.

In this case, there is no evidence the University acted arbitrarily. To the contrary, the evidence suggests that the investigation and outcome were shaped by the evidence gathered from the parties, including Plaintiff. *See* Section I, *supra*. Only after the investigators found, and appeal panel confirmed, that Plaintiff had violated the policy, was Plaintiff suspended. [PFOF ¶¶ 74-75; 132.] As such, there is sufficient factual basis for the University to have taken disciplinary action against Plaintiff, and the action was not arbitrary or capricious.[12] Without an arbitrary decision or action by the University, Plaintiff's negligence claim fails.

---

[12] Wisconsin law holds that schools are afforded broad discretion in disciplinary matters, so long as their actions are not arbitrary or capricious. *Frank v. Marquette University,* 209 Wis. 372, 245 N.W. 125, 127 (1932) ("So long as they acted in response to sufficient reasons and not arbitrarily or capriciously, their acts **may not be interfered with by the courts.**" (emphasis added)). "The test for arbitrary or capricious dismissal is whether the dismissal was based on

## III. THE UNIVERSITY DID NOT BREACH AN IMPLIED CONTRACT WITH PLAINTIFF BECAUSE THE TERMS OF THE IMPLIED CONTRACT AFFORDED THE UNIVERSITY AMPLE DISCRETION

John Doe alleges that the University had an implied contract to abide by the procedures set forth in the 2017 Policy and that the University breached that implied contract when it deviated from the policies, procedures, and definitions set forth in that policy. However, no reasonable jury could find that the University did not abide by the terms and procedures within the 2017 Policy. Further, John Doe has not established that the 2017 Policy creates an enforceable agreement.

First, the 2017 Policy does not impose a legal obligation on the University. The 2017 Policy gave a "general idea" and that the "procedures are flexible." [PFOF 31.] In order to maintain a breach of contract claim, a valid contract must exist between the parties. *Steele v. Pacesetter Motor Cars*, 2003 WI App 242, ¶ 10, 267 Wis. 2d 873, 672 N.W.2d 141. A valid contract requires definite terms, and a contract will be unenforceable when basic terms are indefinite. *Ehlinger v. Hauser,* 2008 WI App 123, ¶ 28, 3131 Wis. 2d 718, 758 N.W.2d 476. A contract is indefinite when essential terms are vague and not "definite as to the parties' basic commitments and obligations." *Id*. (citation omitted).

The terms of the 2017 Policy are indefinite and therefore unenforceable. The 2017 Policy disclaimed definite terms, noting that the policy "gives a general idea of how Marian University campus conduct proceedings work, ***but it should be noted that not all situations are of the same severity or complexity. Thus, these procedures are flexible, and are not exactly the same in every situation***…" [PFOF ¶ 31.] Indeed, other courts have held that such language negates a breach of contract claim as a matter of law. S*ee, e.g.*, *Fellheimer v. Middlebury Coll*., 869 F. Supp. 238, 244 (D. Vt. 1994) (college handbook with provisions noting that procedures are flexible and intended

---

sufficient reasons; if a school has sufficient reasons for dismissal…the court will not interfere." *Cosio v. Medical College of Wisconsin, Inc.*, 139 Wis. 2d 241, 247, 407 N.W.2d 302 (Ct. App. 1987) (citing *Frank,* 209 Wis. at 377).

to "promote fairness" cannot support a claim for breach of contract unless the college acted arbitrarily or capriciously.) Without imposing definite terms and obligations, the 2017 Policy cannot form the basis of a breach of contract claim.

Even assuming that the 2017 Policy created legally enforceable obligations, John Doe cannot establish that the University breached those obligations. John Doe alleged that the University failed to follow the policies, procedures, and definitions in the 2017[13] Policy[14] by:

- Holding John Doe responsible for rules in effect after the alleged sexual misconduct. [Dkt. 17, ¶ 62.]

- Denying John Doe the right to have Jane Roe's allegations adjudicated by a formal hearing. [Dkt. 17, ¶¶ 60, 61.]

