**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**(Milwaukee Division)**

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:19-cv-00388-JPS** . |
| **MARIAN UNIVERSITY,** | |
| **Defendant.** | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

By: /s/ Jesse R. Binnall
Jesse R. Binnall
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street – Suite 300
Alexandria, VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jbinnall@harveybinnall.com
lmckasson@harveybinnall.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

*INTRODUCTION* ..................................................................................................1

*DISPUTED MATERIAL FACTS* ...........................................................................1

    **A.**    Background ................................................................................. 1

    **B.**    The Incident ............................................................................... 6

    **C.**    The Investigation ....................................................................... 7

    **D.**    The University's Code of Conduct ............................................ 12

    **E.**    Improper Training .................................................................... 12

    **F.**    Decision and Sanctions ............................................................ 14

    **G.**    Appeal of the Sanction ............................................................. 14

    **H.**    Remand of Case ....................................................................... 15

    **I.**    Second Appeal ......................................................................... 17

*ARGUMENT* ...................................................................................................17

    **I.**    The University Discriminated Against Doe on the Basis of Sex ............ 17

        a.    Marian's Adjudication of Doe was Biased ....................................... 19

        b.    The University's Procedures Compounded the Failings of the Investigators ........... 20

    **II.**    The University was Negligent in its Investigation as Shown by Bias, Failure to Abide by its Own Policies, and Failure to Properly Train its Agents ................... 25

    **III.**    Implied Contract. .................................................................... 27

    **IV.**    Covenant of Good Faith and Fair Dealing ................................... 28

    **V**    Declaratory Judgment . ............................................................ 29

*CONCLUSION* ................................................................................................30

*CERTIFICATE OF SERVICE* ............................................................................31

**INTRODUCTION**

Marian University discriminated against Doe because of his sex. He was accused by a fellow classmate of sexual misconduct and he maintains his innocence. But he never got a fair process and the University used procedures that stacked the deck against him, because he is a male, in such a way that he could not and did not receive a fair adjudication. The University administrator responsible for the investigation showed remarkable bias; his comments showed that he assumed Doe was guilty before so much as speaking to him. Its administrators failed to provide Doe with the impartial process or the hearing that they promised to him; its motion for summary judgment should be denied.

**DISPUTED MATERIAL FACTS**

Doe was a student at Marian University ("University") from the fall of 2016 until December 2018 when he was wrongfully suspended from the University for two years. DPMF[1], ¶ 1. The University suspended him after a botched investigation that was infiltrated by anti-male bias by the University's agents.

A. Background

The campus environment at the University was directly and substantially affected by an investigation by the U.S. Department of Education's Office of Civil Rights ("OCR") and a number of political and policy movements that focused on female victims of sexual misconduct. PRDPMF[2], ¶¶ 137-38. Doe testified that the prominence of these political movements on campus, including on-campus events and trainings, impacted the campus environment and thus his investigation and appeals process. *Id.*

---

[1] DPMF refers to Defendant's Proposed Material Facts.

[2] PRDPMF refers to Plaintiff's Response to Defendant's Proposed Material Facts.

Specifically, movements such as #METOO, #TIMESUP, and "It's On Us" infiltrated the University. *Id.* Beginning in 2017 and continuing through 2018, the University held "Sexual Assault Prevention Week."[3] PRDPMF, ¶ 138. While seemingly gender-neutral, the week included events promoting #TIMESUP, "What Were You Wearing?" and a viewing of the film 'The Hunting Ground,' all of which are positioned to enhance the voice of female victims. PRDPMF, ¶¶ 137-38.

#TIMESUP is a gender-based movement.[4] Its' legal fund is administered by the National Women's Law Center and was inspired by the media attention to the Harvey Weinstein scandal. *Id.*

The University also joined the national "It's On Us" campaign[5] and began its own "It's On Us" movement in 2017. PRDPMF, ¶ 138. "It's On Us" is a social movement that was initiated and promoted by the White House Council on Women and Girls during President Obama's administration that focused on allegations of sexual assault.[6] PPMF,[7] ¶ 7

In an email sent to students on April 17, 2017 from a University official, during Sexual Assault Prevention Week, students could participate in the "It's On Us" softball game by going to the "Women's Softball v. Alverno" game; "It's On Us" banner signing; Employer Spotlight – Girl Scouts of America; the showing of 'The Hunting Ground' (which is described as "ingeniously employing Title IX legal strategy to fight back and sharing their knowledge among a growing, unstoppable network of young women who will no longer be silent"); and attend the Marian

---

[3] In 2017, the week was called "Sexual Assault Prevention Week." In 2018, it was called "Sexual Assault Awareness Week."

[4] TIME'S UP Now (2019), https://timesupnow.org/work/.

[5] IT'S ON US (2019), http://www.itsonus.org.

[6] *Id.*

[7] PPMF refers to Plaintiff's Proposed Material Facts.

Women's Chorale Spring Concert. PRDPMF, ¶ 138. Per the titles, most events were targeted towards women and women's issues. *Id*

In early 2018, the University hosted an exhibit called "What Were You Wearing?" PRDPMF, ¶ 138. This exhibit showcased the clothing of those who had allegedly been the victims of sexual assault. *Id.* The exhibit was joined by Fond du Lac Area Women's Fund, which also advertised their "Fond du Lac Says No More" initiative (this initiative advocates on behalf of females who allege that they are victims of sexual violence or assault). *Id.* In an article about the "What Were You Wearing?" exhibit, Kate Candee ("Candee"), the Title IX Coordinator at the University (who also served as an investigator in this matter), said she hopes the exhibit "will spark a conversation" and "[w]e need to talk about this community issue…and take a stand as a community." DPMF, ¶ 146; PRDPMF, ¶ 138. She further stated "No more silence. No more silent bystanders. No more violence." *Id.*

'The Hunting Ground' is a film that presents multiple female students who allege they were sexually assaulted at their college campuses and claim that their college administrators either ignored them or required that they navigate a complex academic bureaucracy to have their claims addressed.[8] According to its website, the film is "ingeniously employing Title IX legal strategy to fight back and sharing [female subject's] knowledge among a growing, unstoppable network of *young women* who will no longer be silent [emphasis added]."[9] PPMF, ¶ 8.

With this in the background, on August 24, 2018, the University made a Resolution Agreement with the Department of Education's Office of Civil Rights ("OCR").[10] PPMF, ¶ 9. The

---

[8] *The Hunting Ground* (2019), http://thehuntinggroundfilm.com.

[9] *The Hunting Ground* (2019), http://thehuntinggroundfilm.com./story/.

[10] *Office of Civil Rights* (2018): "It is the mission of the Office for Civil Rights to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights." http://www2.ed.gov/about/offices /list/ocr/complaintintro.html.

