IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
(Milwaukee Division)

| | |
|---|---|
| **JOHN DOE,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**MARIAN UNIVERSITY,**<br><br>    **Defendant.** | Civil Action No. 19-cv-388 |

## PLAINTIFF'S PROPOSED ADDITIONAL MATERIAL FACTS

Plaintiff John Doe ("Doe") submits the following Proposed Additional Facts in support of its Opposition to Defendant's Motion for Summary Judgment:

1. Doe and Roe met each other in early 2017, in their spring semester of their freshman year. [Ex. B (Dx 1) at DEF002667].

2. Doe and Jane Roe ("Roe") were close friends prior to the incident. [Dkt. 32, 17:19-20; Ex. RR, ¶ 2]. Doe and Roe were both enrolled in ROTC. [Ex. RR, ¶ 2].

3. Roe initially stated that Doe confronted her at work in front of Hailey Lowe ("Lowe"), her manager at Victoria's Secret, stating: "[Lowe] was close enough that she knew I was extremely uncomfortable" when Doe talked to her at Victoria's Secret. [Ex. H (Dx 2) at DEF002594]. In her second interview, Roe stated Lowe "saw how uncomfortable [Roe] was and [Lowe] ended up walking over." [Ex. N (Dx 31) at DEF002606]. Lowe's interview did not corroborate Roe's statements. [Ex. AA (Dx 35)]. Lowe did not witness any yelling, she never "walked over," nor did she ask Doe to leave. *Id.* Notably, the findings report acknowledges that Lowe's interview did not corroborate Roe's story. [Ex. M (Dx 85) at DOE001171]. Moreover, it acknowledges "inconsistencies in [Roe's] narrative." [Ex. M (Dx 85) at DOE001170].

1

4. During the Campus Save Committee Meeting on 03/15/16, the committee reviewed a case study pertaining to a Title IX case that took place at George Mason University. The committee discussed due process rights in these investigations. [Ex. OO (Dx 63) at DEF002076].

5. In a Title IX training presented by Peter F. Lake entitled "Higher Education: Hot Topics, Trending Issues and Legal Update," Lake discusses the new proposed New Title IX Regulations, considering due process and cross-examination. [Ex. NN (Dx 80) at 14]. Krikau testified that he uses Lake's presentation as a model for Title IX training and "professional development." [Dkt. 30, 30:8-15]. This presentation listed "MeToo" as a "Hot Topic." [Ex. JJ (Dx 80)].

6. In a January 2017 Student Conduct Processes Presentation, Krikau presented a slide called "Overview - Due Process." [Ex. QQ (Dx 117) at DEF001869]. This slide states:

> "All students are guaranteed due process. At Marian University this means that all students have the right to know the accusations made against them and to respond to those charges verbally or in writing. Due process is managed through our administrative structure and facilitated through our student conduct process and protocols."

[*Id.*]. Further, it states that in "legalese" due process means a "Constitutional right to a[n] equitable hearing." [*Id.*]. In "educationese" it is defined as "doing what we said we would do in our handbooks." [*Id.*]. Krikau drafted these slides. [Dkt. 30, 142:19-143:2].

7. "It's On Us" is a social movement that was initiated and promoted by the White House Council on Women and Girls during President Obama's administration that focused on allegations of sexual assault.[1]

8. 'The Hunting Ground' is a film that presents multiple female students who allege they were sexually assaulted at their college campuses and claim that their college administrators either ignored

---

[1] IT'S ON US (2019), https://www.itsonus.org.

them or required that they navigate a complex academic bureaucracy to have their claims addressed.[2] According to its website, the film is "ingeniously employing Title IX legal strategy to fight back and sharing [female subject's] knowledge among a growing, unstoppable network of *young women* who will no longer be silent [emphasis added]."[3]

9. On August 24, 2018, the University made a Resolution Agreement with the Department of Education's Office of Civil Rights (OCR).[4] [Ex. S (Dx 70)].

10. Before its investigation into the University, OCR made changes to its Title IX policies in response to strong criticism of the 2011 and 2014 Dear Colleague Letters, of which "although well intentioned… have led to the deprivation of rights for many students--- both accused students denied fair process and victims denied an adequate resolution of their complaints."[5]

11. Due to the OCR Resolution Agreement, and the other pressures previously discussed, the University put new policies into place on October 18, 2018.

12. After being informed by the University that he was accused of violating the University's Code of Conduct regarding sexual assault, the University conducted an investigation into the allegations. [Ex. B (Dx 1) at DEF002666].

---

[2] *The Hunting Ground* (2019), http://thehuntinggroundfilm.com.

[3] *The Hunting Ground: The Story* (2019), http://thehuntinggroundfilm.com/story/.

[4] *Office of Civil Rights (2018)*: "It is the mission of the Office for Civil Rights is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights." https://www2.ed.gov/about/offices/list/ocr/complaintintro.html.

[5] United States Department of Education Office of Civil Rights, *Dear Colleague Letter*, (2017), https://www.cmu.edu/title-ix/colleague-title-ix-201709.pdf. PRDPMF ¶ 149.

