Positive
As of: December 13, 2019 5:30 PM Z

# *Cook v. O'Neill*

United States District Court for the Eastern District of Wisconsin

January 6, 2014, Decided; January 6, 2014, Filed

Case No. 09-CV-87

**Reporter**
2014 U.S. Dist. LEXIS 869 *; 2014 WL 37358

TEREZ COOK, Plaintiff, v. ANTHONY O'NEILL, and TODD BALDWIN, Defendants.

**Subsequent History:** Affirmed by *Cook v. O'Neill, 2015 U.S. App. LEXIS 16838 (7th Cir. Wis., Sept. 23, 2015)*

**Prior History:** *Cook v. O'Neill, 2010 U.S. Dist. LEXIS 80783 (E.D. Wis., Aug. 5, 2010)*

## Core Terms

apartment, summary judgment motion, defendants', consented, summary judgment, arrest, officers', sham, dispositive motion, factual dispute, trial testimony, contends, entrance

**Counsel:** [*1] Terez Cook, Plaintiff, Pro se, Waupun, WI.

For Anthony O'Neill, Detective, Todd Baldwin, Detective, Defendants: Martin J De Vries, Sager Colwin Samuelsen & Associates SC, Fond du Lac, WI.

**Judges:** PATRICIA J. GORENCE, United States Magistrate Judge.

**Opinion by:** PATRICIA J. GORENCE

## Opinion

### DECISION AND ORDER

The plaintiff, Terez Cook, a Wisconsin state prisoner, filed this pro se civil rights action pursuant to *42 U.S.C. § 1983* and was granted leave to proceed in forma pauperis. This matter is before the court on the defendants' motion for summary judgment.

The court has jurisdiction over this action pursuant to *28 U.S.C. § 1331* because the matter arises under federal statutes. Venue is proper under *28 U.S.C. § 1391*. The case was assigned according to the random assignment of civil cases pursuant to *General Local Rule 3(a)* (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to *28 U.S.C. § 636(c)* and *General Local Rule 73* (E.D. Wis.).

### I. BACKGROUND OF THE CASE

The plaintiff was granted leave to proceed in forma pauperis on *Fourth Amendment* claims that the defendants entered his home without his consent and that he was arrested and detained without probable cause. The parties filed [*2] cross-motions for summary judgment and on August 5, 2010, the court denied the plaintiff's motion for summary judgment. In addition, the court denied without prejudice the defendants' summary judgment motion based on their failure to include the notice and documents required under *Civil Local Rule 56(a)* to the pro se plaintiff. The defendants re-filed their motion for summary judgment on August 10, 2010, in compliance with the court's Local Rules. On March 7, 2011, the court denied the defendants' motion for summary judgment. Specifically, the court found that

there was a factual dispute regarding whether the defendants had consent to enter Ms. Thede's apartment. The court concluded that: (1) the defendants did not establish that exigent circumstances justified their warrantless entry in Ms. Thede's apartment; (2) whether there was probable cause to arrest the plaintiff could not be resolved at summary judgment, given the factual dispute as to whether the defendants had consent to enter Ms. Thede's apartment; (3) whether the defendants had consent to search Ms. Thede's apartment could not be resolved at summary judgment, given the factual dispute as to whether the defendants had consent [*3] to enter Ms. Thede's apartment; and (4) the factual disputes in the case precluded granting the defendants qualified immunity. In addition, the court stayed this case pending outcome of the state criminal case against the plaintiff, Marinette County Case Number 2005-CF-117, and ordered that either party could move to lift the stay after completion of the plaintiff's state court case.

On May 14, 2013, the court granted the plaintiff's motion to reopen this case based on the completion of his state court case. The court held a telephone status conference on June 12, 2013, and counsel for the defendants requested leave to file a dispositive motion regarding whether *Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)*, bars the plaintiff's claims in this action. Based on the discussions at the conference, the court set a dispositive motion filing deadline for July 31, 2013, which did not limit the dispositive motion to whether the plaintiff's claims were <u>Heck</u>-barred. The defendants' summary judgment motion is fully briefed and will be addressed herein.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the [*4] movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see also, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011)*. "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See *Anderson, 477 U.S. at 248*. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## III. RELEVANT UNDISPUTED FACTS[1]

At all relevant [*5] times, defendants Anthony O'Neill and Todd Baldwin were employed by the Marinette County Sheriff's Department as detectives. This case arises out of a May 31, 2005, incident that occurred at 4223 Autumn Court, Sheboygan, Wisconsin. The factual basis for the plaintiff's claim is centered on incidents occurring immediately before the plaintiff's arrest at that location.

On May 22, 2005, Marinette County Sheriff's Department Detective Todd Baldwin was called to investigate a home invasion and armed robbery that had happened that night in Peshtigo, Wisconsin. The crimes were committed at gun point and a family had been bound and their dog shot. Detective Baldwin and Detective O'Neill investigated the aforementioned crime and determined that the primary suspects were two black males, one named John Egerson and the other who went by the street name "BN" or "Rex," and who ultimately turned out to be the plaintiff, Terez Cook. John Egerson was arrested on May 23, 2005, when he returned to Marinette County. After the arrest of Egerson, the investigation focused on locating the other suspect, BN/Rex.

On May 26, 2005, Detectives Baldwin and O'Neill received telephone records by subpoena which they [*6] believed were for BN/Rex's cell phone and which showed cell phone records listed to Stacy L. Thede of 4223 Autumn Court, Apt. E-106, Sheboygan, Wisconsin. On May 31, 2005, Detectives Baldwin and O'Neill drove to Sheboygan to speak to Stacy Thede about the cell phone records, with the hope that these records would help them find BN/Rex. On that date, Detectives Baldwin and O'Neill, as well as a detective and a uniformed police officer with the Sheboygan City Police Department, went to Ms. Thede's apartment in Sheboygan, Wisconsin.

When the four officers arrived at the apartment building,

---

[1] Facts are taken from the Proposed Findings of Fact Filed in Support of the Defendants' Motion for Summary Judgment, filed July 31, 2013, and the defendants' materials filed in support of summary judgment. The Plaintiff's Response to the Defendants' Proposed Findings of Fact is unsigned. It appears that the signature page is missing. However, the court will consider the plaintiff's filing at summary judgment because it cites to evidentiary materials in the record. Additionally, the plaintiff's response brief supports, and is consistent with, his Response to the Defendants' Proposed Findings of Fact.

they rang the buzzer and the door unlocked. They then entered the building and Ms. Thede met them in the hall. When she was asked, Ms. Thede answered that her name was "Stacy Thede" and that someone named "News" was in her apartment. Detectives Baldwin and O'Neill believed that the person identified as "News" might be the suspect, BN ("Bad News").

The officers entered the apartment and after the plaintiff was identified, the Sheboygan police officer conducted a routine warrant check which showed an outstanding warrant for a parole violation. The plaintiff was then arrested by the Sheboygan officer and [*7] taken to the Sheboygan Police Department.

The plaintiff was convicted by a jury and is serving a sentence in the Waupun Correctional Institution. There have been two appeals relating to the plaintiff's conviction and the conviction has been upheld in the final appeal. On March 27, 2012, the Wisconsin Court of Appeals reversed an order of Marinette County Circuit Court granting the plaintiff's motion for a new trial based on ineffective assistance of counsel. (Affidavit of Martin J. De Vries [De Vries Aff.] ¶ 4, Exh. 2 at 1-2).

At the plaintiff's January 26, 2006, criminal trial, Ms. Thede testified that she consented to the officers' entrance into her apartment on May 31, 2005:

    Q: Did the detectives come in the apartment?
    A: Yes.
    Q: You let them in?
    A: Yes.

(Affidavit of Allen R. Brey [Brey Aff.] ¶ 6, Ex. 3 at 276:3-6). Ms. Thede also testified that she consented to the officers' search of her apartment:

    Q: You consented to the search of your apartment?
    A: Yeah.

(Brey Aff. ¶ 6, Ex. 3 at 277:17-18).

## IV. ANALYSIS

The defendants contend that the plaintiff has no valid claim for violation of constitutional rights based on the entry into Ms. Thede's apartment because she consented to the entry and search. [*8] They also contend that the plaintiff has no valid claim for violation of constitutional rights based on his arrest. The defendants further argue that summary judgment is proper under *Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)*. Lastly, the defendants contend that they are entitled to qualified immunity because they did not violate any clearly

established law.

The plaintiff contends that a judgment in his favor would not necessarily imply the invalidity of his criminal conviction. He further maintains that there exists a genuine material factual dispute over whether Ms. Thede consented to the officers' entry into her apartment. He also contends that the defendants' arguments other than Heck are misplaced because the court gave leave to file a renewed summary judgment motion on the Heck issue only.[2]

In reply, the defendants [*9] acknowledge that Heck does not bar the plaintiff's *Fourth Amendment* claim. (Defendants' Reply Brief at 4). The defendants also contend that summary judgment should be granted because Ms. Thede consented to entry into her apartment, citing her testimony from the plaintiff's January 26, 2006, criminal trial. They assert that in Ms. Thede's January 15, 2010, affidavit, she attempts to explain away her trial testimony by claiming that she did not "let them in, but let them remain in," and that any attempts to change her sworn trial testimony should be stricken under the "sham affidavit" rule.

The plaintiff filed a motion for leave to file supplemental response brief along with a supporting brief and affidavit. (Docket # 75). The court construes this as a sur-reply and will grant the motion fo file this response brief.

## A. Scope of the Defendants' Motion for Summary Judgment

The plaintiff contends that the defendants may not raise the issue of whether Ms. Thede consented to the officers' entry into her apartment because it is outside of the court-permitted scope of their motion for summary judgment. He cites to the May 14, 2013, order, where the court stated that it would hold a status conference [*10] to determine whether the defendants "may file a renewed dispositve motion based on the outcome of the plaintiff's state criminal case or whether this case will proceed to trial." (Order of May 14, 2013, at 1-2).

---

[2] The plaintiff states that the instant motion for summary judgment is the defendants' third one filed in this case. As set forth herein, the defendants were granted leave to re-file their first summary judgment motion and it is identical to their second one except that the latter motion includes the proper notice and rules to the pro se plaintiff, as required under the Local Rules.

Following the June 12, 2013, status conference and based on the discussion at that conference, the court set a dispositive motion filing deadline for July 31, 2013. The court's order does not limit the scope of any dispositive motions to the Heck issue.

In any event, the plaintiff does not cite any case law in support of his contention that the court should not permit the defendants to argue beyond Heck in their summary judgment motion. The "very purpose" of the summary judgment motion is "to weed out unfounded claims, specious denials, and sham defenses[.]" *Bank of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1168-69 (7th Cir. 1996)* (quoting *Babrocky v. Jewel Food Co., 773 F.2d 857, 861 [7th Cir. 1985]).* The court has considerable discretion to permit renewed motions for summary judgment. See *Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002)* (permitting a second summary judgment motion is essentially a decision concerning case management, and district court [*11] judges are in the best position to make such decisions).

Here, the plaintiff is not prejudiced based on the court's consideration of the additional arguments because he had notice and an opportunity to respond to the defendants' arguments. Accordingly, the court will address the defendants' argument that the plaintiff has no valid claim for a violation of his constitutional rights based on the entry into Ms. Thede's apartment because she consented to the entry and search. The plaintiff contends that this issue is still in dispute.