- Not conducting a "thorough, reliable and impartial investigation." [Dkt. 17, ¶¶ 52-53.]

None of these assertions are supported by the alleged contract and, as such, neither can support a claim for breach of contract. First, the investigation and adjudication of the claims made against John Doe were indeed performed pursuant to the 2017 Policy. As noted in the November 12, 2018, findings letter, John Doe was found responsible for "sexual misconduct." [PFOF ¶¶ 74-75.] The definition of "sexual misconduct" that John Doe was found responsible for – as referenced in the November 12, 2018, findings letter – is identical to the language used in the 2017 Policy. [*compare* PFOF ¶ 75 (findings letter definition) *with* PFOF ¶ 29 (2017 Policy definition). As such, Plaintiff's assertion that the University breached an implied agreement by utilizing the incorrect policies is factually incorrect.

---

[13] John Doe alleges that the University should have utilized the 2017 Policy because the incident allegedly took place in 2017. [Dkt. 17, ¶¶ 126, 24.]

[14] John Doe also claims that the University denied him the right to have an appeal panel. [Dkt. 17, ¶ 61.] There is no dispute, however, that both of John Doe's appeals were decided by an appeal panel. [PFOF ¶¶ 86; 119.] As such, his claim has no factual basis and his allegation is patently incorrect.

Second, John Doe was not entitled to a hearing under the 2017 Policy. The 2017 Policy expressly stated that "[i]n a contested allegation, additional investigation may then be commenced ***and/or a hearing may be held***…" [PFOF ¶ 41.] The 2017 Policy afforded the University discretion for handling conduct proceedings and was not obligated to conduct a hearing. [PFOF ¶¶ 31, 41.] Indeed, John Doe acknowledged that the language in the 2017 Policy did not require him to be granted a hearing. [PFOF ¶ 43.] As such, there was no contractual obligation for the University to adjudicate the complaint against John Doe with a hearing. The University had the express discretion to handle the matter with an investigative model, as was done here.

Finally, as to John Doe's assertion that the University failed to conduct a "thorough, reliable, and impartial investigation," the University has already explained in detail all the steps taken during the investigation, all process afforded to Plaintiff, and how Plaintiff took advantage of the process fully. *See* Section I, *supra*. Plaintiff has no evidence the investigation was not thorough, reliable, or was biased against him. Indeed, the undisputed evidence is that the investigation was impartial. [PFOF ¶¶ 143, 145.]

Because John Doe has failed to demonstrate that the University breached the purported implied contact, his claim must be dismissed.

## IV.    THE UNIVERSITY DID NOT BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING.

John Doe also asserts his dissatisfaction with the outcome of the investigation by claiming that the University's actions somehow violated a duty of good faith and fair dealing, as imposed by the alleged contractual relationship between the parties. In order to establish this claim, Plaintiff must demonstrate the University acted arbitrarily and in bad faith. Plaintiff lacks any evidence to support this contention and his claim must be dismissed.

Every contract carries with it a duty of good faith and fair dealing, which "is a guarantee by each party that he [or she] will not intentionally and purposefully do anything to prevent the other party from carrying out his [or her] part of the agreement or do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Metropolitan Ventures, LLC v. GEA Associates*, 2006 WI 71, ¶ 35, 291 Wis. 2d 393, 717 N.W.2d 58 (quoting *Ekstrom v. State*, 45 Wis. 2d 218, 222, 172 N.W.2d 660 (1969)). The duty "is intended as a guarantee against 'arbitrary or unreasonable conduct' by a party." *Foseid v. State Bank of Cross Plains*, 197 Wis.2d 772, 796, 541 N.W.2d 203 (Ct. App. 1995) (quoting WIS JI-CIVIL 3044). Actions that may constitute bad faith between contracting parties include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id.* (quoting Restatement (Second) of Contracts § 205, comment d).