OCR enforces Federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department of Education.[11] *Id.* The Resolution Agreement was in response to a complaint by a female student who claimed that the University discriminated against her on the basis of sex by failing to provide her with a prompt and equitable response to her October 30, 2017 report of sexual assault by another student. PRDPMF, ¶ 135. The Resolution Agreement included that it would change its procedures relating to investigations into sexual assault and that OCR will monitor the implementation of the Resolution Agreement. PRDPMF, ¶ 136.

Separately, the OCR has put forward changes to its Title IX policies. These changes are in response to strong criticism of the 2011 and 2014 Dear Colleague Letters, of which "although well intentioned… have led to the deprivation of rights for many students--- both accused students denied fair process and victims denied an adequate resolution of their complaints."[12] PPMF, ¶ 10.

On August 29, 2018, Dr. Sean Fitzpatrick ("Fitzpatrick"), who was on the appeal panel for Doe and is on the Title IX Campus SaVE committee, tweeted his objections to proposed regulatory changes by the U.S. Department of Education to Title IX policies. DPMF, ¶ 92. Those changes would strengthen the due process protections of accused students by providing them with access to evidence and some form of cross-examination.[13] *Id.* Fitzpatrick specifically tweeted: "Though my knowledge of Title IX is still growing, through what I do know, and my limited experience, I'm

---

[11] *Id.*

[12] United States Dept. of Education Office of Civil Rights, *Dear Colleague Letter*, (2017), http://www.cmu.edu/title-ix/colleague-title-ix-201709.pdf. *See also*, PRDPMF, ¶ 149.

[13] The Dept. of Education's one-page summary of the proposed regulatory changes can be found at: http://www2.ed.gov/about/offices/list/ocr/docs/proposed-title-ix-regulation-fact-sheet.pdf.

certain this would be a *terrible* change to current policies. There are several other ways to ensure due process without risking further trauma for victims." DPMF, ¶ 149 [emphasis added].

The social media display of bias on behalf of Title IX University personnel does not stop there. Dr. Paul Krikau ("Krikau"), who is the deputy Title IX coordinator and served as one of Doe's investigators, issued a series of Tweets just prior to Doe's case. PRDPMF, ¶ 114. These tweets clearly demonstrate his bias against accused males. *Id.* In pertinent part, on September 27, 2018, Krikau retweeted the following statement pertaining to the 2018 Kavanaugh hearing: "Lindsay Graham said this was the worst day he's seen in politics. Really? A woman being allowed to testify about attempted rape is worse than his state flying the Confederate flag? Worse than blocking healthcare knowing people will die? Worse than Trump's meanness?" PRDPMF, ¶ 114. Further, that same day, he retweeted "dr. ford is the bravest woman i think i've ever seen. To gaze into the abyss of your own terror, swallow hard, and do it anyway because it's the right thing to do--- holy shit, what a hero." *Id.* He also retweeted "Kavanaugh didn't offer a word of sympathy or concern for women who have been sexually harassed or abused. It was all about him -- portraying himself as the victim of a partisan conspiracy. How can this man ever be a non-partisan justice?" *Id.* Finally, in response to a woman tweeting "I have to be super selective of when I decide to speak out against harassment because I know it will only open myself up for more harassment" and receiving online Twitter criticism from a man, Krikau came to her defense and responded "a woman states that she has to be selective in what harassment she speaks out about and this cat [referring to the critic] feels the need to speak up and tell her the issue. Take a seat because a hit dog hollers." *Id.*

Notably, Krikau Tweeted all of this merely four days before his investigation into Doe. *Id.* Both the timing and content of these Tweets points to Krikau's clear bias against males and towards female accusers, particularly displayed throughout Doe's case. *Id.*

5

While participating in Title IX trainings, University officials became even more influenced and aware of the external pressures such as the #MeToo movement and potential litigation. At a Title IX training Krikau and Fitzpatrick attended,[14] multiple Title IX cases were presented in slides. PRDPMF, ¶ 138. These slides also mentioned "the threat of litigation." *Id.* In another presentation at the same training, aptly titled in part "Hot Topics," the training mentioned the #MeToo movement. *Id.*

Due to the Resolution Agreement, and the other pressures previously discussed, the University put new policies into place on October 18, 2018 right in the middle of the investigation into Doe. PPMF, ¶ 11; PRDPMF, ¶ 27.

### B. The Incident

In the Fall 2018 semester, with the above background and just two months after the Resolution Agreement was made with OCR, Jane Roe ("Roe") falsely accused Doe of sexual misconduct that she alleged occurred in September 2017. DPMF, ¶¶ 5, 6; PRDPMF, ¶ 6.

Doe and Roe met each other in early 2017, in their spring semester of their freshman year. PPMF, ¶ 5. Doe and Roe were both in the University's ROTC program. PPMF, ¶ 6. They became close friends when they spent every day together in basic training during the summer of 2018. PPMF, ¶ 4.

Doe admits that there was consensual sexual contact between Roe and him at the beginning of the fall semester in 2017. PRDPMF, ¶ 6. That night, Doe and Roe were both at a party and were both drinking. *Id.* After the party, Roe asked Doe and Student A to come to her residence to "eat or just hang out." PRDPMF, ¶ 144. Once there, she initially flirted with Student A. *Id.* Student A felt

---

[14] Fitzpatrick testified twice that Krikau was at these presentations. [Dkt. 36, 47:22-48:20]. Fitzpatrick further testified that these presentations occurred at the same training. [Dkt. 36, 49:1-10].

uncomfortable with Roe because she was "touchy" with him so he left. *Id.* Doe states Roe was "handsy" with Student A and asked to "have sex with him." PRDPMF, ¶ 141.

After Student A left, Doe and Roe engaged in sexual intercourse. PRDPMF, ¶ 6. Roe never told Doe that she was too incapacitated to consent to sexual intercourse. PRDPMF, ¶ 6. Indeed, Roe was perfectly able to consent and was sober enough to make rational decisions before and during their sexual activity. *Id.* She showed no signs of being too incapacitated. *Id.* In fact, she walked approximately two miles the night of the alleged incident in this alleged state. *Id.*

Additionally, two witnesses state that they spoke to Roe the night she had sexual intercourse with Doe. PRDPMF, ¶ 48. They each confirm that Roe admitted to cheating on her boyfriend (the male witness confirms it was with Doe) and was upset about it - including saying "I fucked up." *Id.* Further, these witnesses stated that "she seemed to be in the right state of mind where she was conscious and not intoxicated of any sort" and that "she did not seem intoxicated or sedated in any way." *Id.* Roe testified that she knows these two witnesses and does not deny having a conversation with them. *Id.*

C.  The Investigation

Over a year after their sexual interaction, on or about October 1, 2018, Doe was informed by the University that he had been accused of violating the University's Code of Conduct regarding sexual assault. DPMF, ¶ 8. Doe is innocent. PRDPMF, ¶ 6. The University conducted an investigation into the allegations. PPMF, ¶ 12. The investigations were led by Krikau and Dee Harmsen ("Harmsen"), both of whom are on the Title IX Campus SaVE committee at the University. PPMF, ¶ 13.