13. The initial investigation was led by Paul Krikau ("Krikau") and Dee Harmsen ("Harmsen"), both of whom are on the Title IX Campus SaVE committee at the University. [Exs. OO, M; (Dx 63, 85)]

14. The investigation lasted approximately six weeks. [Ex. H (Dx. 2) at DEF002587; Ex. M (Dx. 85)].

15. Doe appealed the decision by the University. [Ex. C (Dx 3); Ex. RR ¶ 22].

16. In his appeal, Doe emphasized: the biased investigation, including Krikau's bias, that the investigators were not neutral, and that the "Findings Letter" was biased; denial of properly trained advocate; appeal deadline not properly explained; improperly changed policies during the investigation state of his case; denial of access to Doe's interview; material misstatements in the "Findings Letter"; that the "Investigative Report" and "Findings Letter" erroneously equate memory loss with incapacitation; new evidence, including a photograph of the night in question; and that the sanctions imposed are substantially outside the parameters or guidelines set by the University for this type of offense. [Ex. C (Dx 3)].

17. On December 7, 2018, Doe received a letter from the University, informing him that his appeal had been granted on the grounds that there "was a procedural error that may have substantially altered the findings of the case." [Ex. D (Dx 7) at DEF000228].

18. The was investigation was reopened and notably began and ended on the same date, December 12, 2018 – *i.e.* the decision to sanction Doe again was made on the same date the investigation began. [Ex. Q (Dx 9) at DEF000359-6].

19. Kathleen Candee is the Vice President for Student Engagement and serves as the Title IX Coordinator at the University. She has been in this role for seven years. [Dkt. 34, 13:1-7].

20. In the second investigation of Doe's case, Candee reviewed and approved the original investigation and findings. [Dkt. 34, 128:1-20]

21. Doe's objection to Candee as the new investigator was denied and Candee served as an investigator in the remand. [Ex. RR, ¶ 22].

22. Notably, as the Title IX Coordinator, it was Investigator Candee who oversaw the implementation of the new Code of Conduct. [Dkt. 34:123:14-20].

23. When the investigation was reopened, Doe and Roe were able to comment on the transcript of Doe's third interview. [Ex. Q (Dx 9) at DEF000359-61]. Doe submitted comments. *Id.* Roe did not. *Id.*

24. Doe's statement relating to his third interview made clear that: during the interview he was searching for text messages between him and Roe; Doe only asked her "what do you remember about last night" after she alluded to not remembering the night well; he "never suspected she would have memory loss or that she had too much to drink, or was incapacitated"; he "had no reason to believe she would not remember everything from the night before" and was "surprised"; he was "not hiding anything because" he did not "commit[] sexual misconduct"; he did not know what she drank that night; Roe made her own drink; he "never saw anything that would lead [him] to believe that [Roe] was incapacitated." [Ex. GG; Ex. RR ¶¶ 8, 11].

25. At a Title IX training presentation, Fitzpatrick took notes on the slides, including a note that stated: "too much appeals process is dangerous." [Ex. II; Dkt. 36, 45:18-24].

26. The University provided a chart showing the Title IX investigations from 2013-2019. [Ex. EE at DEF001068-69]. The chart indicates there have been sixty-six Title IX reports in that time period. [*Id.*]. There were seven reports in 2013-14 school year; five in 2014-15; three in 2015-16; five in 2016-17; nineteen in 2017-18; and twenty-six so far in 2018-19. [*Id.*]. Eight reports involved male reporters. [*Id.*].

27. On appeal, the investigation's findings and sanctions are presumed to have been decided reasonably and appropriately. [Ex. G (Dx 13) at DEF000488].

5

28. The University's 2018 Policy does not afford hearings for violations of the Student Code of Conduct. [Ex. A (Dx 66)].

29. Ever since Candee became Title IX coordinator, the University has not held a hearing in approximately seven years. [Dkt. 34, 31:3-15]. Thus, while the 2017 Policy mandated a hearing, or at least included it as an optional course depending on the facts, the University actually did even allow for the option of a hearing for approximately seven years [*Id.*; DPMF, ¶ 41].

DATED: November 14, 2019                    Respectfully submitted,

                                                      By: /s/ Jesse R. Binnall
                                                      Harvey & Binnall, PLLC
                                                      Jesse R. Binnall, VSB No. 79292
                                                      Lindsay R. McKasson, CSB No. 293144
                                                      717 King Street, Suite 300
                                                      Alexandria, Virginia 22314
                                                      Telephone: (703) 888-1943
                                                      Facsimile: (703) 888-1930
                                                      Email: jbinnall@harveybinnall.com
                                                                    lmckasson@harveybinnall.com

                                                      *Counsel for Plaintiff, John Doe*

# CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2019, I filed the foregoing using the Clerk's CM/ECF system, which will provide notice to all counsel of record.

> By: /s/ Jesse R. Binnall
> Harvey & Binnall, PLLC
> Jesse R. Binnall, VSB No. 79292
> Lindsay R. McKasson, CSB No. 293144
> 717 King Street, Suite 300
> Alexandria, Virginia 22314
> Telephone: (703) 888-1943
> Facsimile: (703) 888-1930
> Email: jbinnall@harveybinnall.com
> lmckasson@harveybinnall.com
>
> *Counsel for Plaintiff, John Doe*