**B. Consent**

In a prior decision and order, the court determined that the plaintiff's *Fourth Amendment* claims whether there was probable cause to arrest the plaintiff and whether the defendants had consent to search Ms. Thede's apartment could not be resolved at summary judgment because there was a factual dispute between the parties regarding whether Ms. Thede consented to their entrance into the apartment. (See Court's Decision and Order, March 11, 2011, at 5).[3]

_____

[3] On October 29, 2010, the circuit court just reversed the plaintiff's criminal conviction and granted the plaintiff's motion for a new trial based on ineffective assistance of counsel. However, on March [*12] 27, 2012, the Wisconsin Court of Appeals reversed the order of the Marinette County Circuit Court granting the plaintiff's motion for a new trial.

Here, for the first time, the defendants present Ms. Thede's trial testimony where she testified that she consented to the officers' entry into her apartment and to their subsequent search of the apartment. The plaintiff insists that the issue is still in dispute based on Ms. Thede's January 15, 2010, affidavit, filed in support of the plaintiff's motion for summary judgment, in which she avers in relevant part:

18. On January 26, 2006 I was called to testify at Mr. Cook's criminal trial.

19. In those criminal proceedings, I was asked the question by the District Attorney "did the detectives come into your apartment." I responded "yes."

20. I was then asked "did you let them in [sic]?" and I responded "yes."

21. However this response was given in the context of me meaning that once the police officers had already entered the apartment, I did not tell them to leave or did not object directly to them, but let them remain.

22. It was never my intent to give them permission to enter my apartment and it was only after the fact that I did not object.

(Affidavit [*13] of Stacy Thede, January 25, 2010, ¶¶ 18-22).

The defendants maintain that Ms. Thede's affidavit is barred by the "sham affidavit" rule to the extent she claims that she did not consent to entry into her apartment. The plaintiff contends that Ms. Thede's affidavit is not barred because it merely serves to clarify her trial testimony.

The "sham affidavit" rule prohibits litigants from creating sham issues of fact with affidavits that contradict their prior sworn testimony. *Bank of Illinois, 75 F.3d at 1168-69* ("We have long followed the rule that parties cannot thwart the purposes of *Rule 56* by creating 'sham' issues of fact with affidavits that contradict their prior depositions.") (citations omitted). This is not to say that a declaration or affidavit that contradicts prior testimony can never create an issue of fact. A contradictory affidavit may be allowed when it is used to clarify ambiguous or confusing testimony, or when it is based on newly-discovered evidence. *Id. at 1171-72*. Such an affidavit or declaration may also be considered where evidence is offered to show that the prior statement "was mistaken, perhaps because the question was phrased in a confusing manner or because [*14] a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Cowan v. Prudential Ins. Co. of America, 141 F.3d 751, 756 (7th Cir. 1998)*

(quoting *Russell v. Acme-Evans Co., 51 F.3d 64. 68 [7th Cir. 1995])*.

Here, Ms. Thede testified unequivocally that she consented to the officers' entrance into her apartment. She was asked a direct question and she answered directly. The plaintiff's contention, reflected in Ms. Thede's affidavit, that she sought to clarify her testimony rings hollow. Additionally, her explanation that she meant that she consented to them remaining in her apartment, but never consented to the initial entrance, is inconsistent with her trial testimony. Thus, the court concludes that Ms. Thede's affidavit is entitled to no weight regarding the consent issue.

Thus, the undisputed facts establish that Ms. Thede consented to the officers' entrance into her apartment. See *Sparing v. Village of Olympia Fields, 266 F.3d 684, 688 (7th Cir. 2001)* (citing *Payton v. New York, 445 U.S. 573, 585-90, 100 S. Ct. 1371, 63 L. Ed. 2d 639 [1980])* (police officers may not constitutionally enter a home without a warrant to effectual an arrest, absent consent or exigent circumstances). Once inside, [*15] she consented to a search of her apartment. See *United States v. Johnson, 427 F.3d 1053, 1056 (7th Cir. 2005)* (*Fourth Amendment's* probable cause and warrant requirements do not apply where an authorized party voluntarily consents to a search). [4] Then, the Sheboygan officers arrested the plaintiff pursuant based on an outstanding warrant for parole violation. The plaintiff does not challenge the validity of the warrant.

Based on the foregoing, the defendants' motion for summary judgment on the plaintiff's *Fourth Amendment* claims will be granted. As such, there is no need to consider the defendants' remaining arguments.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the plaintiff's motion for leave to file supplemental response brief be and hereby is **granted.** (Docket 75).

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment be and hereby is **granted.** (Docket 66).

**IT IS ALSO ORDERED** that the Clerk of Court shall enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin this 6th day of January,

2014.

BY THE COURT:

/s/ Patricia J. Gorence [*16]

PATRICIA J. GORENCE

United States Magistrate Judge

---

**End of Document**

---

[4] The legality of the plaintiff's search claim is based on whether the defendants had consent to enter Ms. Thede's apartment.

 Cited
As of: December 13, 2019 5:32 PM Z

# *Frederick v. Abbott Labs.*

United States District Court for the Northern District of Illinois, Eastern Division

March 16, 2005, Decided ; March 16, 2005, Filed

No. 03 C 5038

**Reporter**
2005 U.S. Dist. LEXIS 41543 *; 2005 WL 627957

RICKY FREDERICK, ROBERT LEIS, and ROBERT MARTIN, Plaintiffs, v. ABBOTT LABORATORIES, Defendant.

## Core Terms

work order, log book, filter, mechanics, readings, terminated, recorded, manometer, log, material fact, assigned, summary judgment, documents, argues, legitimate expectation, similarly situated, prima facie case, employees, deposition, discovery, completing, missing, full-time, proffered, attended, training, genuine, pretext, gender

**Counsel:** [*1] For Ricky Frederick, Robert Leis, Robert Martin, Plaintiffs: Lisa R. Kane, Janice A. Wegner, Kevin R. Vodak, Zacharias C. Leonard, Lisa Kane & Associates, Chicago, IL.

For Abbott Laboratories Derivative Shareholder Litigation, Defendant: Hubert O. Thompson, Ronald Austin, Jr., Brothers & Thompson, P.C., Chicago, IL.

**Judges:** James B. Zagel, United States District Judge.

**Opinion by:** James B. Zagel

## Opinion

### MEMORANDUM OPINION AND ORDER

Judge James B. Zagel

Plaintiffs Ricky Frederick, Robert Leis, and Robert Martin were previously employed by Defendant Abbott Laboratories ("Abbott") as heating ventilation air conditioning ("HVAC") mechanics. The Plaintiffs were terminated on February 20, 2003, and later filed a two-count Complaint against Abbott. Count I alleges that the Plaintiffs were discriminated against based on their gender in violation of Title VII when they were terminated. Count II alleges that Abbott intentionally terminated the Plaintiffs' employment for the purpose of interfering with their medical and pension benefits in violation of the Employee Retirement Income Security Act ("ERISA"). Abbott now moves for summary judgment.

### I. Background

During the relevant [*2] time period, Abbott employed approximately twelve HVAC mechanics in its Corporate Engineering Division. These mechanics were tasked with completing work orders assigned to them by the HVAC Group Leader, Pete DeBree. Some of these work orders were preventative maintenance ("PM") work orders generated by a computer on a set schedule, which required the HVAC mechanic to inspect airhandling units, read the unit's manometers (devices used to measure air pressure across a filter), and record the readings in a filter performance log book. When an HVAC mechanic completed a PM work order, he was required to sign and date the work order under the words "Work Order Completed By," indicating that the work order had been completed. Directly beneath this section were the words "Work Order Not Completed," followed by the word "Reason." If an HVAC mechanic could not locate the log book to record the manometer

readings, he was permitted to record the manometer readings on a sheet of paper, staple it to the work order and transfer the readings to the log book at a later date. The two filter performance log books, one for production areas and one for office space, were three-ring binders containing log [*3] sheets listing various equipment by building and floor. HVAC mechanics, including the Plaintiffs, received annual Good Manufacturing Practices ("GMP") training on how to properly complete a work order. Kimberly Richtmyre, Supervisor of the HVAC group, conducted monthly HVAC group meetings where HVAC mechanics could ask questions about their work orders.

In early February 2003, the Federal Drug Administration ("FDA") conducted an audit of one of Abbott's divisions. In anticipation of the FDA's audit, Richtmyre retrieved the log book, discovered that some of the log book data was missing and informed David Taylor (Section Manager) and Daniel Fruehe (Manager of Maintenance) of the problem. Fruehe notified his boss, Patrick Killian (Director of Plant Maintenance), about the missing log book data, which by that time the FDA had requested. Killian contacted Lynne Faragher (Human Resources Manager), informing her of the FDA's request, the missing data, and the possibility that there had been falsification of documentation. This information was then relayed to Faragher's boss, Mark Naidicz, Human Resources Director.

Richtmyre obtained the corresponding work orders that required the HVAC [*4] mechanics to record the manometer readings in the log book. The work orders were signed as complete by four HVAC mechanics: the three Plaintiffs and Christopher Galauskas. [1] On February 6, 2003, Naidicz instructed Killian, Fruehe, and Faragher to interview the four mechanics and obtain written statements from them. The Plaintiffs admitted that they had signed the work orders as complete but had not recorded the manometer readings in the filter performance log book. [2] Abbott terminated the Plaintiffs,

on February 20, 2003, for falsification of documentation. The Plaintiffs allege that their Group Leader, DeBree, and the Scheduler / Planner, Dennis Hauser, had previously told them that the log books were no longer being used. Also, the Plaintiffs point out that the work orders contained a line which read "Log Entry Required: N."

[*5] Elizabeth McGruder was an apprentice in Abbott's Skilled Trades Education Program ("STEP") training to be an HVAC mechanic. As a STEP employee, McGruder was required to work with full-time HVAC mechanics during the day and attend classes at a local college at night. McGruder received her work assignments from HVAC Group Leader DeBree. The Plaintiffs allege that McGruder was treated more favorably because she was not terminated following the discovery of the missing filter performance log book data.

## II. Analysis

### A. Count I -- Gender Discrimination

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In determining whether any genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in its favor. *anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A genuine issue of fact exists only when, based on the record as a whole, a reasonable jury could find for the non-movant. *Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999)*. [*6]

In the absence of direct evidence of gender discrimination, as is the case here, plaintiffs must present evidence of discrimination through the three-part burden-shifting test established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Under the burden-shifting method, the plaintiff has the burden of establishing a

---

[1] According to Richtmyre, Galauskas had recorded his readings in the log book, but did not sign and date the entries and missed one reading. (See Richtmyre Dep. Ex. 33). Galauskas was placed on six-month probation for failing to sign and date his log-book entries.

[2] The Plaintiffs were accused of signing six work orders as complete without recording the readings in the filter performance log book. The work orders contained an instruction requiring the HVAC mechanic to document the manometer reading in the filter performance log. Of the six work orders in question, Plaintiff Martin was responsible for

completing two of them, dated complete 7/4/02 and 7/26/02; Plaintiff Leis was responsible for two, dated complete 8/15/02 and 12/6/02; and Plaintiff Frederick was responsible for one, dated complete 11/6/02.

prima facie case for discrimination. *Id.* To establish a prima facie case, the plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the job in question or was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably. *Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 376 (7th Cir. 1998)*.

If the plaintiff makes out his prima facie case, the burden shifts to the defendant to present a legitimate, non-discriminatory basis for the adverse action. *Cowan v. Glenbrook Sec. Servs., 123 F.3d 438, 445 (7th Cir. 1997)*; *Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1007 (7th Cir. 2000)*. If the defendant [*7] is able to do so, the burden shifts back to the plaintiff to establish that the proffered reason is merely a pretext for discrimination. *Cowan, 123 F.3d at 445*; *Miller, 203 F.3d at 1007*.