The facts of this case demonstrate that the University was completely transparent about the process for the investigation. During the first meetings with both Jane Roe and John Doe, Dr. Krikau and Ms. Hamsen expressly outlined the investigation process. [PFOF ¶¶ 8-26; 35.] The information provided to John Doe was consistent with the 2017 Policy in place at the time. [PFOF ¶ 26-27.] When the 2018 Policy was formally adopted in mid-October 2018, Dr. Krikau provided a clear explanation to John Doe as to the changes under the policy and noted that the current investigation would not be affected by the changes. [PFOF ¶¶ 44-46.] Indeed, Plaintiff admits that the changes in the 2018 Policy did not affect his investigation. [PFOF ¶ 44-46.] Plaintiff only raised concerns about the process (namely, his alleged right to a hearing) during his second appeal after he was found responsible for sexual misconduct a second time. [PFOF ¶ 126.] Plaintiff had not previously raised concerns regarding the process. [PFOF ¶ 126.]

Additionally, Plaintiff was granted numerous extensions and he was allowed every opportunity to review evidence, rebut evidence, and provide evidence and identify witnesses in his defense. [PFOF ¶¶ 52-54; 61-63; 79-80; 121; 124.] There is simply no evidence in the record that the University acted in bad faith with regards to the investigation process. To the contrary, the University worked with Plaintiff throughout the process and ensured that he had every opportunity to be heard and present evidence. Accordingly, Plaintiff's claim that the University violated the covenant of good faith and fair dealing is properly dismissed.

## V. PLAINTIFF IS NOT ENTITLED TO DECLARATORY RELIEF FOR THE UNIVERSITY'S ALLEGED PAST ACTIONS

John Doe also seeks a declaration that the University violated Title IX, breached its implied contract with John Doe, and violated its duty of good faith and fair dealing with respect to that implied contract as a result of the past actions taken by the University. [Dkt. 17, ¶¶ 137-139.] He also requested injunctive relief to remedy the alleged violations. [Dkt. 17, p. 25.] However, declaratory and injunctive relief are not available for past violations of a party. Therefore, the claim must be dismissed.

In order for a court to grant declaratory relief, there must be an "actual controversy." *International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980) (citing 28 U.S.C. § 2201). To determine whether there is an "actual controversy" sufficient for a declaratory judgment, there must be "a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L.Ed. 826 (1941) (citation omitted)). Declaratory relief is not available to adjudicate past, completed actions of a party. *Green v. Mansour*, 474 U.S. 64, 73, 106 S. Ct. 423, 88 L.Ed.2d 371 (1985) (citation omitted).

Further, a court cannot grant injunctive relief when there is no continuing wrongful action or violation. *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991).

There is no ongoing controversy between the parties. Rather, John Doe seeks a declaration that the University's ***past*** actions previously harmed him. [Dkt. 17, ¶¶ 137-139.] John Doe has not alleged that any of the University's alleged wrongs – the alleged contractual breach, the alleged breach of implied duty of good faith, or the alleged Title IX violation – are ongoing. [*See* Dkt. 17.] As such, they are allegedly completed actions. This is not the proper use of the declaratory judgment act, and John Doe is not entitled to declaratory or injunctive relief. *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 894 (7th Cir. 2012) ("…declaratory or injunctive relief is only proper if there is a continuing violation of federal law. 'When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.'" (citing *Green*, 474 U.S. at 73; quoting *Al-Alamin*, 926 F.2d at 685). Therefore, John Doe's declaratory judgment claim and request for injunctive relief must be dismissed. Regardless, John Doe is not entitled to the declarations he seeks because the University did not violate Title IX, breach an implied contract, or breach an implied duty of good faith and fair dealing for all of the reasons set forth above.

## CONCLUSION

For the reasons provided heretofore, the Court should grant Defendant's Motion for Summary Judgment and dismiss Plaintiff's claims.

Dated this 15th day of October, 2019.

*/s/ Danielle Baudhuin Tierney*
Lori M. Lubinsky, SBN: 1027575
Danielle Baudhuin Tierney, SBN: 1096371
Attorneys for Defendant
AXLEY BRYNELSON, LLP
P.O. Box 1767
Madison, WI 53701-1767
Telephone: (608) 257-5661/Fax: (608) 257-5444