The investigators explained the investigation process to the parties in materially different ways during their initial interviews on October 1 and 2, 2018. PRDPMF, ¶ 35. For instance, when discussing with Roe her rights to an advocate, Krikau stated that "if at any time you want [an

advocate present], we'll stop and make sure you have one and start again whenever you want." PRDPMF, ¶¶ 9, 35. Further, Krikau and Harmsen explained the differences between an advocate and a lawyer to Roe and told her this can be "really helpful" and is a "second set of ears to support you through it." PRDPMF, ¶ 35.

In contrast, when explaining to Doe his rights to an advocate, Krikau told Doe that he must give him a day's notice if he chooses to have an advocate, and that the investigation team will not "necessarily rearrange the time that you agreed to in order to accommodate the time of an advocate." *Id.* Krikau then told Doe that it is his responsibility to ensure his advocate can be present, "that is on you, not on us." *Id.*

Further, Krikau and Harmsen informed Doe that Kathleen Candee ("Candee"), the Title IX Coordinator, is "aware she may have to have an appeal panel ready" and that "[the appeal panel] had a meeting with her this morning" because "[Candee] may have to have an appeal board of three ready at the end of this." PRDPMF, ¶ 77. No such commentary regarding the appeal panel or meeting was mentioned to Roe. *Id.*

Finally, Krikau and Harmsen took it upon themselves to share with Roe "potential outcomes" of the case, referencing a "stay away," "educational component," "counseling services," or "expulsion from school" for "the other person." *Id.* They failed to mention, however, the very obvious outcome option (in any wholly impartial investigation) of "no finding" in regard to the accusations made against Doe. *Id.*

The investigators also failed to follow the University's procedures. Krikau never related "Step Two" of the investigation process to Doe, relating to the "Formal Hearing." PRDPMF, ¶ 9. The "Formal Hearing" step provides, in pertinent part: "In a contested allegation, additional investigation may then be commenced and/or a hearing may be held when there is reasonable cause to believe that a rule or rules have been violated. A formal notice of the complaint will be

8

issued, and a hearing will be held before an administrator." PRDPMF, ¶ 9. Doe was never notified by Krikau during the initial interview of any possibility of "additional investigation" or a "hearing" which is "Step Two" in the investigative and adjudicatory processes laid out by the University's 2017 Code of Conduct. *Id.*

Krikau and Harmsen stated that Doe would have the opportunity to present questions to be asked of witnesses. DPMF, ¶ 11. Doe submitted questions and rebuttals to be asked of Roe, Gina, Brett, TJ and every other witness who was not present the night of the incident. PRDPMF, ¶ 14. The direct questions were never asked, and the rebuttal issues were never accounted for or reconciled with the witnesses. *Id.* Further, despite being told by Krikau that he would be able to review all of the evidence collected in the case, Doe was not allowed to review the transcript of his third interview (on November 5, 2018), and was thus denied the opportunity to challenge or question the transcript from that third interview. PRDPMF, ¶ 13. This ultimately was the subject of Doe's first appeal and resulted in the appeal being granted. *Id.*

The investigation lasted approximately six weeks. PPMF, ¶ 15. The investigators were biased and did not lead an impartial, reliable, or thorough investigation, as required by both the 2017 and 2018 Policies. PRDPMF, ¶ 14.

During his initial interview with Roe on October 1, 2018, before any other witnesses were interviewed and before Krikau even knew Doe's name, Krikau made the following statements:

        a.   "At this time, this is clearly a policy violation;"

        b.   "[W]e have established very clearly that we have a [sic.] sexual misconduct;" and

        c.  "I would say very clear case of harassment and intimidation and stalking."

PRDPMF, ¶¶ 36, 37.

Moreover, during this same interview Harmsen questioned the legitimacy of Roe's claims against Doe, stating "[w]e can't prove that, it's him threatening," PRDPMF, ¶ 37. Krikau responded by stating: "[g]ood news about us as we only have to come two [sic.] more likely than not," referencing the standard the University has to overcome in finding a respondent guilty. *Id.*

In addition to the remarks made above, Krikau also stated to Roe, "we don't want anything coming from your side over to him either because basically, it would destroy your case. So, you know." *Id.*

Additionally, Harmsen testified that she was not impartial during all times of the investigation but felt no need to recuse herself.[15] PRDPMF, ¶ 38. She also stated that Krikau was not impartial. *Id.*

The investigators also overlooked Roe's lack of credibility. For instance, Roe changed her story regarding when she first reported the alleged sexual misconduct. PRDPMF, ¶ 71. In her initial interview with investigators on October 1, 2018, Roe states she "made a comment" to one of the captains at ROTC concerning the incident, stating she was raped. *Id.* In her second interview with investigators on October 11, 2018, Roe states she "went and told [her] captain in ROTC what hap [sic.]" "about a week after the incident" again, stating Doe raped her. *Id.* In her third interview on November 1, 2018, Roe stated she only told Captain Cordas that Doe was "inappropriate" with her, but "didn't say he had sex with me." *Id.*

Krikau noted this discrepancy, in a comment to the second interview, writing "[Roe] contradicts this when we directly ask her this later." *Id.* Despite these inconsistencies in Roe's story, Krikau chose not to interview the Captain Cordas regarding whether Roe actually reported any

---

[15] Later in the deposition, after a break with her attorney, Harmsen changes her testimony and testified that neither she nor Krikau were showing bias. *See also*, PRDPMF, ¶ 71 at n. 4. When asked whether she spoke with counsel about any part of her testimony on break, she answers "yes." *Id.*

sexual misconduct to him as she claimed. PRDPMF, ¶¶ 54, 56. The investigators did, however, succeed in interviewing each of Roe's witnesses as well as other random witnesses the University chose. DPMF, ¶ 56; PRDPMF, ¶ 56.