## 1. The Plaintiffs' Prima Facie Case

Since the parties do not dispute that elements (1) and (3) of the prima facie test had been met, I consider here only whether the Plaintiffs were meeting Abbott's legitimate expectations and whether McGruder was a similarly situated female employee who received more favorable treatment. [3] First, Abbott argues that summary judgment is appropriate because the Plaintiffs cannot establish that they were meeting Abbott's legitimate expectations. Abbott claims that the Plaintiffs falsified documentation when they signed work orders as complete but did not record the manometer readings in the filter log book. Plaintiffs neither made any notation on the work orders indicating that the work orders could not be completed nor recorded the manometer readings on a separate sheet of paper to be transferred into the log book at a later date. Abbott maintains that it had a legitimate expectation that the Plaintiffs would not sign work orders [*8] that state that they had performed work that they had not, in fact, performed.

---

[3] With respect to the first element (that the male Plaintiffs are part of a protected class in a gender discrimination suit), this may be somewhat of an oversight on the part of Abbott. I may be wrong, but it seems that Plaintiffs may have a difficult time establishing the existence of background circumstances, which would suggest that the Defendant is one of those unusual employers who discriminates against the majority. *Mills v. Health CareServ. Corp., 171 F.3d 450, 456-57 (7th Cir. 1999)*.

In response, the Plaintiffs make four brief arguments. First, the Plaintiffs indicate that prior to their termination, each of the three Plaintiffs had consistently received positive performance evaluations from Group Leader DeBree and Supervisor Richtmyre. Second, the Plaintiffs assert that, as HVAC Group employees, they attended annual GMP training conducted by Abbott's Quality Group and monthly meetings conducted by DeBree [*9] and Richtmyre where the HVAC employees were instructed on how to complete their assigned work orders. During these meetings, the Plaintiffs say they were explicitly told to sign and date the work orders upon completion without making any other marks on the work orders. Third, the Plaintiffs claim that, in late spring or early summer of 2002, they were explicitly instructed by DeBree and Planner / Scheduler Hauser that the filter performance log books were no longer being used and that the filter log readings did not need to be recorded until further notice. The Plaintiffs maintain that neither DeBree nor Hauser ever informed them that the log book procedure was being re-instituted. Finally, the Plaintiffs point to a line contained on the work orders that reads "Log Entry Required: N." The Plaintiffs claim that they understood this line to mean that they were not required to record their manometer readings in the filter performance log book.

The fact that the Plaintiffs had received positive performance evaluations is not sufficient evidence that they were meeting their employer's legitimate expectations. *Peele v. Country Mut. Ins. Co., 288 F.3d 319, 329 (7th Cir. 2002)* [*10] (quoting *Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 336 (7th Cir. 1991)* (In ascertaining whether a plaintiff has met his employer's legitimate expectations, the issue is not the employee's past performance, but "whether the employee was performing well at the time of his termination."). Furthermore, employers generally have a legitimate expectation that its employees will not falsify documents. *See Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 767 (7th Cir. 1994)*; *Contreras v. Suncast Corp., 129 F. Supp.2d 1173, 1180-81 (N.D. Ill. 2001)*.

However, the Plaintiffs' allegations that, in late spring or early summer of 2002, they were explicitly instructed by DeBree and Hauser that the filter performance log books were no longer being used and that the filter log readings did not need to be recorded, if true, would rebut Abbott's claim that they were not meeting the company's legitimate expectations. Stripped down, this is a case of one party's word against the other. DeBree denies telling any HVAC mechanics that the filter

performance log book was no longer being used or that the manometer readings were not to be recorded. [*11] Richtmyre also denies that she discontinued the use of the filter performance log book prior to the Plaintiffs' termination. [4]

Plaintiff Martin stated that in June or July of 2002, DeBree informed him that filter log readings were no longer being taken and recorded and then took his filter log book. (Martin Dep. at 58-62). The reason given by DeBree for the discontinuation of the log book entry procedure, according to Martin, was that the HVAC mechanics' time could no longer be billed to the department in which the equipment being recorded was located. The next day, Martin inquired about the filter log readings with Planner / Scheduler Hauser who likewise informed Martin that the filter performance [*12] logs were no longer being recorded. Plaintiff Leis testified that, sometime in 2002, DeBree informed him and Plaintiff Frederick that the log books were no longer being used. (Leis Dep. at 66-69). Leis also stated that he repeatedly asked both DeBree and Hauser for the log books when he received a work order instructing him to record a filter log reading.

Other HVAC Group employees also testified that the filter log books were no longer being used. Matt Walker, HVAC mechanic, claims he was instructed by DeBree that the filter log books were no longer being utilized in late 2002. (Walker Dep. at 33-34). According to Walker, after stating to DeBree that he could not sign work orders as complete unless he recorded the filter log readings, DeBree specifically instructed Walker to sign off on work orders and not to worry about recording the readings in the filter log book. Chris Galauskas, former HVAC mechanic and one of the mechanics who, along with the Plaintiffs, was investigated for missing log book data, testified at his deposition that he was instructed that the filter log books were no longer being used; yet, he continued to receive work orders that required filter log readings [*13] to be taken and recorded. [5]

---

[4] At her deposition, Richtmyre testified that the HVAC Group changed the work order policy after the Plaintiffs were terminated, in March or April of 2003, by eliminating the log book entry requirement and allowing HVAC mechanics to record the manometer readings directly on the work order. (Richtmyre Dep. at 87-88).

[5] It should be noted that Galauskas did not testify as to the date that he was allegedly told that the log books were no longer being used. Thus, it could have been after March or April of 2003 when Richtmyre testified that Abbott discontinued the log book entry procedure, as mentioned

(Galauskas Dep. at 29; 32-33). Kevin Ehmke, former HVAC mechanic, testified that the filter log books were removed from the HVAC Group by Richtmyre and that he overheard her say that the log books were "a waste of time." (Ehmke Dep. at 27).

Abbott argues that even if DeBree told the Plaintiffs that the filter performance log book was no longer being used, which he denies, the Plaintiffs still have not established that they were meeting Abbott's legitimate expectations because the Plaintiffs knew that if the log book was unavailable, HVAC mechanics were to record the manometer readings on a separate sheet of paper and attach the readings to the work order. Also, if a work order could not be completed [*14] as written, HVAC mechanics were required to write the reason the work order could not be completed in the space marked "Work Order Not Completed." Rather than doing either of these things, the Plaintiffs simply signed the work orders as completed. However, the validity of this argument is contingent upon whether DeBree told the Plaintiffs that the filter performance log book was no longer being used or that the manometer readings are not to be recorded. DeBree was the Group Leader and the Plaintiffs' direct superior. Additionally, at their annual and monthly training meetings, the Plaintiffs say, they were explicitly told to sign and date the work orders upon completion without making any other marks on the work order. The Plaintiffs suggest this instruction as a reason for not marking the "Work Order Not Completed" section of the work order.

Drawing all reasonable inferences in the Plaintiffs' favor, I conclude that the Plaintiffs have satisfied the second element of their prima facie case because they have presented a genuine issue of fact as to whether they were meeting Abbott's legitimate expectations.

Abbott also argues that summary judgment is appropriate because the Plaintiffs [*15] failed to establish that similarly situated female employees were treated more favorably than the Plaintiffs. A plaintiff may demonstrate that another employee is similarly situated by showing that there is someone who is directly comparable to him in all material respects. *Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).* In determining whether employees are similarly situated, "a court must look at all relevant factors," and "in disciplinary cases-in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited

---

above.

reason-a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. *Radue v. Kimberly Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)*. For example, "this normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*

The Plaintiffs identify Ms. McGruder as a similarly situated [*16] female employee who was treated more favorably than themselves. Abbott sets forth several factual arguments seeking to point out differences between the Plaintiffs and McGruder. First, Abbott indicates that McGruder was not an HVAC mechanic; rather, she was an apprentice in the STEP program. As such, she worked at Abbott during the day and attended classes at a local college at night. STEP employees typically rotate through different departments within Abbott, usually for six months at a time. Upon completion of the apprenticeship, a STEP employee can apply for a full-time position with Abbott. Second, Abbott claims that even though McGruder received work assignments from Group Leader DeBree, McGruder's manager and the person to whom she ultimately reported was the STEP coordinator, Bob Lynch, a manager in a different department. Third, Abbott argues that the Plaintiffs and McGruder differed in their duties. McGruder was required to work with an HVAC mechanic because, as a STEP employee, she was not allowed to work alone. Abbott claims that, while she was assigned PM work orders, McGruder was not assigned any work orders that required her to take filter readings on airhandlers because [*17] that was a "one person job." Finally, Abbott found no evidence that McGruder signed any work orders stating that she had completed work that she had not completed.

Plaintiffs counter each of Abbott's assertions. First, Plaintiffs contend that McGruder was a full-time employee in the HVAC Group and point out that she worked in the HVAC Group from February 2002 until October 2003, considerably longer than the typical six-month rotation within Abbott. Also, many full-time HVAC mechanics have attended classes at a local college at night; in fact, Plaintiff Frederick began his employment at Abbott in the STEP program, attending HVAC training classes at a local college at night Additionally, like Plaintiffs, McGruder was required to obtain her refrigerant certification card to maintain employment in the HVAC Group. Second, Plaintiffs stress that

McGruder received her assignments and work orders from Group Leader DeBree, in an identical fashion as Plaintiffs. Furthermore, DeBree and Richtmyre were responsible for evaluating McGruder's performance. [6] (Richtmyre Dep. at 141). Third, while McGruder was not allowed to work alone, it was common for DeBree to assign HVAC mechanics to work in [*18] pairs, including the Plaintiffs. (In her affidavit, McGruder stated that she performed all the job functions and duties of an HVAC mechanic) (McGruder Aff. 4, 8). Plaintiff Martin stated in his deposition that when McGruder was assigned to work with him, "there was nothing [Martin] did that [McGruder] didn't do." (Martin Dep. at 146). DeBree has admitted that McGruder may have signed and completed work orders that she had been assigned to perform with a full-time HVAC mechanic. (DeBree Dep. at 62). According to McGruder's affidavit and Plaintiff Frederick's deposition testimony, McGruder executed PM work orders and made entries into the filter performance log book during the time she worked in the HVAC Group. (McGruder Aff. at 2-3; Frederick Dep. at 83, 86). Finally, McGruder claimed in her affidavit that, during her employment in the HVAC Group, she received assignments to perform work orders that instructed her to record filter log readings in the filter performance log book after the log book procedure allegedly had been eliminated. (McGruder Aff. at 19). She was, therefore, unable to record the filter log readings as required by the work order.

[*19] Abbott argues, even if McGruder did falsify work order documents, the decision maker, Paul Finegan (Vice President, Corporate Engineering Department), was not aware of any such conduct by McGruder. On February 6, 2003, according to Abbott, after interviewing and obtaining the written statements from the Plaintiffs, Richtmyre, Faragher, Taylor, and Fruehe met to discuss the situation. The following day, Richtmyre sent an e-mail to Faragher, Taylor, Fruehe, and Killian confirming that the general consensus from their conversations was that the Plaintiffs should be terminated for falsification of documentation. Killian, one of the four recipients of the e-mail, testified at his deposition that he recommended to his superior, Finegan, that the Plaintiffs be terminated. (Killian Dep. at 24-25). Finegan approved the recommendation and Plaintiffs were subsequently terminated on February 20, 2003. [7]

---

[6] A performance evaluation was never actually completed because McGruder took maternity leave before completing her HVAC rotation.