Roe also stated that multiple people had contacted her fiancé and told him Doe had confessed to raping Roe. PRDPMF, ¶ 56. Krikau accepted these allegations as true without contacting the fiancé and without attempting to gain the alleged witnesses' identities either from Roe or from her fiancé. *Id.* Indeed, Roe's fiance was never interviewed by the investigators. *Id.*

Roe also gave conflicting and unreliable statements regarding Doe's alleged intimidation of her. PRDPMF, ¶ 78. She initially stated that he confronted her at work in front of Haley Lowe, her manager at Victoria's Secret, stating: "[Lowe] was close enough that she knew I was extremely uncomfortable" when Doe talked to her at Victoria's Secret. *Id.* In her second interview, she stated Lowe "saw how uncomfortable [Roe] was and [Lowe] ended up walking over." *Id.* Lowe's interview did not corroborate Roe's statements. *Id.* Lowe did not witness any yelling, she never "walked over," nor did she ask Doe to leave. *Id.*

Roe also gave conflicting and seemingly unbelievable statements regarding receiving threatening text messages from unknown numbers. Specifically, she initially stated that she reported it to the police who told her that the numbers were from "burner phones" and there was "no way to track them." *Id.* During her next interview, she changed her story and claimed instead that a friend who worked for the Milwaukee Police Department "ran the numbers" and there was no way to track them. *Id.* Again, Krikau did not investigate these statements or ask any questions regarding the truth or accuracy. He did not interview anyone at the police department. *Id.*

In Roe's initial interview with Krikau and Harmsen, she stated the incident happened on Saturday September 4, 2017. PRDPMF, ¶ 78. Yet, September 4, 2017 was a Monday. *Id.* This is yet one more inconsistency in which she was never asked.

D. The University's Code of Conduct

In the middle of the investigation, Doe was notified via email from Krikau that changes had been made to the Code of Conduct. PRDPMF, ¶ 32. These changes were a result of the Resolution Agreement the University entered into with OCR. PRDPMF, ¶ 136. The changes went into effect on October 18, 2018, subsequent to the initial complaint being made on October 1, 2018. PPMF, ¶¶ 11, 14; PRDPMF, ¶ 27. At no time did Krikau explain to Doe that the University had retracted Doe's right to a formal hearing to determine whether he was responsible (*i.e.* guilty) for the alleged conduct. PRDPMF, ¶ 9.

Both the 2017 and 2018 Codes of Conduct are at issue here. The 2017 Code of Conduct would have allowed Roe's accusations against Doe to be adjudicated at a formal hearing. PRDPMF, ¶ 40. The 2018 Code of Conduct did not allow for hearings. PRDPMF, ¶ 44. Per both Codes of Conduct, investigators should "commence a thorough, reliable and impartial investigation." PRDPMF, ¶ 136. The University admits that the 2017 Policy should have been used for Doe's adjudication. DPMF ¶ 27.

The University was unresponsive to Doe's attorney when he called multiple times the morning of November 15, 2018 requesting information regarding the school policies in place at the time of Doe's alleged violation. PRDPMF, ¶ 9. Further, when asked about the changes in the old and new policies while representing Doe, Severa Kreuger, the University's appointed advocate for Doe (before he hired an attorney), did not know the answer. PRDPMF, ¶ 11. This advocate, assigned to Doe by the University, was improperly trained and unprepared for Doe's representation. *Id.*

E. Improper Training

As stated above, the OCR and Marian University entered into a Resolution Agreement. PRDPMF, ¶¶ 44, 136. The Resolution Agreement stipulated that the University must change its policies and procedures, provide Title IX staff training, provide a qualified Title IX coordinator, provide University personnel training, provide student training, notify the initial complainant the changes that were made, and finally report to the OCR compliance with the agreement. *Id.* Clearly, OCR noticed the the University's training was lacking as it required, pursuant to the Resolution Agreement, for the University to provide much more training and to report its compliance to OCR.

The training that was provided to University officials played into their biases. At one such Title IX training, at which Krikau and Fitzpatrick attended, multiple Title IX cases were presented in slides. PRDPMF, ¶ 138. These slides specifically mentioned "the threat of litigation." *Id.* At this same training, Fitzpatrick took notes on the slides, stating: "too much appeals process is dangerous." PPMF, ¶ 27. At the same training, another presentation was taught, aptly titled in part "Hot Topics," the training mentioned the #MeToo movement in its slides. PRDPMF, ¶ 138.

During the Campus Save Committee Meeting on March 15, 2016, the committee reviewed a case study pertaining to a Title IX case that took place at George Mason University. The committee discussed due process rights in these investigations. PPMF, ¶ 4. In a Title IX training presented by Peter F. Lake entitled "Higher Education: Hot Topics, Trending Issues and Legal Update," Lake discusses the new proposed New Title IX Regulations, considering due process and cross-examination. PPMF, ¶ 5. Krikau testified that he uses Lake's presentation as a model for Title IX training and "professional development." *Id.* This presentation listed "MeToo" as a "Hot Topic." *Id.* Finally, in a January 2017 Student Conduct Processes Presentation, Krikau presented a slide called "Overview- Due Process." PPMF, ¶ 6. This slide states:

> "All students are guaranteed due process. At Marian University this means that all students have the right to know the accusations made against them and to respond to those charges

verbally or in writing. Due process is managed through our administrative structure and facilitated through our student conduct process and protocols."

*Id.* Further, it states that in "legalese" due process means a "Constitutional right to a[n] equitable hearing." *Id.* In "educationese" it is defined as "doing what we said we would do in our handbooks." *Id.* Krikau drafted these slides. PPMF, ¶ 6.

## F.   Decision and Sanctions

On November 12, 2018, Doe received a letter from Krikau informing him that he had been found responsible for sexual misconduct – non-consensual intercourse. DPMF, ¶¶ 74, 75. The decision was allegedly made on the grounds that Roe was too incapacitated to make the decision to have intercourse and that Doe knew or should have known she was too incapacitated. PRDPMF, ¶ 51. Doe was suspended for two years from the University. DPMF, ¶ 76.

There was no hearing before the decision was made. PRDPMF, ¶ 27. Indeed, the letter confirms that the University utilizes the "investigator model," meaning that the investigator assigned to the matter investigates, makes findings, and decides the sanction. *Id.*

The findings report, drafted by the investigators, states that the contradiction relating to Roe's statement regarding the intimidation allegation only calls into question whether there was intimidation, but does not relate to Roe's claims that she was sexually assaulted. PRDPMF ¶ 48. Moreover, it acknowledges "inconsistencies in [Roe's] narrative." *Id.* Thus, the University acknowledges inconsistencies by Roe, but still finds against Doe.

## G.   Appeal of the Sanction

Doe appealed the decision by the University. DPMF, ¶ 86; PPMF, ¶ 16. Pursuant to the University's 2017 Code of Conduct, appeals requests are limited to the following grounds: 1) A procedural error occurred that significantly impacted the outcome of the hearing); 2) To consider new evidence, unavailable during the original hearing or investigation, that could substantially impact

14

the original finding or sanction. A summary of this new evidence and its potential impact must be included; 3) The sanctions imposed are substantially outside the parameters or guidelines set by Marian University for this type of offense or the cumulative conduct record of the responding student. DPMF ¶ 93.

On December 7, 2018, Doe received a letter from the University, informing him that his appeal had been granted on the grounds that there "was a procedural error that may have substantially altered the findings of the case." PPMF, ¶ 18. Specifically, it was determined that the lack of process for Doe and Roe to review and comment or question a complete transcription of or listen to the recording of Doe's third interview on November 5, 2018 may result in a different finding. *Id.* The Appeal Panel remanded the case back to the investigation stage and ordered "that the investigation be reopened. . ." PRDPMF, ¶ 113.