[7] There is some dispute as to whether Finegan alone had the

[*20] According to Abbott, even if Richtmyre had knowledge regarding any falsification of work orders by McGruder, which Richtmyre denies, Finegan alone was the decision maker, and "the law is clear that the knowledge of a non-decision maker is irrelevant." (Df. Memo. At 8). In support of this proposition, Abbott cites to *Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1366 (7th Cir. 1988)*; *Lindsey v. Baxter Healthcare Corp., 757 F. Supp. 888, 896 (N.D. Ill. 1991)*; and *Hempstead v. Rockford Hous. Auth., 2000 U.S. Dist. LEXIS 5606, 2000 WL 516187 (N.D. Ill. Apr. 25, 2000)*. However, this argument is somewhat misplaced. All three of the cases referenced by Abbott consider the non-decision maker's knowledge in determining pretext, not whether an employee is similarly situated. The central question here is whether McGruder had essentially the same job and followed the same procedures as the Plaintiffs. Whether Finegan knew of McGruder's actions and responsibilities at the time is simply irrelevant.

Drawing all reasonable inferences in the Plaintiffs' favor, I conclude that the Plaintiffs have satisfied the fourth element of their prima facie case because they have presented [*21] a genuine issue of fact as to whether McGruder was a similarly situated female employee who was treated more favorably than the Plaintiffs were treated.

## 2. Pretext

Finally, Abbott argues that even if the Plaintiffs are able to establish a prima facie case of gender discrimination, Abbott would nonetheless be entitled to summary judgment because Abbott had a legitimate, non-discriminatory reason for terminating their employment. A plaintiff may establish that the defendant's proffered reason for termination was pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Mechnig, 864 F.2d at 1364* (quoting *Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*). The plaintiff may demonstrate that the employer's reason is unworthy of credence by providing "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation . . . or were insufficient to motivate" the action. *Gordon v. United*

*Airlines, Inc., 246 F.3d 878, 888-89 (7th Cir. 2001)* [*22] (quoting *Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 395 (7th Cir. 1998)*). Thus, the inquiry here is limited to whether the employer honestly believed the reason it gave for the decision to terminate the Plaintiffs, and not whether it made a mistake or a bad business decision. *Kralman v. Illinois Dep't of Veterans' Affairs, 23 F.3d 150, 156-57 (7th Cir. 1994)*.

Abbott asserts that the Plaintiffs were terminated because they falsified company documents when they signed work orders indicating that they had completed their assigned tasks, despite the fact that they did not complete those tasks. Plaintiffs, on the other hand, claim that the circumstances surrounding their termination and this litigation support a finding of pretext. First, Plaintiffs allege that Abbott lied about who was involved in the Plaintiffs' terminations. The Plaintiffs point out that when Abbott responded to Plaintiffs' First Set of Interrogatories, Abbott stated that Richtmyre, Faragher, Taylor, Fruehe, and Killian were the individuals involved in the decision to terminate the Plaintiffs. Not until eight months later did Abbott assert that Finegan was the individual [*23] who made the ultimate decision to terminate Plaintiffs. This, Plaintiffs contend, shows that Abbott was "attempting to insulate itself from liability by continuing to climb the corporate ladder in order to separate the decision maker from pertinent knowledge regarding the discriminatory bases for the terminations of Plaintiffs." (Pl. Memo. at 13). The late discovery of Finegan's identity does not, however, establish pretext. Abbott has stated that their Answer was truthful when given and that it had later determined during discovery that although all of the individuals listed were involved in the decision to terminate Plaintiffs, none of those individuals possessed the authority to make the final termination decision. Ultimately, Finegan's decision-making responsibility was disclosed to Plaintiffs at Killian's deposition on July 23, 2004, leaving time for Plaintiffs to depose Finegan during the discovery period. [8] (Killian Dep. at 24-25).

[*24] Plaintiffs further allege that legitimacy of Abbott's given reason for their termination is disputed by the record in this case. Plaintiffs' claims that Abbott had abandoned its policy of taking manometer readings and recording them in the log books. Plaintiffs assert that DeBree and Richtmyre removed the log book from the HVAC Group. DeBree stated at his deposition on July 27, 2004, that he was unaware of where the filter log

---

power to terminate an employee and whether he was involved in the decision to terminate the Plaintiffs' employment.

[8] Abbott points out that the Plaintiffs did not take the opportunity to depose Finegan during discovery.

books were being kept at the time of his testimony and that the last time DeBree saw them in his desk was a "couple of years" ago. (DeBree Dep. at 36). The Plaintiffs contend that, following the alleged elimination of the log book entry procedure, DeBree and Hauser told the HVAC mechanics, including Plaintiffs, to disregard instructions on the work orders regarding log book entry and sign and date them as complete without recording the manometer readings. Plaintiffs also assert that the work orders contained the instruction "Log Entry Required: N." Looking at the facts in the light most favorable to the Plaintiffs, I find that the evidence presented casts sufficient doubt on Abbott's proffered non-discriminatory reasons to survive summary judgment.

## B. Count [*25] II-ERISA

With respect to Plaintiffs' ERISA claim, Abbott argues that the Plaintiffs cannot establish a prima facie case of interference with their ERISA because the Plaintiffs were not qualified for their job positions and were not discharged under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. See _Salus v. GTE Directories Serv. Corp., 104 F.3d 131, 135 (7th Cir. 1997)_. Further, Abbott asserts that even if the Plaintiffs could establish their prima facie case, they cannot rebut Abbott's legitimate, non-discriminatory reason for terminating Plaintiffs' employment because they fail to show that Abbott's explanation is pretextual and "that the motivating factor behind the termination was the specific intent to interfere" with the Plaintiffs' ERISA rights. _Id._ Upon further review, Plaintiffs conceded all claims under Count II of their Complaint.

## III. Abbott's Motions to Strike

## A. Abbott's Motion to Strike Portions of Plaintiffs' Response to Abbott's Statement of Material Facts

In addition to its Motion for Summary Judgment, Abbott has also filed a Motion to Strike portions of Plaintiffs' [*26] Response to Abbott's Statement of Material Facts. Local Rule 56.1(b)(3)(A) provides that the opposing party to a motion for summary judgment must respond to the movant's Statement of Material Facts with "a response to each numbered paragraph in the moving party's statement, including, in the case of any

disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon . . ." Local R. 56.1(b)(3)(A). If the non-moving party fails to comply with the local rules regarding its response, the response may be stricken. _Rosemary B. v. Bd. of Ed., 52 F.3d 156 (7th Cir. 1995)_. "The well-known consequence of a failure to comply with local rule [_56.1_] is that each of the properly supported facts contained in the movant's [56.1] statement of material facts is deemed admitted." _MacDonald v. Commonwealth Edison Service Annuity Fund, 810 F. Supp. 239, 242 (N.D. Ill. 1993)_; Local Rule 56.1(b)(3).

First, Abbott argues that Plaintiffs' responses to Material Facts 39, 42, 45, 48, 51, 73, 75, 76, 78, 79, 90, 97, 101, 105, 109, 110, and 119 should be stricken because they are improper. In the responses other than 119, Plaintiffs stated they [*27] did not dispute the material fact stated and proceeded to offer additional non-conflicting, explanatory information. Since the Plaintiffs did not dispute these material facts, I deem them admitted. The admission of these facts is, however, of little consequence since it does not mean that Plaintiffs are prohibited from using the explanatory information in their motion for summary judgment. The additional information provided by Plaintiffs is based on the record and may be used to put the facts in context. Material Fact 119 was properly disputed by Plaintiffs and is not deemed admitted.

Second, Abbott argues that Plaintiffs' responses to Material Facts 17, 18, 19, 32, 35, 36, 38, 41, 44, 47, 50, 67, 70, 71, 77, 84, 85, 86, 88, 96, 98, 102, 103, 106, and 111 should be stricken because Plaintiffs fail to cite sufficient information to support their denial. After reviewing Plaintiffs' Answers and the supporting materials, I find they are sufficiently supported and should stand.

## B. Abbott's Motion to Strike Certain Exhibits Offered by Plaintiffs

Abbott argues that Plaintiffs' Exhibits DD, OO, PP, QQ, TT, WW, YY, and AAA should be stricken because they have not been properly identified [*28] by affidavit or otherwise made admissible. As a general rule, however, "documents produced in response to discovery are self-authenticating." _Architectural Iron Workers Local No. 63 Welfare Fund v. United Contrs., 46 F. Supp. 2d 769, 772 (N.D. Ill. 1999)_(quoting _South Cent. Bank v. Citicorp Credit Services. 863 F. Supp. 635, 645 (N.D. Ill. 1994)_("there is no error to admit as evidence documents

that Defendants themselves possess and produced in response to Plaintiff's request for production of documents."). Exhibits OO, PP, QQ, TT, WW, YY, and AAA were produced by Abbott, and are, therefore, admissible without further authentication. Exhibit DD was not produced during discovery and is not automatically authenticated.

## VI. Conclusion

For the reasons stated above, Abbott's Motion for Summary Judgment is GRANTED as to Plaintiffs' ERISA claim and is otherwise DENIED, Abbott's Motion to Strike Portions of Plaintiffs' Response to Abbott's Statement of Material Fact is GRANTED in part and DENIED in part, and Abbott's Motion to Strike Certain Exhibits Offered by Plaintiffs is GRANTED with respect to Exhibit DD and is otherwise DENIED.

 [*29]  ENTER:

James B. Zagel

United States District Judge

DATE: March 16, 2005


Positive
As of: December 13, 2019 5:31 PM Z

# *Owsiak v. Kimco Corp.*

United States District Court for the Northern District of Illinois, Eastern Division

November 12, 1997, Decided ; November 13, 1997, Docketed

95 C 4116

**Reporter**
1997 U.S. Dist. LEXIS 18271 *; 1997 WL 722990

CECYLIA OWSIAK, Plaintiff, v. KIMCO CORPORATION, an Illinois Corporation, Defendant.

**Disposition:** [*1] Defendants' motion for summary judgment denied.

## Core Terms

hired, employees, terminated, janitors, deposition, pretext, prima facie case, national origin, replacement, janitorial, summary judgment, crew, genuine dispute, protected class, discriminatory, statistical, proffered, staff, statistical evidence, similarly situated, contradict, disparate, argues, circumstantial evidence, protected group, genuine issue, court finds, circumstances, comments, younger

## Case Summary

### Procedural Posture

Defendant former employer filed a motion for summary judgment with the court regarding plaintiff former employee's claims for age and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and the Age Discrimination in Employment Act (ADEA), *29 U.S.C.S. § 621 et seq.*

### Overview

The former employee filed suit against the former employer alleging discrimination on the basis of her age and national origin. The former employer filed a motion for summary judgment which the court denied. The court held that an Equal Employment Opportunity Commission (EEOC) charge created a genuine dispute as to whether the former employer's worker made threatening remarks that explicitly referred to "Poles" and denied the former employer's motion to strike the former employee's attached EEOC charge from her response. Because the court found a genuine dispute as to whether the former employer's worker played some role in the decision to terminate the former employee, the court found that the alleged discriminatory threats created a reasonable inference of intentional discrimination. The court also found a reasonable inference that younger employees were treated more favorably than older employees in the reduction in force and subsequent hiring.