## H. Remand of Case

Doe was notified that the new investigation began on December 12, 2018. DPMF, ¶ 107. Notably, the new investigation began and ended on the same date, December 12, 2018 – *i.e.* the decision to sanction Doe again was made on the same date the investigation began. PPMF, ¶ 18.

After remand, a new investigator was added to the matter in addition to Krikau - Candee. PRDPMF, ¶ 111. Candee is the Vice President for Student Engagement and serves as the Title IX Coordinator at the University. PPMF, ¶ 19. As stated above, Candee is on record as being a supporter of the "What Were You Wearing?" exhibit, which was joined by the Fond Du Lac Women's Fund. PRDPMF, ¶ 139. She was not new to the investigation or disciplinary proceedings. PPMF, ¶ 20. Indeed, as the Title IX Coordinator, she reviewed and approved the original investigation and findings. PPMF, ¶ 21. Any bias of hers would indeed infiltrate into the entire Title IX program and undoubtedly affect any investigation, including the investigation into Doe. At the time of remand, Doe objected to Candee as the new investigator as her bias and partiality was

15

apparent. PRDPMF, ¶ 111. His objection was denied and Candee served as an investigator during the remand. PPMF, ¶ 23.

Notably, as the Title IX Coordinator, it was Investigator Candee who oversaw the implementation of the new Code of Conduct. PPMF, ¶ 24. She knew or should have known that its application in Doe's case substantially deviated from the University's policy.

When the investigation was reopened, Doe and Roe were able to comment upon the transcript of Doe's third interview. PPMF, ¶ 25. Doe submitted comments. PPMF, ¶ 26. Roe did not. PPMF, ¶ 27. Doe's statement relating to his third interview made clear that: during the interview he was searching for text messages between him and Roe; Doe only asked her "what do you remember about last night" *after* she alluded to not remembering the night well; he "never suspected she would have memory loss or that she had too much to drink, or was incapacitated"; he "had no reason to believe she would not remember everything from the night before" and was "surprised"; he was "not hiding anything because" he did not "commit[] sexual misconduct"; he did not know what she drank that night; Roe made her own drink; he "never saw anything that would lead [him] to believe that [Roe] was incapacitated." PPMF, ¶ 29.

Candee and Krikau did no further investigation and ultimately found Doe responsible for the second time on December 12, 2018. PRDPMF, ¶ 113. Specifically, they noted that the standard for their decision was "was it more likely than not that the responding party [Doe] knew or should have known that the reporting party [Roe] was incapacitated at the time? PRDPMF, ¶ 113. The "Decision Letter" then notes the "rationale for that decision was made in the original finding letter. *Id.* "We do not find anything in this review by the responding party of the final interview on November 5, 2018 that would alter that decision." *Id.* This "Decision Letter" was one page in length and was signed by Krikau. *Id.* Clearly the investigators did not take the time to consider Doe's statement regarding his third interview.

16

I. Second Appeal

In his second appeal, Doe argued that the University improperly changed its policies during the investigation of his case (i.e. denied him a formal hearing), that Krikau was biased, that Candee was biased, that he was given the wrong appeal form, and that the investigators improperly equated Roe's memory loss with incapacitation. PRDPMF, ¶ 133.

On appeal, the investigation's findings and sanctions are presumed to have been decided reasonably and appropriately. PPMF, ¶ 28. Therefore, the burden is on the appellant to show by "clear evidence" why the findings should be overturned. PRDPMF, ¶ 104. According to the University "clear evidence" standard is the same as the "clear and convincing evidence" standard. *Id.* The appeals panel affirmed the findings and sanction. *Id.*

**ARGUMENT**

A motion for summary judgment is inappropriate if there are genuine issues of material fact, viewing the facts in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56; *Carmody v. Board of Trustees of University of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018). It is the moving party's burden to demonstrate the absence of any dispute over material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are in dispute here; the motion should be denied.

I. The University Discriminated Against Doe on the Basis of Sex

The University discriminated against Doe because of he is a male. Indeed, the University's policies and practices favor females over males in disputes involving allegations of sexual misconduct or sexual harassment. Moreover, in this specific case, Krikau showed remarkable bias against Doe and in favor of Roe. This bias flowed from Krikau and infected the entire disciplinary process against Doe. While Krikau never came out directly and told anyone that he was favoring

Roe on the basis of sex, the circumstantial evidence that he did so was compelling and creates a material issues of fact that requires the weighing of competing evidence at trial, rather than short-circuiting the litigation prematurely on summary judgment.

Title IX of the Education Amendments of 1972 prohibits educational institutions that receive federal funding from excluding students from participating in educational programs, denying them the benefits of such programs, or otherwise discriminating against them "on the basis of sex." 20 U.S.C. § 1681(a). While other circuits have developed various theories for determining Title IX cases, this Circuit uses a straight-forward test based upon the text of Title IX: "did the university discriminate against the plaintiff on the basis of sex?" *Doe v. Purdue*, 928 F.3d 652, 668-69 (7th Cir. 2019); *see also Doe v. Columbia College of Chicago,* 933 F.3d 849 (7th Cir. 2019) (reviewing the pleading standard for Title IX cases).

In determining the liability of schools under Title IX, courts, including this Circuit, borrow from Title VII case law, in questions where the statutes are parallel. *See Smith v. Metropolitan School District of Perry Township,* 128 F. 3d 1014, 1023 (7th Cir. 1997) (Title IX cases borrow from Title VII case law in areas where the statutes are parallel but not in areas where the text is different); *see also Whitaker v. Kenosha Unified School District No. 1 Board Of Education,* 858 F. 3d 1034 (7th Cir. 2017).

In Title VII cases, employment discrimination plaintiff can show discrimination by direct or indirect methods. *Hossack v. Floor Covering Associates of Joilet, Inc.* 492 F.3d 853, 860 (7th Cir. 2007). When using the indirect method, the burden shifting framework of *McDonnell Douglas Corp. v. Gree*n, 411 U.S. 792, 802-804 (1973) applies. *Hossack,* 492 F.3d at 860. In that approach a plaintiff must establish a prima facie case of discrimination. Upon such a showing, the burden of production shifts to the defendant to show a nondiscrimination reason for an adverse action against plaintiff. Finally, the plaintiff has the opportunity to show that such a reason is a mere pretext. *Id.*

a.         **Marian's Adjudication of Doe was Biased**

The adjudication of the charges against Doe was led by Krikau. Indeed, because Doe was denied a hearing, Krikau and his colleague Harmsen played the roles of adjudicator and investigator. When there was an appeal, the grounds were substantially limited to : 1) A procedural error occurred that significantly impacted the outcome of the hearing (e.g. substantiated bias, material deviation from established procedures, etc.); 2) To consider new evidence, unavailable during the original hearing or investigation, that could substantially impact the original finding or sanction. A summary of this new evidence and its potential impact must be included; 3) The sanctions imposed are substantially outside the parameters or guidelines set by Marian University for this type of offense or the cumulative conduct record of the responding student. In their initial intake interview with Roe, before any other witnesses were interviewed, Krikau demonstrated his bias on numerous occasions. For instance, he told Roe:

- "At this time, this is clearly a policy violation;"

- "[W]e have established very clearly that we have a [sic] sexual misconduct;"

- "I would say very clear case of harassment and intimidation and stalking."