### Outcome

The court denied the former employer's motion for summary judgment regarding the former employee's discrimination claims.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Evidence > Types of Evidence > Documentary Evidence > Affidavits

Governments > Courts > Judicial Precedent

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

*HN1*[⬇] **Summary Judgment, Evidentiary Considerations**

Under *Fed. R. Civ. P. 56(e)*, evidence may consist of an affidavit sufficient to create a genuine issue of fact if: (1) it is based on personal knowledge; (2) it sets forth facts as would be admissible in evidence; and (3) it shows that the affiant is competent to testify to the matters stated therein. Precedent permits parties to rely upon verified complaints, even though they are technically not affidavits, in order to raise genuine issues of facts.

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN2*[⬇] **Supporting Materials, Affidavits**

A party may submit an affidavit in order rebut prior admissions at deposition. However, such an affidavit should normally not merely contradict the prior admission, but either clarify prior confusing testimony or provide a plausible explanation for the contradiction. Where the court finds that the affidavit is a "sham," it is appropriate to strike it from the record and consider the summary judgment in its absence.

Civil Procedure > ... > Summary

Judgment > Supporting Materials > General Overview

*HN3*[⬇] **Summary Judgment, Supporting Materials**

Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition is mistaken.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Evidence > Burdens of Proof > Burdens of Production

*HN4*[⬇] **Entitlement as Matter of Law, Appropriateness**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.*

*56(c)*. While courts view the facts in the light most favorable to the nonmoving party, there is an affirmative burden of production on the nonmoving party to defeat a proper summary judgment motion. Before a court denies a summary judgment motion, it must be determined whether there is sufficient evidence from which a jury could find in favor of the nonmoving party. Courts are cautious in granting summary judgment in employment discrimination cases because often issues of intent and credibility are involved.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN5[↓] Discrimination, Title VII Discrimination**

Under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, a plaintiff may demonstrate intentional discrimination either by direct proof or through an indirect, burden shifting analysis.

Evidence > Admissibility > Circumstantial & Direct Evidence

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Evidence > Inferences & Presumptions > Inferences

Evidence > Types of Evidence > Circumstantial Evidence

**HN6[↓] Admissibility, Circumstantial & Direct Evidence**

Under the direct method, a plaintiff can use either: (1) direct evidence, which proves discrimination without the need for inference; or (2) circumstantial evidence, which provides a basis for drawing an inference of discrimination, to prove her prima facie case of discrimination. In contrast to the burden-shifting method, the plaintiff need not, in a direct evidence case, establish a prima facie case. Direct evidence is that evidence that may be interpreted as an acknowledgment by the defendant or its agent of its discriminatory intent in making the challenged decision. Circumstantial evidence permits an inference of discriminatory intent. Two pertinent examples of such evidence are (1) suspicious timing, ambiguous statements, comments and behavior toward employees

who belong to the protected group, and (2) systematic better treatment of similarly situated employees outside of the protected group.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN7[↓] Discrimination, Title VII Discrimination**

There are requirements for the burden shifting method of proof. Plaintiff must first establish her prima facie case of discrimination. By demonstrating this case, plaintiff raises a rebuttable presumption of discrimination. The defendant must then clearly set forth, through the introduction of admissible evidence, reasons for its action that are not discriminatory. This is not a burden of proof, but of production. Once met, the presumption of discrimination disappears and the plaintiff must demonstrate, by a preponderance of the evidence, that the reasons provided are mere pretexts for discrimination.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN8[↓] Discrimination, Title VII Discrimination**

In order to prove a prima facie case of discrimination under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, using the burden-shifting indirect method, a plaintiff must show that: 1) she is a member of a protected class; 2) she is performing her job to her employer's legitimate expectations; 3) she is terminated; 4) the employer treats workers not in plaintiff's protected class more favorably than plaintiff.

Labor & Employment Law > ... > National Origin Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > Discrimination > National Origin Discrimination > Scope & Definitions

Labor & Employment Law > ... > National Origin Discrimination > Employment Practices > Discharges

**HN9[↓] Evidence, Burdens of Proof**

If a plaintiff is able to prove her prima facie case of national origin discrimination, the burden switches to the defendant to prove that it had a legitimate, non-discriminatory reason for plaintiff's termination. The reason given by the employer does not need to be a "good or sympathetic justification," but must merely provide an explanation of why the termination occurs that is not based on discrimination.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > Wrongful Termination > Defenses > General Overview

**HN10**[⤓] **Discrimination, Title VII Discrimination**

Pretext may be shown through direct evidence that the employer is more likely motivated by a discriminatory reason, or through circumstantial evidence that employer's explanation is not credible. The plaintiff must show that the employer does not honestly believe the reasons it gives for firing. But challenging the prudence or wisdom of the employer's decision is not enough. The court may not deny a motion for summary judgment based upon its own assessment of the defendant's business judgment. It does not sit as super-personnel department that reexamines an entity's business decisions.

Labor & Employment Law > ... > Disparate Treatment > Evidence > General Overview

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview

Labor & Employment Law > ... > Disparate Treatment > Defenses > Reductions in Force

Labor & Employment Law > ... > Disparate Treatment > Employment Practices > Pattern & Practice

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN11**[⤓] **Disparate Treatment, Evidence**

In order to demonstrate pretext, however, a plaintiff may rely upon statistical evidence revealing disparate treatment between those inside and outside the protected group. This evidence need not necessarily be rigorously statistical, as long as it is sufficient to show systematically more favorable treatment. But it must be of a kind and degree sufficient to raise the inference of intentional discrimination to have probative value in a disparate treatment case. The usefulness of the statistical evidence will depend upon the surrounding facts and circumstances of each case.

Business & Corporate Compliance > ... > Discrimination > Age Discrimination > Federal & State Interrelationships

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > General Overview

Labor & Employment Law > Discrimination > General Overview

**HN12**[⤓] **Age Discrimination, Federal & State Interrelationships**

Analysis for a claim of discrimination under the Age Discrimination in Employment Act of 1967, *29 U.S.C.S. § 621 et seq.*, is generally identical to that under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.* As with Title VII, the plaintiff must first establish a prima facie case of discrimination: (1) she is in the protected class of workers over age 40; (2) she is performing her job to her employer's legitimate expectations; (3) she is discharged; and (4) the employer treats substantially younger workers more favorably than her.

**Counsel:** For CECILIA OWSIAK, plaintiff: David L. Lee, Attorney at Law, Chicago, IL.

For KIMCO CORPORATION, defendant: Bridget A. Neuson, Attorney at Law, Matthew Bart Schiff, Schiff & Hulbert, Chicago, IL.

**Judges:** Blanche M. Manning, United States District Court Judge. Magistrate Judge Rosemond.

**Opinion by:** Blanche M. Manning

# Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff, Cecylia Owsiak ("Owsiak"), filed the instant two count complaint alleging that her former employer, Kimco Corporation ("Kimco"), discriminated against her on the basis of her age and national origin when it discharged her. Count I alleges that the discharge violated Title VII of the Civil Rights Act of 1964. *42 U.S.C. § 2000e, et. seq.* Count II alleges that it violated the Age Discrimination in Employment Act ("ADEA"). *29 U.S.C. § 621 et. seq.* Kimco now moves, pursuant to *Federal Rule of Civil Procedure 56(c)*, for summary judgment on both counts. For the reasons set forth below, defendant's motion is denied.

BACKGROUND

Owsiak worked as a janitor at the 77 S. Wacker building since 1976. The owner of the building was IIT Chicago-Kent College of Law ("Chicago-Kent"). Kimco is a company that provides janitorial services for private and commercial parties. In general, when a new janitorial company takes over services for the building, the employees are terminated by the old janitorial [*2] company and hired by the new company.

Owsiak, who is of Polish origin, began working for defendant Kimco in 1990 when it took over janitorial services for the Wacker building. She was forty years old at that time. Her employment assignment remained the same despite the change of employers to Kimco. At all relevant times, all four janitors working for Kimco at the building were of Polish origin. The supervisor for this crew was Aisa Sabovic ("Sabovic"), who was of Yugoslavian origin. The Regional Manager for the building was Dean Denges ("Denges").

Sabovic communicated with the staff in Polish in such a manner that they could understand one another in conversation. From the record, it appears that Sabovic criticized Owsiak's janitorial work. On June 15 and July 12, 1990, Denges issued written reprimands to Owsiak

for refusing to follow Sabovic's instructions. On the other hand, Denges testified at deposition that Owsiak performed well enough to retain her position with Kimco.

Owsiak believes that Sabovic was prejudiced against her because she was Polish. In support of this belief, Owsiak testified that Sabovic used vulgar and threatening language with her on numerous occasions. In [*3] addition, when Owsiak suffered a nose bleed from overexertion, Sabovic refused to call an ambulance for her. Most importantly, in her charge filed with the Equal Employment Opportunity Commission ("EEOC"), Owsiak stated that she believed that she was discriminated on the basis of her national origin because Sabovic had said "many times" that "she would get rid of all the Poles and that she would 'fuck' all the Poles." At deposition, however, when repeatedly questioned as to why she believed Sabovic hated Poles, Owsiak never explicitly testified to any ethnically charged comments. Instead, she responded that Sabovic regularly said to the janitors, "I will fuck all of you out of here." Owsiak also testified that Sabovic had made that comment, at least one time, in reaction to a complaint by the crew's union representative on their work assignments. Owsiak provided no complaint of overt discrimination or use of vulgar language from any other Kimco supervisor.

In December 1991, Chicago-Kent permanently closed the Wacker building and moved its facility to a new building about three blocks away at 565 W. Adams. Kimco was the successful bidder that won the new janitorial contract for the [*4] Adams building. Kimco's contract at the Wacker building ended in December 1991 when the building closed. The contract to provide services at the new building did not begin until January 1992. Chicago-Kent relocated to the new building during these two months. Denges was the manager for Kimco responsible for both contracts.

In December 1991, Kimco terminated all of the janitors working the Wacker building, including plaintiff. At the time of termination, Owsiak was 42 years old and another janitor was 61 years old. The other two janitors were 32 and 38 years old. Kimco did not discharge Sabovic, but instead transferred her to the Adams building to work as a supervisor. Of the six janitors hired for the new building, only one was of Polish origin. Their ages were 44, 38, 36, 34, 29 and 26.

By affidavit, Denges and the President of Kimco, David Tarsons ("Tarsons"), each attested that Denges was the sole decision maker for Kimco with regard to terminating the janitorial staff at the Wacker building. Denges also

attested that he was the sole decision maker with regard to new hires at the Adams building, and that Sabovic had no input in his decision to terminate the employees from the [*5] Wacker building. Denges stated that his sole reason in terminating the Wacker crew was because Kimco had lost the particular contract under which that crew worked. He stated that he hired new staff at the Adams building because it was efficient. Specifically, he explained that transferring the Wacker janitorial crew to the Adams building immediately would have required him to hire temporary replacement workers to complete the work on the old contract.

In another affidavit, Dawn E. Rupcich ("Rupcich"), the former Director for Administration and Finance for Chicago-Kent, verified that Kimco had won a bid to obtain the second contract to provide services at Adams. However, she stated that the effective date of that new contract was January 1, 1992, and that Kimco began to provide services for Chicago-Kent at the Adams building in early January 1991. In his affidavit, Tarsons asserts that Kimco did not provide services at the Adams building December 1991. In support, he attaches copies of two invoices for services provided during that month for a "VIP tour clean-up" and "post-construction clean-up."

Owsiak notes that she was a member of a local union and asserts that her union contract [*6] prohibited the challenged termination. Specifically, she claims that the union contract requires dismissal by seniority in reduction-in-force cases.