When Harmsen raised a question about the strength of Roe's claims, Krikau responded by saying "[g]ood news about us [is] we only have to come two [sic] more likely than not" as he referred to the University's evidentiary standard: preponderance of the evidence. That it was "good news" that there was a low pleading standard" was clear that from the beginning, Krikau saw himself as Roe's advocate, not as a neutral arbiter of the dispute. It certainly was not good news to Doe that there was an evidentiary standard that was easier for Roe to meet.

When confronted with these statements at her deposition, Harmsen admitted that neither she nor Krikau were impartial during parts of the investigation. While she later backed away from the

admission, after discussing her testimony with her counsel, which version of her contradictory testimony is most believable is a material issue of fact that should be resolved at trial.

Other instances also showed the bias of the investigators. Roe made the complaint more than a year after the alleged incident. She claimed that she also made allegations regarding the incident to others in ROTC. Her account was inconsistent. The investigators, however, ignored the various inconsistencies in her story. Instead, they chose to treat Roe's account as wholly accurate and reliable and discounting Doe's statements.

b. **The University's Procedures Compounded the Failings of the Investigators**

The University promises students a fair and impartial process (the Code of Conduct requires that the investigation be "thorough, reliable, and impartial"). They have decided, however, to use the investigator model which denies students the right to a live hearing to determine guilt or innocence. Instead, the investigators serve as judge, jury, and executioner and are virtually unchecked in their fact-finding powers. This is despite the fact that the 2017 Student Code of Conduct provided that: "In a contested allegation, additional investigation may then be commenced and/or a hearing may be held when there is reasonable cause to believe that a rule or rules have been violated. A formal notice of the complaint will be issued, and a **hearing will be held** before an administrator." (Emphasis added).

Nevertheless, like all students since 2013, Doe was denied the ability to have a live hearing where the credibility of the witnesses could be tested. True, students can appeal the decision of the investigators, but such appeals are limited to procedural errors, new evidence, and that the sanctions are substantially outside the University's guidelines or parameters. In other words, students cannot challenge the factual findings, even if clearly erroneous.

Failing to have a live hearing prevented Doe from being able to adequately defend himself. That the University used the investigator model made Doe especially susceptible to a biased investigator, as happened here. There was no check to make sure that a biased investigator could not ruin Doe's academic career.

### c. Material Evidence Shows the Bias Against Doe was Based Upon Gender

#### 1. Gender bias

Gender bias can be shown in a number of ways, including statements by members of a disciplinary tribunal or school officials and patterns of decision making that tend to show the influence of gender. *Miami University,* 882 F.3d at 593; *see also Marymount,* 297 F. Supp. 3d at 585 (statistical evidence can show gender bias). Statistical evidence can show causation of gender being a motivating factor in the erroneous finding. *See, e.g., Yusuf,* 35 F.3d at 715-16 ("The allegation that males invariably lose when charged with sexual harassment at Vassar provides a verifiable casual connection similar to the use of statistical evidence in an employment case"). A defendant is not excused because any "discriminatory motivation does not come from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action." *Doe v. Columbia Univ.,* 831 F. 3d 46, 58 n. 11 (2d Cir. 2016).

In *Doe v. Purdue,* the Court acknowledged that the plaintiff there, like Doe here, casts his claim against the backdrop of the 2011 Dear Colleague Letter from the Office of Civil Rights ("OCR"). *Id.* at 668. *Doe v. Purdue* acknowledged, however, that "the letter, standing alone, is obviously not enough." *Doe v. Purdue* then looked to other factors that may support sex discrimination, such as the Title IX coordinator choosing to credit Jane's account without hearing directly from her, refusing to hear from the plaintiff's witnesses, including his male roommate, and posting on its Title IX Office's Facebook page an article from *The Washington Post* titled "Alcohol isn't the cause of campus sexual assault. Men are" the same month in which the plaintiff was disciplined. *Id.* at 669-70. Although *Doe v. Purdue* was

21

at the motion to dismiss stage, similar facts to these can be used to overcome the standard at the motion for summary judgment stage.

The evidence of sex-based discrimination here is compelling. Krikau acted with remarkable bias when investigating Doe; bias that was on the basis of sex.

The University's Resolution Agreement with OCR provided that the University's employees would receive more Title IX training. Specifically, it stipulated that the University must change its policies and procedures, provide Title IX staff training, provide a qualified Title IX coordinator, provide University personnel training, provide student training, notify the initial complainant the changes that were made, and finally report to the OCR compliance with the agreement. PRDPMF ¶ 44. Thus, one can inference that as of August 2018, the OCR deemed the University's trainings deficient by requiring the University to increase trainings and report compliance to the OCR.

When the University employees, including Krikau, did receive training, it infused with bias. While participating in Title IX trainings, University officials became even more influenced and aware of the external pressures such as the #MeToo movement and potential litigation. At a Title IX training Krikau and Fitzpatrick attended,[17] multiple Title IX cases were presented in slides. PRDPMF, ¶ 138. These slides also mentioned "the threat of litigation." Id. In another presentation at the same training, aptly titled in part "Hot Topics," the training mentioned the #MeToo movement. *Id.* The point was clear, to avoid financial loss or public criticism, favor the female accuser.

The culture of sex-based discrimination by the University is borne out in the statistics. There have been sixty-six Title IX reports since 2013. [*Id.*]. There were seven reports in 2013-14 school

---

[17] Fitzpatrick testified twice that Krikau was at these presentations. [Dkt. 36, 47:22-48:20]. Fitzpatrick further testified that these presentations occurred at the same training. [Dkt. 36, 49:1-10].

year; five in 2014-15; three in 2015-16; five in 2016-17; nineteen in 2017-18; and twenty-six so far in 2018-19. [*Id.*]. Of the sixty-six Title IX reports since 2013, only eight reports involved male reporters. [*Id.*].