As noted, after her discharge, Owsiak filed a complaint with the EEOC charging that she had been terminated because of her age and national origin. In response to a subsequent EEOC questionnaire, Denges stated that Sabovic's nationality was "Polish" on one page, and "Hispanic" on another page. Sabovic's personnel records revealed that she was of Yugoslavian origin. Denges also stated on the questionnaire that Owsiak's job performance did not meet expectations.

DISCUSSION

I. *Defendant's Motion to Strike.*

Kimco first moves to strike Owsiak's references to her EEOC Charge in her 12(N) statement under Federal *Rule 56*. In support of her allegation that Sabovic made a direct reference to her Polish status, Owsiak relies upon her EEOC Charge, which states that Sabovic said she would "fuck all you Poles out from here." Kimco asserts two reasons that Owsiak should not be

permitted to rely upon this document. First, it contends that the EEOC Charge does not constitute an affidavit within the meaning of Federal *Rule 56(e)*. Second, assuming [*7] that it does constitute an affidavit, a plaintiff may not use such a document in order to contradict a prior admission in the record.

A. *EEOC Charge as Affidavit under Federal* *Rule 56(e)*.

*HN1*[↑] Under Federal *Rule 56(e)*, evidence may consist of an affidavit sufficient to create a genuine issue of fact if: (1) it is based on personal knowledge; (2) it sets forth facts as would be admissible in evidence; and (3) it shows that the affiant is competent to testify to the matters stated therein. Precedent has permitted parties to rely upon verified complaints, even though they are technically not affidavits, in order to raise genuine issues of facts. *Ford v. Wilson, 90 F.3d 245, 247 (7th Cir. 1996)*; *Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995)*. In each of these cases, the court accepted the verified complaint as an affidavit for purposes of summary judgment because it satisfied each of the three conditions listed above.

Kimco first attempts to distinguish the instant case from *Ford* and *Schroder* because Owsiak does not rely upon a verified complaint, but an EEOC Charge. Kimco notes that Owsiak has identified no case law accepting an EEOC Charge as an affidavit [*8] under *Rule 56(e)*. Although true, neither Kimco nor this court has identified any case law holding to the contrary. In *Ford v. Wilson*, the Seventh Circuit found that it was "of no moment" that the verified complaint was not called an "affidavit," as long as it complied with the requirements under *Rule 56(e)*. *90 F.3d at 247*; *see also Jeffries v. Sherman Block, 940 F. Supp. 1509, 1511-12 (C.D. Cal. 1996)* (Holding that plaintiff's declaration submitted with his complaint could be treated as an affidavit for purposes of summary judgment). Therefore, the court looks to whether an EEOC Charge satisfies each of the conditions above.

Kimco does not deny that the EEOC Charge was signed under oath, that the specific allegation at issue was purportedly based upon Owsiak's personal knowledge or that Owsiak would be competent to constitute a witness to those facts. Rather, Kimco contends that the EEOC Charge does not satisfy the second element because it fails to set forth specific facts. However, on its face, the complaint appears to allege more than mere general claims of discrimination. The relevant allegation in the EEOC Charge is that Sabovic "said many times through 1990 and 1991 [*9] that she would get rid of all

the Poles and the she would 'fuck' all the Poles." This allegation may not necessarily provide a precise quote by Sabovic, and arguably may be interpreted as somewhat ambiguous as to whether Sabovic's threats were directed only to Polish individuals or explicitly referred to "Poles." But Kimco provides no argument to convince this court that the ambiguity is sufficient to render the allegation inadmissible as evidence. Therefore, the court accepts the EEOC Charge as an affidavit for purposes of *Rule 56(e)*.

B. *Sham Affidavit.*

In the alternative, Kimco asks the court to strike the EEOC Charge arguing that it directly contradicts clear deposition testimony. Generally, a party cannot thwart the purpose of summary judgment by creating "sham" issues of fact with affidavits that contradict their prior deposition testimony. *See Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1168 (7th Cir. 1996)*; *Adelman-Tremblay v. Jewel Companies, Inc., 859 F.2d 517, 520 (7th Cir. 1988)*; *Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir. 1985)*. HN2[↑] A party may submit an affidavit in order rebut prior admissions at deposition. However, [*10] such an affidavit should normally not merely contradict the prior admission, but either clarify prior confusing testimony or provide a plausible explanation for the contradiction. *Bank of Illinois, 75 F.3d at 1170* & n. 11. Where the court finds that the affidavit is a "sham," it is appropriate to strike it from the record and consider the summary judgment in its absence.

Kimco argues that Owsiak effectively admitted at deposition that Sabovic never made any derogatory remarks against Poles. Specifically, Kimco notes that, despite repeated questioning at deposition as to what precise derogatory statements Sabovic made to her, Owsiak never testified to any ethnically charged comments. Kimco contends that Owsiak should not be permitted to contradict this failure to allege any derogatory comments with the claim from the EEOC Charge.

As explained, the "sham" affidavit doctrine developed in the circumstances where the nonmoving party produces an affidavit after the damaging testimony. In the instant case, in contrast, Owsiak's testimony following the creation of the affidavit injures her case. Kimco argues that this temporal reversal of the order is irrelevant. The Seventh Circuit [*11] has stated that HN3[↑] "where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the

statement in the deposition was mistaken." *Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995)*.

However, the "sham" affidavit principal was created in order to address affidavits or evidence created in response to summary judgment. In such circumstances, the courts are concerned that plaintiff and counsel will simply compose an affidavit to rectify the prior sworn testimony, regardless of the veracity of that affidavit. *See Bank of Illinois, 75 F.3d at 1169-70*; *Babrocky, 773 F.2d at 861*. But where the affidavit was composed prior to the deposition, the court does not address the same circumstances. It is far less likely that the plaintiff created this prior testimony with an eye toward summary judgment.

Kimco responds that depositions are inherently more reliable than self-serving affidavits, which are generally drafted by attorneys in order to meet the strategic needs of litigation. As Kimco has pointed out above, Owsiak does not rely upon a normal "affidavit." She relies on an EEOC Charge. Such testimony generally is not composed [*12] by lawyers. *See Cheek v. Western & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)*. Most often, they are written by plaintiffs with little or no legal advice.

The court concedes that Owsiak's explanation for her failure to more specifically refer to ethnic slurs is not very persuasive. At deposition, counsel for the defendant repeatedly asked Owsiak "what exact words did [Sabovic] use," and finally inquired, "did she say anything about you being Polish?" However, Owsiak never provided any statement that explicitly referred to "Poles." Instead, she provided various non-ethnically charged vulgar and insulting statements, and explained, "in the general sense, she threatened us because we were Polish," and that "she said that I will fuck all of you out of here."

In her response brief, counsel explains that Owsiak was confused by the English. But the deposition was conducted with a Polish translator. The questions were fairly clear and repeated. Neither plaintiff nor her counsel indicated at the deposition that she did not understand the questions. However, admissions made at deposition are treated generally as evidentiary admissions, as opposed to judicial admissions. *Keller [*13] v. U.S., 58 F.3d 1194, 1199 n. 8 (7th Cir. 1995)*. Evidentiary admissions are not conclusive, and may be rebutted by other evidence in the record. *Id.* The EEOC Charge provides such potential evidence. As noted, the Charge, itself, is somewhat ambiguous. It could be

interpreted to explain that Sabovic merely made insulting and threatening statements to all of the Polish workers. But the more reasonable reading of the EEOC Charge is that Sabovic explicitly referred to the Polish ancestry of the janitors in her threats. Therefore, the court finds that the EEOC Charge creates a genuine dispute as to whether Sabovic made threatening remarks that explicitly referred to "Poles" and denies the defendant's motion to strike plaintiff's attached EEOC Charge from her 12(N) response. [1]

[*14] II. *Summary Judgment.*

HN4[↑] ] Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. Pro. 56(c)*. While we view the facts in the light most favorable to the nonmoving party, there is an affirmative burden of production on the nonmoving party to defeat a proper summary judgment motion. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Before a court denies a summary judgment motion, it must be determined whether there is sufficient evidence from which a jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Courts are cautious in granting summary judgment in employment discrimination cases because often issues of intent and credibility are involved. *Sarsha v. Sears Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993)*.

A. *National Origin Discrimination Claim.*

HN5[↑] ] Under Title VII, a plaintiff may demonstrate intentional discrimination either by direct proof or through an indirect, burden shifting analysis. *Hill v. Burrell Communications [*15] Group, Inc., 67 F.3d 665 (7th Cir. 1995)*. Owsiak appears to proceed under both methods.

1. *Direct Proof.*

HN6[↑] ] Under the direct method, a plaintiff can use either: (1) direct evidence, which proves discrimination

without the need for inference; or (2) circumstantial evidence, which provides a basis for drawing an inference of discrimination, to prove her prima facie case of discrimination. *See Troupe*, 20 F.3d at 736. In contrast to the burden-shifting method, the plaintiff need not, in a direct evidence case, establish a prima facie case. *E.g., Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S. Ct. 613, 621, 83 L. Ed. 2d 523 (1985)*. Direct evidence is that evidence that may be interpreted as an acknowledgment by the defendant or its agent of its discriminatory intent in making the challenged decision. *Troupe*, 20 F.3d at 736. Circumstantial evidence permits an inference of discriminatory intent. Two pertinent examples of such evidence are (1) suspicious timing, ambiguous statements, comments and behavior toward employees who belong to the protected group, and (2) systematic better treatment of similarly situated employees outside of the protected group. [*16] *See id.*

Owsiak asserts that she has both direct and circumstantial evidence. First, she contends that Sabovic's alleged discriminatory statements constitute direct evidence of discrimination. Second, she argues that the replacement of four Polish janitorial employees with five non-Polish and one Polish janitorial employee provides evidence of systematic treatment.

Whether considered as direct evidence or circumstantial evidence of stray derogatory comments, the alleged statements by Sabovic may only support Owsiak's case if they meet three conditions: (1) they must be made by someone playing some role in the challenged employment decision; (2) they are causally related to that employment decision; and (3) they were proximately related in time to that decision. *See, e.g., Burrell Communications, 67 F.3d at 669; McCarthy v. Kemper Life Ins Co, 924 F.2d 683, 686-87 (7th Cir. 1991)*. Only the first and second requirements are at issue.

The court first notes that the alleged comments are adequately related to the challenged discharges. Regardless of their derogatory or ethnic content, Sabovic's alleged remarks not only evidenced a strong animus to Owsiak, but also directly [*17] indicated a desire to remove Owsiak from her job. Threatening to "get rid of all the Poles" or "fuck all of you out of here" is simply not comparable to random ethnic slurs or generalized statements such as "learn to speak English." *Cf. Hong v. Children's Memorial Hospital, 993 F.2d 1257, 1266 (7th Cir. 1993)*. Rather, they explicitly express a desire to remove members of the protected

---

[1] While the defendant's questions can hardly be termed circuitous or misleading, the court notes that slightly more unequivocal inquiry may have extinguished any issue of fact on this matter. In particular, defendant could have confronted plaintiff with her prior sworn statement and asked her to explain which of the two was correct.

group from employment. *See also* [Brown v. City of Aurora 942 F. Supp. 375, 381 (N.D. Ill. 1996)](#) (comments that the plaintiff should be home taking care or her child were "related" to the decision to terminate her in a sex discrimination case).