While the University wishes to avoid liability by focusing on the self-serving testimony of employees, the training materials and statistics show that it has specifically fallen prey to the national pressures described in Doe's Amendment Complaint ¶ 105. Dkt. 17. These national pressures also include the "Kavanaugh hearings"[19] regarding the allegations against him by Christine Blasey Ford that occurred on September 27, 2018 – mere days before Roe's complaint against Doe. In response to the Kavanaugh hearings, Krikau posted a series of Tweets described thoroughly above on September 27, 2018. This undeniably shows his bias.

It is a question of fact for the jury to decide whether or not they believe Krikau when he asserts that his bias did not impact his investigation of Doe. When a recipient of federal educational funds "adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, [it] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex." *Columbia Univ.,* 831 F.3d at 58 n. 11.

Notwithstanding the external factors described above, the University also experienced internal factors, such its own OCR investigation, the "It's On Us" movement , Sexual Assault Awareness Week, including the showing of 'The Hunting Ground', and trainings that included the #METOO movement, The OCR investigation and resulting Resolution Agreement undoubtedly put significant pressure on the University as it required tons of resources to complete all that was required, including but not limited to changing its policies and procedures, providing Title IX staff training, providing a

---

[19]

qualified Title IX coordinator, providing University personnel training, providing student training, notifying the initial complainant the changes that were made, and finally reporting to the OCR compliance with the agreement.

## 2. Comparator

In deciding whether enforcement is discriminatory, the Court may look to the University's actions towards a female student who is similar in all material respects.[20] *S.C. Dep't of Mental Health*, 641 Fed. Appx 202, 210 (4th Cir. 2015) (applying Title VII). The comparator need not be identical match, but more is needed than that they both were part of the same institution at the same time. *See Haywood v. Locke*, 387 Fed. Appx. 355, 359-60 (6th Cir. 2010) (applying Title VII). Doe's discipline was affected by sex, as previously discussed, and a similarly situated female student was treated more favorably.

Here, Krikau and Harmsen learned that Roe physically touched Student A, causing Student A to feel uncomfortable with Roe because of the touching and causing him to leave. *Id.* Doe states Roe was "handsy" with Student A and asked to "have sex with him." PRDPMF, ¶ 141. Yet, the investigators took no actions to investigate this interaction to see if Roe herself was responsible for sexual misconduct. That they did not is further indication of their gender bias.

The University puts forth a gender-neutral excuse for their decision to punish Doe: they claim that the deciding factor was that he asked Roe what she remembered from the night before. Doe, however, only asked that question when he decided to talk to her the next morning about the sexual

---

[20] The Fourth Circuit has not held that a comparator, *i.e.* a similarly situated female student who was treated more favorably by the school, is necessary to succeed in a selective enforcement claim, but several district courts have applied such a requirement. *See Doe 2 v. Fairfax Cty. Sch. Bd.*, No. 1:18-cv-846, 2019 U.S. Dist. LEXIS 90084, at *16 (E.D. Va. 2019) (appeal pending) (*citing, e.g., Sheppard v. Visitors of Va. State Univ.*, No. 3:18-cv-723, 2019 U.S. Dist. LEXIS 70661, 2019 WL 1869856, at *4-5 (E.D. Va. 2019); *Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 932 (W.D. Va. 2017)).

encounter and she brought up her memory problems. Moreover, in light of the overwhelming evidence of the University's bias, whether this excuse is a pretext for their discrimination is, at the ver least, a material issue of fact to be decided at trial. Summary judgment should be denied on Doe's Title IX claim.

## II. The University was Negligent in its Investigation as Shown by Bias, Failure to Abide by its Own Policies, and Failure to Properly Train its Agents

A defendant's duty is established when it is foreseeable that its acts or omissions may cause harm to another. *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wisc. 2d 479, 483 (1974). Once negligence is established, the defendant is liable for unforeseeable consequences in addition to foreseeable ones. *Id.*

The University does not dispute that it owed a duty to Doe. Instead, it merely argues that it did not breach such a duty. The University would like the Court to take the question of breach away from the jury. Dkt. 41 at 22 (relying on *Morgan v. Pennsylvania General Ins. Co.*, 87 Wis. 2d 723, 732 (1979)). Of course, this Court has the authority to do so in rare circumstances; however even the case on which the University relies, admits "as a general rule, negligence is a jury question." *Morgan*, 87 Wis. 2d at 732. That case further states "[a] claim [for negligence], however, should only be dismissed if it is clear from the complaint that under no conditions could the plaintiff recover." *Id.* at 733. Here, the question of breach is for the jury to decide. Doe's complaint as well as the facts presented in this brief show that there are disputed facts relating to the University's breach of its duty to Doe.

The University admits that negligence law in Wisconsin recognizes a duty of care of all persons to refrain from acts that will cause foreseeable harm to others. Dkt. 41 at 23 (citing *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 484 (1974)); *see also*, *Morgan*, 87 Wis. 2d at 732 ("the test for negligence is whether the conduct foreseeably creates an unreasonable risk to others"). "A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause

25

harm to someone else." *A.E. Inv. Corp.*, 62 Wis. 2d at 484. In conducting its investigation and adjudication of Roe's complaint, it is foreseeable that the University could harm Doe if it did not regard the truth, did not abide by its policies and procedures, and did not provide proper training for all faculty and staff members who would take part in the investigation and adjudication. Indeed, Doe was harmed because of these failings.

The University requests that this Court apply out-of-state law relating to negligence. Dkt. 41 at 23 (citing *Doe v. University of St. Thomas*, 368 F.3d 1309, 1317 (D. Minn. 2019)). This Minnesota District Court case stated that private universities "have a common law duty not to act arbitrary in handling disciplinary matters." *Id.* Therefore, Defendant only argues using this improper negligence standard and suggests that the relevant query is: "did the University violate a duty to Plaintiff by acting arbitrarily during the discipline investigation?" Dkt. 41 at 23. As stated above, this is not the law in Wisconsin; however, even under this standard, Doe answers that question with a resounding "Yes."

Specifically, Krikau negligently failed to fairly and adequately investigate the allegation and gather the information required to reach an informed conclusion concerning Doe's accountability. Further, the University failed to abide by its policies and procedures. Finally, the University failed to properly train its agents that were charged with the investigation and adjudication of Doe.

When Krikau made his initial comments to Roe, as previously explained, he tipped his hand and showed his bias. Likewise, his tweets and his decision to ignore evidence harmful to Roe's case he eschewed his duty of impartiality. That the University acted with such clear bias shows that it acted arbitrarily and capriciously when it investigated and punished Doe without giving him a meaningful opportunity to refute the charges against him. This was negligent, regardless of whether or not the bias was "on the basis of sex."