Although Owsiak's assertion that Sabovic played any role in the challenged decision to terminate stands on shakier ground, Denges' misstatement to the EEOC raises a genuine dispute. By affidavit, Denges states that he made the decision to discharge the Wacker crew and hire different workers for the Adams building. Denges further attests that Sabovic played no role nor provided any input for that decision. In the context of summary judgment, where the employer's position is supported by unchallenged testimony, the plaintiff must provide "affidavits or other [*18] evidentiary vehicles" to set forth specific facts which show a genuine issue of fact. [*Faulkner v. Baldwin Piano & Organ Co., 561 F.2d 677, 683 (7th Cir. 1977)*](#). Owsiak offers no affirmative "specific facts" to directly rebut these claims other than her own suspicions. Such suspicions of the credibility of the defendant's sworn statement are not sufficient to create a genuine dispute.

However, Owsiak does provide one piece of affirmative evidence in order to challenge the credibility of Denges' claim. In response to an EEOC investigative questionnaire on Owsiak's discrimination claims, Denges submitted a written response that identified Sabovic's nationality as "Polish," despite the fact that Kimco's personnel files identified her nationality as Yugoslavian. As Kimco replies, these facts do not necessarily indicate deceit on the part of Denges. Denges may merely have committed a careless error. In fact, on the same questionnaire, he later misidentified Sabovic's ethnicity as Hispanic. But at this stage of the proceedings, the court must make all reasonable inferences in the plaintiff's favor.

Kimco further questions the effect or reason for the alleged misrepresentation because [*19] the fact that Sabovic was not Polish is not sufficient to raise an inference of discrimination. As explained below, because Sabovic was not similarly situated to Owsiak and the other janitors, her national origin would not support any inference based upon Kimco's retention of Sabovic. In a recent case, the Seventh Circuit held that, in order to challenge the credibility of a decision maker's assertion based upon a misstatement to the EEOC, the plaintiff must provide "a necessary connection in the evidence" between those two statements. [*Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996)*](#). In *Rabinovitz*,

the plaintiff asserted that his employer's decision not to promote him was based upon his Jewish identity. *See* [id. at 484](#). The employer presented evidence that the plaintiff was less qualified than the chosen candidates. In a prior EEOC investigation, the decision maker had stated that she was unaware that the plaintiff belonged to the protected group; But at deposition, she later recalled that the plaintiff in fact had informed her that he was Jewish. [*Id. at 484*](#). The court refused to permit an inference of pretext based upon this potential misrepresentation because [*20] the plaintiff failed "to make the necessary connection in the evidence between [the decision maker's] (alleged) desire to lie to the EEOC investigator and her decision to reject Rabinovitz for the promotion." In particular, the concealed fact clearly would not have been sufficient to raise an inference of discrimination. [*Id. at 488*](#).

In contrast, the court believes that the circumstances in the case at bar do provide the necessary connection. As in *Rabinovitz*, the fact that Sabovic is not Polish would not have been sufficient alone to raise an inference of pretext. However, Owsiak is not attempting here to directly demonstrate pretext through this misstatement. Instead, she wishes to draw question to Denges' assertion that he made the sole decision to terminate, and not transfer, the Wacker crew. In Owsiak's EEOC Charge, she alleged that Sabovic had made repeated discriminatory threats that she would have the Polish workers fired. If Sabovic was also Polish, the veracity of this allegation would be highly suspect. As in *Rabinovitz*, Sabovic's non-Polish ancestry alone is not sufficient to raise an inference of discrimination. But presuming, as we must at this stage of [*21] the proceedings, that Denge intentionally lied about Sabovic's national origin, the reason for such a lie would be to directly undermine the probative weight of Owsiak's allegation of Sabovic's threat. Consequently, the court finds that this alleged misrepresentation is connected to Owsiak's further challenge to Denge's current claim to undermine the probative value of the alleged threat, that Sabovic played no role in the challenged employment decision.

Because the court finds a genuine dispute as to whether Sabovic played some role in the decision to terminate the plaintiff, the court further finds that the alleged discriminatory threats create a reasonable inference of intentional discrimination. Owsiak also attempts to present further circumstantial evidence of systematic better treatment of similarly situated employees outside of the protected class. In particular, she points to the hiring of largely non-Polish staff at the Adams building.

As explained in the following analysis of Owsiak's indirect proof of discrimination, this evidence is insufficient standing alone to establish an inference of discrimination. However, this relevant evidence still strengthens the inference permitted [*22] by the alleged remarks and Denges' misstatement to the EEOC.

2. *Burden Shifting Analysis*.

*HN7*[⬆] The requirements for the burden shifting method of proof have been often repeated by this court. Plaintiff must first establish her prima facie case of discrimination. By demonstrating this case, plaintiff raises a rebuttable presumption of discrimination. The defendant must then "clearly set forth, through the introduction of admissible evidence, reasons for its action" that are not discriminatory. This is not a burden of proof, but of production. Once met, the presumption of discrimination disappears and the plaintiff must demonstrate, by a preponderance of the evidence, that the reasons provided are mere pretexts for discrimination.

a. *Prima facie case*.

*HN8*[⬆] In order to prove a prima facie case of discrimination under Title VII, using the *McDonnell Douglas* burden-shifting indirect method, a plaintiff must show that: 1) she is a member of a protected class; 2) she was performing her job to her employer's legitimate expectations; 3) she was terminated; 4) the employer treated workers not in plaintiff's protected class more favorably than plaintiff. *See McDonnell Douglas Corp. [*23] v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*.

Plaintiff has created a genuine issue of fact that she has established her prima facie case of national origin discrimination. Kimco does not dispute that she has established the first and third elements. As to the second element, Kimco asserts that the evidence indicates that Owsiak's performance did not meet its legitimate expectations. Although the evidence certainly could support such a contention, the record does not eliminate any issue of fact. Kimco only offers evidence that Sabovic criticized Owsiak's work, and that Owsiak received two reprimands for insubordination. Even if this usually would be sufficient to defeat a prima facie case, Denges testified that Owsiak's performance was adequate to retain her position.

The court also finds that Owsiak has raised a genuine dispute as to the fourth element of her prima facie case. Usually in a claim for discriminatory discharge, the plaintiff must demonstrate that the employer replaced her or at least sought applicants to replace her. *See, e.g., Grohs v. Gold Bond Bldg. Prods., 859 F.2d 1283, 1286 (7th Cir. 1988)*. In the context of reduction of force, however, [*24] plaintiffs may meet their burden by demonstrating that those outside of the protected class were treated more favorably. *See, e.g., Oxman v. WLS-TV, 846 F.2d 448, 454-55 (7th Cir. 1988)*. As Kimco argues, Owsiak may not rely upon its retention of Sabovic in order to satisfy this element. In order to satisfy the fourth element, a plaintiff must compare herself to others similarly situated to prove the fourth element. *See Smith v. Cook County, 74 F.3d 829, 831 (7th Cir. 1996)*. "Similarly situated" has been defined as others with similar job descriptions; Sabovic was a supervisor and plaintiff was her subordinate, so a direct comparison is inappropriate. *See id. at 831-32*. Owsiak does not contest that Sabovic, as a supervisor, held a position that required more specialized skills than those of the regular janitorial staff. Therefore, the fact that Kimco retained Sabovic while discharging the remaining crew does not satisfy the fourth element of the prima facie case.

However, plaintiff does not need to compare herself to Sabovic in order to satisfy the fourth element. In the present case, Kimco hired, fairly contemporaneously, six employees for nearly identical positions at [*25] the Adams building. Because it characterizes the new hirings as under a distinct and separate contract with Chicago-Kent, Kimco argues that Owsiak's position was not replaced. Rather, Kimco contends that it is a wholly distinct position with distinct duties; apparently, janitorial duties under the new contract at a different building.

But Kimco's argument is unconvincing. First, the record provides no basis to infer, let alone definitively conclude, that there was any real distinction between the janitors' responsibilities at the Wacker building or its replacement building on Adams. In fact, both buildings were owned by Chicago-Kent and even appear to have served the same functions for the school. Kimco eliminated one group of positions due to a loss of business: the contract ended because Chicago-Kent closed the building. Kimco created the new positions almost contemporaneously in light of a contract that only existed but for the closing of the old building: Chicago-Kent moved its facilities to the new building from Wacker. The only distinction between the duties of the two sets of positions is the location and client contract that created them. But for all practical purposes, they [*26] appear the same. *See also Shenker v. Lockheed Sanders, Inc., 919 F. Supp. 55, 60 (D.Mass.*

1996) (relevant inquiry is not whether the hired employee takes the same title as the discharged plaintiff, but rather whether he performs the same functions and duties). Based upon these circumstances, the court finds the subsequently hired staff at the Adams building may be fairly characterized as replacements for the Wacker crew. [2]

Four Polish janitorial staff were terminated from the Wacker building. One Polish and five non-Polish janitors were hired for the Adams building. This discrepancy [*27] in the national origin between the discharged workers and those hired for the related contract permits an inference that Polish workers were treated less favorably.

b. *Legitimate, non-discriminatory reason for termination.*

HN9[↑] If a plaintiff is able to prove her prima facie case of national origin discrimination, the burden switches to the defendant to prove that it had a legitimate, non-discriminatory reason for plaintiff's termination. The reason given by the employer does not need to be a "good or sympathetic justification," but must merely provide an explanation of why the termination occurred that is not based on discrimination. See *Timm v. The Mead Corp., 32 F.3d 273, 275 (7th Cir. 1994).*

Kimco argues that the reason for the termination was that there was an overlap between the prior contract at the Wacker building and the new contract at another building; and that it was more efficient not to hire temporary workers to finish the contract at the old building. Kimco has attempted to support this explanation by affidavits by both its president and Denges. Regardless of what Owsiak may think of the objective reasonableness of this explanation, it provides a nondiscriminatory [*28] basis for the challenged discharge and satisfies its burden.

c. *Pretext.*

Since Kimco is able to rebut plaintiff's presumption of discrimination, the burden switches back to Owsiak to

prove that Kimco's given reason for the termination was pretextual for intentional discrimination. HN10[↑] Pretext may be shown through direct evidence that the employer was more likely motivated by a discriminatory reason, or through circumstantial evidence that employer's explanation is not credible. See *Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).* The plaintiff must show that the "employer did not honestly believe the reasons it gave for firing [her]." *Wolf v. Buss America, Inc., 77 F.3d 914, 919 (7th Cir. 1996).* But challenging the prudence or wisdom of the employer's decision is not enough. The court may not deny a motion for summary judgment based upon its own assessment of the defendant's business judgment. See *Dale v. Chicago Tribune Co., 797 F.2d 458 (7th Cir. 1986).* It does not sit as "super-personnel department that reexamines an entity's business decisions." *Id.*

Owsiak offers several possible pieces of evidence [*29] to rebut Kimco's proffered explanation. To refute Kimco's explanation, Owsiak contends that (1) work did not begin upon the Adams building until after work had ceased on the Wacker building, and (2) the termination of the Wacker crew breached the seniority provisions of Kimco's labor contract with the janitorial union. To further draw question to Denges' credibility in proffering the efficiency explanation, Owsiak asserts that Denges had lied to the EEOC about Sabovic's national origin. As additional circumstantial evidence, Owsiak argues that the statistical diminution in the number of Polish janitors between the two projects raises an inference of discrimination. Finally, Owsiak offers the alleged discriminatory threats by Sabovic.

As explained above, Owsiak has raised a genuine issue of fact whether Sabovic played some role in the decision to terminate the employees. Because these purported threats were related to the challenged employment decision and may be inferred to have been uttered by a person playing a role in the challenged decision, they also raise a reasonable inference that Denges' explanation is pretextual.