III. Implied Contract

The legal relationship between a private college and its students is contractual in nature; a student has the right to not be suspended without good cause. *Bissessur v. Indiana University Board of Trustees*, 581 F. 3d 599, 601 (2009). The policies, procedures, bulletins, and handbooks given to students are contractual in nature. *Cosio v. Medical College of Wisconsin, Inc.,* 139 Wisc. 2d 241, 245 (1987), *see also Bissessur,* 581 F. 3d at 601 (catalogues, bulletins, circulars, and regulations available at matriculation may become part of the contract). For implied contracts, the plaintiff must point to an identifiable and tangible continuing benefit promised by the university that it failed to honor. *Id.* Additionally, once a contract is created, it creates an obligation of good faith and fair dealing; no party can act to deny the other the fruits of the contract. *Metroplitan Venures, LLC v. GEA Associates,* 291 Wis. 2d 393 (1969). This too prohibits arbitrary and unreasonable conduct of a part to the contract. *Foseid v. State Bank of Cross Plains,* 197 Wisc. 2d 772, 796 (Wisc. Ct. App. 1995).

Pursuant to Wisconsin law, whether an implied contract exists is a question of fact. *Theuerkauf v. Sutton*, 102 Wis. 2d 176, 183 (1981). Moreover, the Seventh Circuit has firmly established that "the basic legal relation between a student and a private university or college is contractual in nature." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009) (citing *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)). "A student may establish that an implied contract existed between himself and the university that entitled the student to a specific right, such as the right to a continuing education or the right not to be suspended without good cause." *Id.* That court further pointed to "catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant" as becoming "part of the contract." *Id.* Here, the University's Code of Conduct, clearly states "investigators should commence a thorough, reliable and impartial investigation." As demonstrated above, Doe sets forth facts the University did not commence a thorough, reliable, or impartial investigation.

Therefore, there remains two issues for the jury – (1) whether an implied contract existed and (2) if so, did the University breach that contract by its failure to commence a thorough, reliable, and impartial investigation.

Whether the implied contract required a hearing is governed by the "reasonable expectation" of a contract doctrine as provided for under Wisconsin law. *See Weimer v. Country Mut. Ins. Co.*, 216 Wis. 2d 705, 719-20 (Wis. 1998); *Columbus Milk Producers' Coop. v. Dep't. of Agriculture*, 48 Wis. 2d 451, 463 (Wis. 1970); *Mgmt. Comput. Servs. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 186 (Wis. 1996). Therefore, it is a question of fact whether a reasonable college student would have the expectation of the rules in effect at the time of the alleged sexual misconduct, including an entitlement to a hearing, and not a matter of law.

The University promised Doe an impartial, reliable, or thorough investigation in its handbook. It failed to deliver. It promised him the right to a hearing before an administrator. Once again, it failed to do so. It violated its contractual rights to Doe and summary judgment should be denied.

IV.  Covenant of Good Faith and Fair Dealing

Once a contract is created, it "implies a duty of good faith and fair dealing between the parties and a promise against arbitrary or unreasonable conduct." *Marquette Univ. v. Lapertosa*, 2000 Wisc. App. LEXIS 1197, at *13 (Wis. Ct. App., Oct. 17, 2000).[21] Again, the bias nature of the investigative and adjudicatory process shows that the University and its agents failed to act in good faith when they punished Doe without giving him a fair shake. Not only did their baised acts violate Title IX and not only were they negligent, they also violated the covenant of good faith and fair dealing.

---

[21] A copy of this decision can be found in Dkt. 19, Exhibit 1, pursuant to Civil L.R. 7(j)(2).

## V. Declaratory Judgment

The declaratory judgment act is used to adjudicate an actual and ongoing controversy between the parties. *International Harvester Co. v. Deere &Co.,* 623 F.2d 1207, 1210 (7th Cir. 1980). It is not used to adjudicate past and complete disputes. *Green v. Mansour,* 474 U.S. 64, 73 (1985). *Doe v. Purdue* established that students can seek injunctive relief to expunge the finding of guilt on a disciplinary record. *Doe v. Purdue*, 928 F.3d at 666 (holding that the plaintiff had standing because his "marred [discipline] record is a continuing harm for which he can seek redress"). Here, there is an "actual controversy" and a continuing wrongful action.[22]

Currently, Doe cannot attend the University due to the improper sanction he received from the University. Moreover, the finding of 'responsible' of sexual misconduct is presently on his student record resulting in obvious harm by Doe, including but not limited to negatively affecting Does' ability to transfer universities to finish his degree, apply to graduate universities, or find employment. Finally, his scholarship and admission in ROTC are in jeopardy (similar to the *Doe v. Purdue* plaintiff, which the Seventh Circuit recognized – "if the guilty finding is expunged, a career in the Navy may once again be open to him." 928 F.3d at 666).

Outside of the Seventh Circuit, courts have recognized the harm a finding of misconduct can have on one's record. The Supreme Court recognized the harm charges of misconduct can have on a student's record. *Goss v. Lopez,* 419 U.S. 565, 575 (1975) (charges of misconduct "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment"). A court in the Eastern District of Virginia also recognized the specific harm charges of sexual misconduct could cause. *Doe v. Rector & Visitors of*

---

[22] *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991).

*George Mason Univ.*, 132 F. Supp. 3d 712, 724 (E.D. Va. 2015) ("this stigmatizing label [of sexual misconduct] will impair his ability to seek further education or employment elsewhere.").

Doe is not merely seeking to adjudicate the propriety of past conduct. The wrongs by the University as alleged in his complaint and amended complaint are ongoing today and are still affecting Doe in his daily life. Prospective relief, through a declaration or injunction, are necessary for Doe to save his future educational and career prospects by removing the finding from his student record as well as allow him to return to the University should he choose. Doe also alleges a continuing violation of federal law[23] in his claims relating to Title IX. Doe's declaratory judgment and request for injunctive relief should not be summarily dismissed.

## **CONCLUSION**

For the foregoing reasons, the University's motion for summary judgment should be denied. Because of the important rights and legal issues involved here, Plaintiff requests a hearing on the motion.

DATED: November 14, 2019   Respectfully submitted,

        By: _/s/_ Jesse R. Binnall_____
        Jesse R. Binnall
        Lindsay R. McKasson
        Harvey & Binnall, PLLC
        717 King Street – Suite 300
        Alexandria, VA 22314
        Telephone: (703) 888-1943
        Facsimile: (703) 888-1930
        jbinnall@harveybinnall.com
        lmckasson@harveybinnall.com

        *Counsel for Plaintiff*

---

[23] *Kress v. CCA of Tenn., LLC.*, 694 F.3d 890, 894 (7th Cir. 2012).

**CERTIFICATE OF SERVICE**

I certify that on November 14, 2019, the forgoing was filed with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record who are registered with CM/ECF. There are no *pro se* parties in this matter.

By: /s/ Jesse R. Binnall
Jesse R. Binnall, VSB No. 79292
Harvey & Binnall, PLLC
717 King Street – Suite 300
Alexandria, VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
Email: jbinnall@harveybinnall.com

*Counsel for Plaintiff*