Owsiak also succeeds in her direct attack on Kimco's proffered [*30] explanation. In his affidavit, Denges explains that "it was not efficient to transfer employees from 77 S. Wacker and hire replacements for them . . . for the short period until [the Wacker building] closed." Although not certain, this explanation implies a presumption that janitorial services commenced at the Adams building prior to the Wacker building's closing on December 31, 1991. However, Chicago-Kent's former

---

[2] Even if the court were to agree that the plaintiffs was not technically replaced, courts have permitted a plaintiff to satisfy the fourth element by showing that their duties were reassigned to another employee, either currently employed or newly hired, outside of the protected group. See *Collier v. Budd Co., 66 F.3d 886, 890-91 (7th Cir. 1996); Montana v. First Federal Sav. & Loan, 869 F.2d 100, 105 (2d Cir. 1989).*

Director of Finances, Rupcich, attests that Kimco began providing janitorial services at the Adams building in early January 1992, distinctly after services had ended at the Wacker building. If Kimco in fact did not provide janitorial services at the Adams building until this time, it is difficult to discern the need for any temporary workers.

In response, Kimco effectively argues that Rupcich is simply mistaken. Kimco does not deny that the contract for the Adams building did not become effective until January 1992. But Kimco's president, Tarsons, explains that Kimco actually provided preliminary services at the Adams building in mid-December 1991. In support, he attached copies of two invoices for services: (1) the first for a "VIP tour clean-up" between December 18 [*31] and 20 in 1991; and (2) the second for a "post construction clean-up" between December 26 and January 2, 1992. Thus, Kimco explains that Rupcich must have only been referring to Kimco's services under the formal contract.

Kimco accurately notes that Owsiak has provided no further evidence to rebut these attached invoices. However, Kimco only provided this evidence with its reply brief and 12(N) response. Kimco has now provided strong testimonial and documentary evidence that Rupcich's claim was in error. But this does not extinguish any genuine dispute over whether an overlap of services to the two buildings actually occurred as implied by Denges' proffered nondiscriminatory reason. The court may not merely accept the defendant's evidence and ignore the prior testimony of a third party based upon personal knowledge. Kimco may be able to quickly dispose of this dispute upon cross-examination of Rupcich. Until then, this question is best left to the jury.

If Rupcich's testimony is accurate and no overlap in services occurred, this fact would adequately contradict the implied assumptions of Denges' explanation to permit an inference that the explanation is simply not true. If Denges' [*32] proffered reason for the discharge were false, then a jury could infer that it was a pretext for discrimination. Accordingly, Owsiak has raised a genuine issue of fact whether Kimco's proffered explanation is pretextual for national origin discrimination.

While it may provide some additional evidence in support of the claim of pretext, the court notes that Owsiak's current "statistical evidence" is insufficient alone to raise an inference of pretext. As explained,

Owsiak may not rely upon Kimco's retention of Sabovic in order to demonstrate disparate treatment of those outside the protected group. Owsiak has presented no other evidence of "similarly situated" employees who were treated differently upon the closing of a building or another reduction in force. *HN11*[↑] In order to demonstrate pretext, however, a plaintiff may rely upon statistical evidence revealing disparate treatment between those inside and outside the protected group. *E.g., Box v. A&P Tea Co., 772 F.2d 1372, 1379 (7th Cir. 1986).* This evidence need not necessarily be rigorously statistical, as long as it is sufficient to show systematically more favorable treatment. *See Troupe,* 20 F.3d at 736. But it "must be of [*33] a kind and degree sufficient to raise the inference" of intentional discrimination to have probative value in a disparate treatment case. *Goetz v. Farm Credit Serv., 927 F.2d 398, 405 (8th Cir. 1991).* The usefulness of the statistical evidence will depend upon the surrounding facts and circumstances of each case. *See International Bhd. Of Teamsters v. United States, 431 U.S. 324, 340, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977).*

In support, Owsiak submits the decrease in proportion of Polish workers between the janitorial crews at the two building. At first blush, these statistics appear to tell a dramatic story. One hundred percent of the janitors terminated were Polish. Only around sixteen percent of the janitors hired for the Adams building were Polish. But to imply discrimination, statistical evidence should account for the more obvious non-discriminatory explanations for disparities. In particular, when looking at the dearth of employees hired from the protected class, statistical evidence should refer to the labor or applicant pool. *See Mays v. Chicago Sun-Times, 865 F.2d 134, 137 n.2 (7th Cir. 1989); EEOC v. O & G Spring & Wire Forms, 38 F.3d 872, 876 (7th Cir. [*34] 1994)* (same in pattern and practice claim). Owsiak does not provide any such evidence of the proportion of Polish workers in the potential applicant pool for new janitors.

Moreover, the significance of these statistics is severely undermined by the tiny sample from which they were drawn. Where the sample group of compared employees is very small, the possibility that the disparity is merely due to chance rises significantly. *See Parker v. Federal National Mortgage Association, 741 F.2d 975, 980 (7th Cir. 1984); Soria v. Ozinga Bros., Inc., 704 F.2d 990, 995 (7th Cir. 1983).* Consequently, courts have found disparities taken from small samples inadequate to support an inference of discrimination. *See, e.g., 741 F.2d at 980-81* (statistics derived from

four discharged employees, 3 in protected class, of a total of 12 employees "lacks sufficient breadth to be trustworthy"); *Campbell v. Fasco Indust. Inc., 861 F. Supp. 1385, 1395 (N.D.Ill. 1994)* (sample group of 9 too small to infer discrimination); *Khan v. Grotnes Metalforming Sys. Inc., 679 F. Supp. 751, 762 (N.D.Ill. 1988)* (fact none of 5 Swiss employees fired in RIF uses too small of a sample to be probative); *Deuschle [*35] v. Unisys Corp., 1992 U.S. Dist. LEXIS 15932, 59 Fair Empl. Prac. Cas. (BNA) 1264, 1268 (C.D.Ill. 1992)* (statistics drawn from sample of 15 employees too small), *aff'd*, 993 F.2d 1549 (7th Cir. 1993); *LeBlanc v. Great American Ins. Co., 6 F.3d 836, 836* & 848 (1st Cir. 1993) (group of 5 too small); *Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991)* (group of nine too small); *see also Soria, 704 F.2d at 995* (noting that in bench trials, courts have almost uniformly rejected statistical evidence based on groups such as 15 employees disciplined from total of 61 employees). Owsiak looks to a total sample group of four terminated employees from a total of ten. In light of the circumstances of this case, the court finds this sample too small to support an inference of pretext. *Cf. Fisher v. Transco Services-Milwaukee Inc., 979 F.2d 1239, 1245 (7th Cir. 1992)* (permitting inference of discrimination from group of 11 terminated employees from total of 52).

But Owsiak does not only rely upon this comparative evidence. The court has already found that both pieces of evidence raise genuine disputes as to whether Kimco's proffered explanation is pretext. Therefore, the court denies [*36] Kimco's motion for summary judgment as to count I.

B. *Age Discrimination.*

*HN12*[⬆] Analysis for a claim of discrimination under the ADEA is generally identical to that under Title VII. *See Smith, 74 F.3d at 830*. Owsiak does not proceed under the direct method of proof in her ADEA claim, but only the indirect method. As with Title VII, the plaintiff must first establish a prima facie case of discrimination: (1) she was in the protected class of workers over age 40; (2) she was performing her job to her employer's legitimate expectations; (3) she was discharged; and (4) the employer treated substantially younger workers more favorably than her. *Smith, 74 F.3d at 831*.

1. *Prima Facie Case.*

There is no dispute that Owsiak has satisfied the first and third elements. As explained with reference to count

I, the record raises at least a genuine dispute as to whether she met Kimco's expectations. Rather, the only issue is whether she has demonstrated that significantly younger similarly situated employees were treated more favorably. As noted, Owsiak cannot compare herself to Sabovic because they were not similarly situated employees. Besides, at only seven months her junior, [*37] the court doubts that Sabovic qualifies as "substantially younger."

But also as explained above, the court considers the Adams building staff as replacements for purposes of the fourth element of the prima facie case. A plaintiff may simply establish the fourth element of the prima facie case for an ADEA claim by demonstrating that younger workers were treated more favorably. *See Oxman, 846 F.2d at 454-455*. The three other janitors terminated were ages 32, 38 and 61. Plaintiff was 42. The new janitors hired were ages 25, 28, 33, 35, 37, 47. Thus, five of the six replacements were younger than Owsiak. Thus, the average age of janitors fell from 43.25 to 34. As noted, these figures rely upon too small a pool to support any statistical conclusions. If simply one more discharged employee was under 40 or one more hired employee was over 40, the figures would hardly hint at age discrimination. However, the plaintiff's burden to demonstrate her prima facie case is not an onerous one. *See Campbell*, 861 F. Supp. At 1397. This drop does appear to reflect some better treatment of younger workers. Only one of the new janitors was in the protected class. Although the court concedes that the [*38] case is close, there is a reasonable inference that younger employees were treated more favorably than older employees in the reduction in force and subsequent hiring.

2. *Pretext.*

As explained, Kimco has produced a legitimate nondiscriminatory reason for the terminations and decision not to transfer Owsiak; it was more cost-effective for the defendant to hire new staff than to hire temporary workers. Consequently, Owsiak must offer evidence of pretext to rebut this proffered explanation. *Taylor v. Canteen Corp., 69 F.3d 773, 779 (7th Cir. 1995)*.

In contrast to her national origin claim, Owsiak does not present any evidence of derogatory remarks based upon age. Instead, she primarily relies upon her statistical comparison and Rupcich's affidavit. For the reasons stated above, Rupcich's affidavit does raise a genuine dispute as to Denges' proffered explanation.

Therefore, Owsiak has raised a genuine issue of fact as to her ADEA claim, as well.

Because this dispute may be quickly resolved upon cross-examination, the court further finds that Owsiak's present statistical evidence is insufficient, alone, to raise a reasonable inference of pretext. As already explained, this [*39] statistical evidence suffers from two critical flaws. First, as it looks to newly hired workers, the evidence should provide a comparison of the older hired workers with the older workers in the labor pool. *See Smith v. General Scanning Inc., 876 F.2d 1315, 1321 (7th Cir. 1989); Kier v. Commercial Union Ins. Co., 808 F.2d 1254, 1258 (7th Cir. 1987).* Second, Owsiak's evidence derives from too small of a pool to provide meaningful results. In fact, Owsiak's age discrimination comparison is far less impressive than her national origin claim. Only 50% of the terminated workers were in the protected class of workers over 40. While only one of six replacement workers were in the class, a direct comparison between those in the protected and unprotected class is not the most significant relationship. Rather, it is the relationship of age between the workers that is most important. In addition to the plus-forty replacement, two more of the workers were in the mid to later thirties. In the context of age discrimination, statistical disparities must be "quite large" in order to prove helpful. *Matthews v. Allis-Chalmers, 769 F.2d 1215, 1218 (7th Cir. 1985).* While the magnitude in disparity [*40] of ages between the terminated and hired employees may be adequate in some circumstances, it is insufficient to account for the high likelihood of chance differences due to the small sample size.

However, because Rupcich's affidavit appears to contradict Kimco's legitimate explanation for its decision to terminate and not transfer Owsiak, the court finds a genuine dispute as to pretext. Therefore, Kimco's motion for summary judgment is also denied as to count II.

CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment is denied.

**Enter:**

**Blanche M. Manning**

**United States District Court Judge**

**Date:** NOV 12 1997

**End of Document**