# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOHN DOE,

                 Plaintiff,

v.

MARIAN UNIVERSITY,

                 Defendant.

Case No. 19-CV-388-JPS

**ORDER**

       Plaintiff John Doe ("Doe") is a former student of Defendant Marian University. Doe alleges that Marian University committed gender[1] discrimination, negligence, and various contract violations during an investigation into Doe's alleged sexual misconduct. The Court's subject matter jurisdiction is predicated on the Title IX gender discrimination claim, as the parties are both citizens of Wisconsin and there are no other federal questions. Marian University filed a partial motion to dismiss, followed by a motion for summary judgment and a motion to strike Doe's responses to Marian University's proposed statement of facts. (Docket #21, #29, and #49). For the reasons explained below, the motion to strike will be granted in part and denied in part. The Court will grant the motion for summary judgment in part and dismiss the Title IX gender discrimination claim, which provides the basis for this Court's subject matter jurisdiction. The motions to dismiss will be denied as moot. Doe will be free to bring his remaining claims in state court.

---

[1]The parties use "sex" and "gender" interchangeably as they relate to Doe. Therefore, for the purposes of this order, the Court will also use the terms "sex" and "gender" interchangeably.

## 1. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## 2. MOTION TO STRIKE

The basis for the motion to strike is Doe's response to Marian University's proposed statement of facts. *See* (Docket #49). Civil Local Rule 56(b)(2)(B) requires parties opposing summary judgment to submit a "concise" response to the moving party's statement of facts. Doe's response is not concise. (Docket #45). Additionally, it attempts to refute admissions that Doe made in his deposition with an after-the-fact affidavit. Marian University contends that Doe seeks to manufacture an issue of fact by submitting a "sham" affidavit that contradicts his deposition testimony. Moreover, in disputing Marian University's proposed statement of facts, Doe cites to evidence that includes hearing transcripts from the underlying investigation, emails between the parties, and Marian University's handbooks and training materials. *See* (Docket #43-1–43-44). Marian University submits that this is inadmissible hearsay evidence. Marian University asks the Court to either strike many of Doe's responses to the

proposed statement of facts, or permit Marian University to reply to certain responses to the proposed facts. *See* (Docket #57 at 6) (requesting permission to reply to Doe's responses to the proposed statement of facts in order to direct the Court's attention to certain evidence in the record). In light of the Court's review of the record, no reply is necessary. For the reasons explained below, the motion to strike will be denied in part and granted in part.

The Court will consider Doe's affidavit in evidence; however, where Doe's responses to the proposed statement of facts directly contradict his sworn deposition, the deposition will control. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) (holding that "where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken."); *see also Johnson v. Shah*, 15-CV-344-SMY-RJD, 2018 WL 724427, at *1–2 (S.D. Ill. Feb. 6, 2018) (disregarding portions of affidavit that contradicts deposition testimony).

The exhibits that Doe has offered in support of his opposition are admissible. The evidence in question consists of transcripts of the hearings that occurred at Marian University, during which Marian University employees interviewed various witnesses, including Doe and Doe's accuser, Jane Roe ("Roe"). There are also copies of policies, email exchanges between the parties, and internal documents and investigative reports.

The rule against hearsay prohibits statements that "the declarant does not make while testifying at the current trial or hearing. . .offer[ed] in evidence *to prove the truth of the matter asserted in the statement*." Fed. R. Evid. 801(c) (emphasis added). What this means for Marian University is that Doe cannot submit hearing transcripts into evidence to prove what he said at the hearing—i.e., that he did not sexually assault Roe. He *can*, however,

Case 2:19-cv-00388-JPS   Filed 12/31/19   Page 3 of 27   Document 58

submit the hearing transcripts (and emails, policies, and investigative reports about the alleged misconduct) into evidence to prove something *other* than the truth of the matter asserted in those documents—e.g., that there was gender bias in the investigation. *United States v. Bursey*, 85 F.3d 293, 296 (7th Cir. 1996) (holding that "statements that are offered not to prove 'the truth of the matter asserted,' but for some other legitimate purpose, do not qualify as hearsay."); *Stewart v. Henderson*, 207 F.3d 374, 377 (7th Cir. 2000) (unsworn, out-of-court statements may be offered to show motivation or state of mind).

In this case, which is not a sexual misconduct case but a gender discrimination case, the statements regarding Doe's purported sexual misconduct made during the allegedly discriminative investigative process can be used to show who the university interviewed, what information the university received, how the university treated each interviewee, how much weight the university gave certain pieces of evidence, and what motivated the university's ultimate findings. *Stewart*, 207 F.3d at 377; *Bakalis v. Golembeski*, 35 F.3d 318, 326 n.8 (7th Cir. 1994) (statements "offered to show the motivation of the speaker with regard to the actions taken" would not be considered hearsay); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) (Title VII retaliation case in which Seventh Circuit found that statements "offered to show [employer's] state of mind at the time she was evaluating [employee's] performance" were "properly considered by the district court.").

Moreover, an opposing party's statement is not hearsay, and may be admitted into evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(d)(2)(D) (statements "made by a party's agent or employee on a matter within the scope of that relationship and while it existed" are not

hearsay); *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007) (holding that an employee's "statement about a matter within the scope of [his] employment" constituted an opposing party admission by the defendant company under Federal Rule of Evidence 801(d)(2)(D)). Therefore, the statements that Marian University employees made while acting in those capacities and conducting the investigation as agents of Marian University are not hearsay if offered into evidence by Doe.

One piece of hearsay evidence proffered by Doe, a chart documenting all reports, investigations, and findings of sexual misconduct on Marian University's campus, is admissible under the hearsay exception for records of regularly recorded activities. *See* Fed. R. Evid. 803(6); (Docket #43-31). Generally speaking, this rule holds that hearsay records of events are admissible if the following criteria are met: the record is made at or near the time of the event by a person with knowledge; the record is kept in the normal course of the organization's dealings; keeping the record was a regular practice; the record can be properly authenticated; and there is no other indicia of untrustworthiness. *Id.* Marian University has withdrawn their objection to this piece of evidence in a recent filing; therefore, the Court will deem it admissible. *See* (Docket #55 at 6).

On a broader level, the Court is satisfied that the substance contained in the evidence in question—including Doe's affidavit, emails between Doe and Marian University employees about the investigation, and Marian University's policy statements and handbook sections—could be presented in an admissible form at trial. For example, Doe could be cross-examined, and the university witnesses could lay a foundation for, and authenticate, the documentary evidence. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d

412, 420–21 (7th Cir. 2016). With those issues resolved, the Court now turns to the facts of the case.[2]

## 3. RELEVANT FACTS

### 3.1 Cultural Backdrop

The setting for this case is Marian University, a small, private institution located in Fond du Lac, Wisconsin. In 2017 and 2018, Marian University, like many universities, was focused on curbing campus sexual assault. To this end, Marian University conducted programming to raise awareness of the importance of consent and to de-stigmatize being a victim of sexual assault, as many victims feel that they are at fault for their assaults.

The on-campus sexual assault awareness programming included a screening of *The Hunting Ground*, a documentary that follows sexual assault survivors as they pursue remedies for their assaults. The film includes interviews with male victims of rape and sexual misconduct, and presents these accounts in a serious, respectful way. *The Hunting Ground*, which has been submitted into evidence by Doe, has been the subject of criticism because of issues with veracity and its unapologetically pro-victim bias. *See e.g.*, Jeanie Suk Gerson, *Shutting Down Conversations about Rape at Harvard Law*, The New Yorker (Dec. 11, 2015) *available at* https://www.newyorker.com/news/news-desk/argument-sexual-assault-race-harvard-law-school. However, there is no evidence in the record of criticisms of the documentary based on gender bias, and the Court is not independently aware of such criticisms.

---

[2]The parties also filed three motions to restrict certain documents offered into evidence. (Docket #42, #46, and #51). In light of the sensitive, personal information divulged in these documents, the Court will grant those motions.

The university also hosted an exhibit called "What Were You Wearing?" which showcased the outfits that female sexual assault survivors were wearing on the nights that they were assaulted. Kathleen Candee, ("Candee"), the Title IX coordinator at Marian University, commented favorably about the exhibit, saying "We need to talk about this community issue. . .and take a stand as a community. No more silence. No more silence by bystanders. No more violence."

The sexual assault awareness and prevention programming unfolding on Marian University's campus is a microcosm of a national conversation. Various movements such as #MeToo and Times Up have encouraged people—often, but not always women—who previously felt embarrassed or ashamed for their sexual harassment and abuse to come forward with their stories. Around this time, Dr. Paul Krikau ("Krikau"), the Dean of Students, voiced his support for victims of sexual assault, including Dr. Christine Blasey Ford, who alleged that Justice Brett Kavanaugh sexually assaulted her when they were young, and testified against his nomination to the Supreme Court.

Increasingly, institutes of higher education must grapple with how to appropriately and respectfully address victim complaints of sexual misconduct. These complaints may arise from situations between students where both parties were voluntarily inebriated, there are no other witnesses ("he said/she said"), and one or both parties may have little to no memory of the events. In light of the poor evidentiary value of these cases, they are rarely the subject of criminal proceedings. However, universities often conduct their own quasi-legal investigations into the issues. If findings of sexual misconduct are made, outcomes range from educational interventions to expulsion. Some universities focus on reformative justice,

while others mete punishment to the accused. It can be gleaned from the evidence that Marian University generally falls into the latter category. Marian University requires investigators to find that an accused committed the assault by a "preponderance of the evidence" before punishment can be imposed.

In 2011, the Department of Education implored universities to investigate and address allegations of sexual misconduct in a "Dear Colleagues" letter. This letter set forth requirements for handling complaints of sexual harassment and sexual violence. However, in 2018, in response to mounting concerns that those accused of sexual assault were not afforded procedural protections in these institutional investigations, the Department of Education suggested strengthening protections for the accused by, for example, requiring live cross-examinations of witnesses. One male educator at Marian University, Sean Fitzpatrick, voiced his opposition to the suggestion that parties be allowed to cross-examine each other, stating that "[t]here are several other ways to ensure due process without risking further trauma for victims."

Unrelatedly, in late 2018, Marian University found itself in the process of changing its policy regarding sexual assault investigations. This change came about because the Department of Education's Office of Civil Rights ("OCR") had looked into an incident at Marian University after a student filed a Title IX complaint that her allegations of sexual misconduct were not appropriately addressed. The investigation prompted some reforms to the original policy, and Marian University allowed OCR to monitor the implementation of the reforms (embodied in a "Resolution Agreement"). Although Marian University was held to compliance with 20 U.S.C. §§ 1681–1688 ("Title IX") on the basis of its receipt of some form of

federal funds, it is not clear whether a failure to comply with the Resolution Agreement would result in a loss of federal funding. *See* (Docket #43-19).

### 3.2 Background Facts

In the autumn of 2017, Doe and Roe were sophomores at Marian University. They had become acquainted during their freshman year and spent the summer together undergoing Reserve Officers' Training Corps ("ROTC")'s basic training. They were part of the same training program and social group, and, by the end of basic training, considered each other close friends.

One night in early September, Doe and his roommate, Student A ("SA"), attended an off-campus party together. They met up with Roe at the party. Everyone was drinking. Doe and SA each drank several beers over the course of the evening. Roe drank primarily from her water bottle, which contained a mixed drink that she had prepared for herself. Doe and SA did not know how much Roe drank, or whether she had been drinking earlier in the evening.

Eventually, Roe, Doe, and SA decided to leave the party together. They walked back to campus, which is approximately a two-mile walk. The parties agree that while they were all drunk, nobody was vomiting, slurring speech, or having difficulty walking.

There is a dispute as to what transpired after, but it is not material for this Court's purposes. Nevertheless, the Court will articulate the competing accounts and the relationships underlying the litigation, which will help explain the investigation that occurred a year after the events in question.

Roe's memory of the evening exists in flashes. She does not really remember the walk home, but she has some memory of arriving back at her

apartment. She remembers that Doe came into her room. She believes that Doe changed her into different clothes, because she woke up dressed in a white, long sleeved softball shirt—different from her party clothes. She remembers that Doe was on top of her and penetrating her, and she remembers saying no several times. She remembers crying throughout the night.

The next morning, she remembers that Doe came over to her dorm. Doe asked Roe if she remembered anything from the night before, and she responded that she knew they were together, but it was foggy. Doe told her that they had sex, and Roe was very upset. She told him that she didn't remember it, and she was mad at him for taking advantage of her. By Roe's account, Doe was contrite and tried to do everything he could to make her feel better. (Docket #32 at 24:19–20). She did not speak to him for a week.

About a week later, she and Doe had a conversation about their relationship. Doe told her that he loved her and wanted to be with her, but Roe did not return his sentiments. They continued to see each other regularly through school and ROTC, and shared the same friend group, but their relationship became more distant, and at certain points, very strained. At times, Doe was disrespectful to Roe during ROTC. At one point, though it is disputed when or what exactly she said, Roe went to her ROTC captain and told him that Doe had been inappropriate with her at a party. The ROTC captain told her that the two needed to "work it out."

By contrast, Doe remembers arriving at Roe's apartment along with SA, on Roe's invitation. The three of them spent some time in the dorm's common area. Roe was flirtatious with SA and sexually propositioned him, but he was not interested. After some time, SA left. Roe went to her room, and Doe followed her. They talked for a bit, and then began to have sex.

Doe remembers that Roe participated in sex by, for example, being on top and engaging in oral sex. At some point, Roe stated that she wanted to stop having sex, so they stopped and Doe left her room. The next morning, he went back to her apartment to see her. They talked for a little while, and it became clear to Doe that Roe did not remember everything from the previous evening. He told her that they had sex, and she became very upset with him. Sometime later, they spoke at length about their relationship and agreed that they would put the incident behind them. Doe and Roe continued to see each other regularly and share the same friend group, but their relationship was different. At some points in the spring of that year, when they had disputes involving ROTC, Roe threatened to report him to military officials for sexual misconduct using the military's Sexual Harassment, Assault, and Rape Prevention complaint process (to "SHARP" him, as it were).

The investigators also received input from SA, who remembers leaving the party with Doe and Roe, attending a second party with Doe and Roe, and then returning to Roe's apartment to hang out and eat snacks. He remembers that Roe was very flirtatious with him. He was not interested in her, and left the common area of her apartment to get food. He also took a nap. He returned to Roe's apartment about an hour later and saw Doe and Roe still sitting in the common area. At this point, he elected to return to his apartment. After some time, Doe also returned.

Quite late in the investigation, the investigators also received letters from Roe's roommate, E.V., and her boyfriend, L.G., who remember seeing Roe crying during the night in question. When they asked her what was wrong, she said she was upset that she had "fucked up" with a person she was seeing because she had had sex with Doe.

A few months later, in January 2018, Roe met her now-fiancé ("Fiancé"), through a mutual friend's Instagram account. Fiancé is in the military and began messaging Roe. Doe and Fiancé knew each other from their small hometown, where they went to the same sub-200-person high school. They did not like each other. Doe considered Fiancé a "player," and advised Roe not to date him. He told Roe about an incident involving Fiancé sexually harassing Doe's little sister while in high school.

For his part, Fiancé told Roe that he and Doe were longtime rivals and that their families had never gotten along. Fiancé maintained that the sexual harassment incident that Doe described was "a joke" gone awry. Fiancé told Roe that he did not want her hanging out with Doe. As Roe and Fiancé grew closer, tensions between the three escalated.[3]

In August or September of 2018, Fiancé was home from deployment. He attended a party in his and Doe's very small hometown. At the party, someone told Fiancé that Doe had been bragging about a sexual encounter with Roe.[4] Fiancé confronted Roe, and Roe set him straight—she barely remembered the incident, and she told him that Doe had taken advantage of her. Shortly thereafter, Roe filed an official complaint with the school and with the military. At some point during this time, Roe also received anonymous, threatening text messages from an untraceable "burner"

---

[3]To illustrate: In 2018, during Easter break, Roe received a Snapchat from Doe in which Doe told her he wanted to "kick [Fiancé's] ass." Fiancé saw it, jumped in his truck, and drove to Doe's farm. Roe followed Fiancé in her own car. When she arrived at Doe's farm, Doe and Fiancé were standing in the middle of the farm, apparently pointing hunting rifles at each other. Roe had to mediate. (Docket #13 at 45:22–46:20).

[4]Though immaterial, it is unclear whether Doe allegedly bragged about raping Roe, or just having sex with her. Doe denies that he told anybody about the incident.

phone, trying to get her to stop the investigation. This prompted her to go to the police.

### 3.3 The Investigation

Roe took her campus complaint to Krikau and Dee Harmsen ("Harmsen"). Krikau was the Dean of Students and the Deputy Title IX Coordinator at Marian University. Harmsen was the Director of Community Standards at Marian University until November 5, 2018. She assisted Krikau in his investigation.

Roe's initial complaint was anonymous as to Doe, but described in general terms the blacked-out encounter, her lack of consent, Doe's bragging, and the subsequent anonymous threatening text messages. Upon hearing these events Krikau noted that it seemed like a "clear" case of sexual misconduct and harassment. Harmsen noted that it would be difficult to prove that the text messages originated with Doe, but Krikau reminded her of the "good news" that is the low standard of proof for these types of complaints. Krikau also told Roe not to text Doe, as it might be bad for her case. Additionally, when explaining the potential outcomes of the proceedings to Roe, they did not offer "no finding" as an option. A "no finding" result would mean that the investigators determined that there was insufficient evidence to conclude that sexual misconduct occurred. At this meeting, Roe told Krikau and Harmsen Doe's name, and a formal investigation commenced.

Krikau and Harmsen promptly informed Doe that an allegation had been made against him involving non-consensual sexual intercourse. At this meeting, they described how the investigation into the allegations would unfold, relying on Marian University's 2017 policy (the "2017 Policy") for such investigations. Roe received the same information.

Saliently, Doe was told that he had ten days to prepare for the investigation. He would be permitted to ask questions during the process, and could request an advocate, if he desired. On this point, the investigators spent much more time discussing the advocate option with Roe. With Doe, they simply told him that it was his responsibility to secure an advocate, and that the investigation would not necessarily accommodate the advocate's schedule. Doe was told that he would be allowed to provide witnesses, review the evidence in the case, and raise any questions about the evidence. Although he would not be permitted to personally cross-examine witnesses, he would be allowed to review transcripts of the investigative interviews and other evidence, and could raise questions and flag inconsistencies.

Harmsen also told Doe that he could not be retaliated against for this investigation, and Krikau provided Doe with some advice on structuring his arguments. (Docket #43-23 at 11). During this initial meeting, Krikau and Harmen also informed Doe about the appeal process. Krikau and Harmsen did not explain the appeal process to Roe.

Krikau and Harmsen did not tell either party that a hearing would be conducted. The 2017 Policy permits, but does not require, the investigators to conduct a hearing, and hearings were not common practice in these types of investigations. The school tends towards using an "investigator model," whereby two investigators interview witnesses, review evidence, allow rebuttals, and come to a conclusion.

Doe provided one witness for the investigation, SA. Krikau and Harmsen interviewed SA twice. Doe did not provide any other witnesses. For two of his three interviews, Doe was provided an advocate—a professor

at Marian University. He did not request her assistance at the third interview.

Roe submitted three witnesses—her roommate, her friend, and her former boss. She too was interviewed on more than one occasion with the benefit of an advocate—another professor at Marian University. Both parties were kept abreast of who the other party had named as a witness, and what the status of the interviews were.

The investigative panel also sought out several additional witnesses who were either mentioned in the complaint or whom they heard about over the course of the investigation. These witnesses consisted of four men and a woman. (Docket #43-13 at 4–5). Both parties were allowed access to these interview transcripts.

The investigation took approximately one month, and both parties received regular updates about the investigation and the status of the interviews. Halfway through the investigation, Marian University's sexual misconduct policies changed in light of the Resolution Agreement with OCR. The new 2018 policy (the "2018 Policy") required faculty to attend rigorous Title IX trainings. Additionally, the 2018 Policy reduced the adversarial nature of the proceedings by doing away with hearings at the investigative level, as well as the appeal panel. Instead, the 2018 Policy required that allegations be decided by investigators, and appeals resolved by the Director of Human Resources.

Roe and Doe were each informed about these changed policies at the same time, as well as how they would impact the outcome of the investigation. Because the investigation was already under way, the policy changes only affected the "deliberation" stage. Thus, instead of having the option for a hearing or requiring the investigator to come to a conclusion in

two days, the 2018 Policy required investigators to review the evidence within ten days of the investigation's conclusion, and draft a written report. Additionally, the parties would not have an appeal panel, only review from the Director of Human Resources. Despite these changes, Doe received an appeal panel for his appeal, pursuant to the 2017 Policy. Effectively, at the deliberation stage, both the 2017 and the 2018 Policy were applied to Doe. *See* (Docket #43-6 at 1).

The policies did not change the parties' abilities to review evidence, and Doe took advantage of the opportunities to review transcripts and challenge the evidence provided by Roe and the other witnesses. Both parties were able to review the final report. Doe also submitted a rebuttal statement. However, he was informed by Harmsen that he did not have to worry too much about rebutting each witness account, some of which were inconsistent with Roe's testimony, because they were all "hearsay." Additionally, although Doe raised specific questions and rebuttals, it does not appear that the investigators addressed them in their investigation and ultimate review.

A "findings letter" went out on November 12, 2018, which determined that Doe was responsible for committing sexual misconduct by having sex with a person whom he knew or should have known was too inebriated to consent. The investigators had based their findings on Doe's third interview, during which he could not explain, to the satisfaction of the investigators, why he had asked Roe about her memory of the night before. The findings letter incorrectly told him and Roe that they only 24 hours to appeal; however, the actual amount of time was 72 hours, and both parties were ultimately granted a full week to submit an appeal. Roe did not appeal.

Doe appealed on many grounds and received a hearing before three professors, including Fitzpatrick, who had previously opined that parties to a Title IX investigation should not cross-examine one another in person. Doe was given the panel members' names before the hearing, and granted the opportunity to challenge the makeup of the panel. He did not submit any challenges. The appeal panel reviewed the record and considered Doe's various arguments. Doe's appeal was granted on the grounds that he had been denied access to a transcript of his third interview. Roe did not have access to this interview transcript, either. The appeal panel ordered that the investigation be reopened to rectify the error and allow the parties the opportunity to review the transcript.

On remand, Candee, the Title IX Coordinator who had implored the campus to address the "community problem" of sexual assault, joined the investigative team because Harmsen had left the university. The investigation was conducted pursuant to the appeal panel's directive, and the parties were allowed to examine the transcript of Doe's third interview. The outcome of this review did not change the investigators' opinion of the facts, and on December 13, 2018—just one day after the investigation was reopened—Doe was again found responsible for sexual misconduct.

Doe inquired about the appeal process again, and learned that the same panel members who decided his first appeal would decide the second one. Doe did not challenge this, and proceeded with his second appeal. In addition to issues raised on his first appeal, Doe also argued that he was improperly denied a hearing and that his investigation was biased. The appeal panel reviewed the evidence again, and, on January 8, 2019, affirmed the investigators' decision.

## 4.    ANALYSIS

### 4.1    Title IX Claim

Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Individuals may bring claims for gender discrimination against their schools under Title IX. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 689 (1979). The Seventh Circuit recently articulated the elements for bringing a Title IX discrimination claim:

> A Title IX discrimination claim requires a plaintiff allege (1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender.

*Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019) (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 657 (7th Cir. 2019)). There is no dispute that Marian University receives educational funding and that Doe was excluded from his educational program (he was suspended for two years). The Court therefore turns to the last issue, which is whether Doe was discriminated against "based on gender." *Id.*

On this issue, the central question in this circuit is whether "the alleged facts, if true, raise a plausible inference that the university discriminated. . .'on the basis of sex?'" *Purdue Univ.*, 928 F.3d at 668–69. While a certain zeitgeist might provide a "backdrop" for discrimination, the Seventh Circuit made clear that a plaintiff must also "allege facts raising the inference that [Defendant] acted at least partly on the basis of sex in his

particular case." *Id.* at 669. This "particularized 'something more'" is "required to survive a motion to dismiss." *Columbia Coll.*, 933 F.3d at 856. On summary judgment, a plaintiff must also show that there is some evidence that could lead a reasonable jury to find discrimination on the basis of sex. Merely demonstrating a discriminating outcome falls short of demonstrating a discriminatory intent. *Hayden v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569, 583 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX."); *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (requiring a Title IX plaintiff to "prove that the disparity in treatment was due to his gender, rather than his status as a student accused of sexual misconduct[.]").

The facts presented, while illustrative of a complex set of relationships and an ersatz legal-cum-educational process, do not support a claim for gender discrimination. In *Purdue University*, the Seventh Circuit found that a plaintiff had sufficiently pled a claim for Title IX gender discrimination when he alleged the following: (1) A 2011 "Dear Colleagues" letter from the Department of Education suggested that the university risked losing its federal funding if it did not punish sexual misconduct; (2) the university's dean credited the female victim's testimony without ever speaking to her; (3) the disciplinary panel credited the female victim based only on her accusation (i.e., they did not interview her); (4) the panel refused to hear any of the male accused's witnesses, including his male roommate, or any of the accused's impeachment evidence; (5) the panel was openly hostile to the male accused and denied him access to the final report; and (6) the school's Title IX Office, where the victim's advocate worked, had very recently posted an article to social media insinuating that "men as

a class" were responsible for sexual assault, rather than individual perpetrators. 928 F.3d at 667–670.

The Seventh Circuit noted that the "strongest" fact supporting an inference of gender discrimination was that the dean and the disciplinary panel credited the victim's account "without hearing directly from her." *Id.* at 669. The plausibility of this inference was "strengthened" by a social media post from the organization that represented the victim, whose statement in support of the victim was given considerable weight by the university. *Id.* at 669–70. The post was an article titled, "Alcohol isn't the cause of campus sexual assault. Men are." *Id.* The Seventh Circuit, obliged to draw reasonable inferences in plaintiff's favor, observed that the statement "could be understood to blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault." *Id.* In light of all of these allegations, the Seventh Circuit determined that the pleading could survive the motion to dismiss stage. However, at the summary judgment stage, the plaintiff would face "problems of proof," and must provide evidence in support of each of the facts alleged. *Id.* at 670. Only then would it go to the factfinder, who "might not buy the inferences that [plaintiff is] selling." *Id.*

The backdrop for this case, like others, is the 2011 Dear Colleagues letter, which raised the specter of revoked federal funding if Title IX claims were not adequately addressed. The Court notes that the events in *Purdue University* unfolded in 2015, under the Obama Administration. The *Purdue University* court noted that the Obama Administration had made clear that it was "committed to using all its tools to ensure that all schools comply with [T]itle IX," which implied that a "school's federal funding was at risk if it could not show that it was vigorously investigating and punishing

sexual misconduct." *Id.* at 668 (citing and quoting Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.)). Here, there is no evidence of a financial incentive—Doe has not pointed to any similar statement from the Trump Administration, and the Resolution Agreement between Marian University and the OCR is silent on the issue of funding. There is no other evidence from which to infer that the OCR investigation promoted a culture of gender discrimination—for example, there is no directive instructing the university to go after *men*, rather than *people*, accused of sexual misconduct.

As for the proceedings themselves, there is no evidence of gender discrimination. Both parties were kept equally abreast of the investigation, received the same access to materials, and received some guidance on how to go about handling the investigation. The fact that Doe—but not Roe—was told about the appeal process at the beginning of the investigation could suggest bias in favor of the victim, but there is nothing to link this to gender-motivated discrimination. *Columbia Coll.*, 933 F.3d at 856 (explaining that allegations that are "divorced from gender" necessarily do "not imply that the [school's] decision was based on Doe's gender."). There is no evidence that the investigator interviewed only women, or that Roe's account was baselessly credited without an interview from her. *C.f. Purdue Univ.*, 928 F.3d at 669. There is no evidence that the investigators were hostile towards Doe. *C.f. id.* at 657, 669. The investigators interviewed several men as witnesses, two of whom were friends with Doe, as well as both Doe and Roe on multiple occasions. The hearing notes contain analyses of Doe's credibility *and* Roe's credibility, and explain that the

ultimate finding was based on Doe's fumbling responses to the morning-after questions. *See* (Docket #43-14 at 2–3) (marking inconsistencies in Roe's testimony); (Docket #14-13 at 1) (investigators' summaries of the parties' testimony, noting shortcomings in both parties' accounts); *Id.* at 7, 9 (investigators' explanations of their finding in light of the various incongruities, each focusing on Doe's third interview, wherein he had trouble satisfactorily explaining why he would ask Roe what she remembered from the previous night); *see also Columbia Coll.*, 933 F.3d at 856 (affirming a motion to dismiss a Title IX claim, noting that "documents attached to Doe's complaint do not imply the board blindly accepted Roe's allegations while finding Doe incredible."). Here, there is no evidence that the investigators blindly accepted Roe's version of the facts.

Nor does Doe provide evidence that women who were accused of sexual misconduct received a fairer investigation, or that he was punished extensively *because* he was a male. It would be a very different story if Doe had also accused Roe of sexual misconduct and was treated differently from her, but those are not the facts of this case.

Doe tries to argue that Roe was treated differently from Doe when Roe sexually propositioned SA. Doe opines that the lack of discipline against Roe illustrates gender discrimination. There are two reasons why this argument is unavailing. First, a sexual proposition is not rape. Depending on the circumstances, it might not even constitute sexual harassment. Second, SA never filed a complaint against Roe. If he had, and if the university had treated him differently from Roe, then the jury might have something to consider. But he did not do this, so these cases are not comparable. In short, there is nothing for a jury to weigh on the issue of gender bias.

Doe provides evidence that two different policies were used in his investigation and he was not allowed a hearing. But apparently no student had been granted a hearing since 2013, and Doe does not offer any evidence to connect the way he was treated with the fact of his gender. *See Columbia Coll.*, 933 F.3d at 856 (allegations that are "divorced from gender" do not support a claim for gender discrimination). Doe repeatedly states that the process discriminated against him because he was male, but conclusory statements are not evidence and are not enough to survive a motion to dismiss, let alone summary judgment. *See Ludlow v. NW Univ.*, 125 F. Supp. 3d 783, 792 (N.D. Ill. 2015) ("'because he is male' is the kind of conclusory statement that courts reject").

Finally, the facts presented about the investigators and the appeal panel in this case fail to raise an inference of gender discrimination. While Candee, Krikau, and Fitzpatrick had each voiced support for victims of sexual assault, none of these statements were targeted against "men as a class," or were made in favor of the victim because she was a woman. *C.f. Purdue Univ.*, 928 F.3d at 669–70 (accepting that a statement to the effect of, "[a]lcohol isn't the cause of campus assault. Men are." could be construed to "blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault.").

In this case, the professors who spoke out on the issue of sexual assault did so in gender-neutral terms. For example, Candee referred to sexual assault as a "community problem," Fitzpatrick argued that due process for the accused could be protected without traumatizing the victim, and Krikau tweeted his support for Dr. Blasey Ford and other victims who had difficulty reporting their assaults. None of the comments suggest that a victim is more believable because she is a woman, or that an accused is

more likely to be guilty because he is a man. While their comments are pro-victim, this does not compel the conclusion that they are also pro-woman, or anti-man. *Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016) ("[A] disciplinary system that is biased in favor of alleged victims and against those accused of misconduct. . .does not equate to gender bias because sexual-assault victims can be both male and female."); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (holding that "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (holding that statements that "reflect a bias against people accused of sexual harassment and in favor of victims. . .indicate nothing about gender discrimination."). Similarly, allegations that a university was compelled to "believe the victim" during an investigation do not sustain the inference that the university "took the genders of the victim and the accused into account." *Ludlow*, 125 F. Supp. 3d at 793; *Doe v. Rider Univ.*, 2018 WL 466225, at *10 (D.N.J. Jan. 17, 2018) (citing and quoting *Ludlow*). Here, there is no evidence that a male victim would be disfavored in a Title IX sexual misconduct investigation—indeed, the evidence actually suggests that male victims would be treated equally to female victims. *See* (Docket #43-32, *The Hunting Ground* (The Weinstein Company 2015)); *see also* (Docket #43-31 at 1–2) (chart documenting sexual misconduct complaints at Marian University and indicating that 33% (3 out of 9) of the incidents reported by men received a finding of sexual misconduct, while 28% (16 out of 56) of the incidents reported by women

received a finding of sexual misconduct. Overall, approximately 28% of complaints resulted in a finding of sexual misconduct).[5]

Evidence of a feminist zeitgeist at Marian University does not carry the day. *See Columbia Coll.*, 933 F.3d at 855 ("generalized allegations" of sexual assault awareness programing, a campus screening of the *Hunting Ground*, and school-sanctioned social media posts regarding male "sexual entitlement," without more, were insufficient to state a claim for gender discrimination). Doe does not offer circumstantial evidence of discrimination; he offers logical fallacies. The fact that some university affiliates—not even the actors involved in this case—screened a documentary to raise awareness about campus sexual assault is not evidence of bias in any direction. The fact that Doe's investigation took place on a campus that promoted female empowerment does not raise an inference of gender discrimination. *Id.*; *see also Ludlow*, 125 F. Supp. at 793 (holding that "pressure" from "radical women's groups" did not raise a plausible inference that the college investigated plaintiff "because he was a man," rather than "because he was accused of rape."). The fact that many female victims of sexual assault across the country have rallied under the #MeToo and Times Up movements is not evidence that in this case, Doe

_____

[5]Marian University uses this chart in their reply brief to make this same point regarding equal outcomes for respondents/accused. (Docket #52 at 12) (noting that the percentage of findings where a male is the accused is 32.69%, while the percentage of findings where a female is the accused is 33.33%.).

The Court's value regarding reporters/victims was reached by omitting the two complaints where the gender of the reporter/victim was undefined, and, for one misconduct finding where there were two reporters/victims—a man and a woman—including that incident in the count for findings from male reporters *and* findings from female reporters. If this event is not double counted, but rather excluded from the tally, the values are: 25% of male reported incidents received a finding and 27% of female reported incidents received a finding.

Case 2:19-cv-00388-JPS   Filed 12/31/19   Page 25 of 27   Document 58

was discriminated against because he was a man. Doe has failed to combine his "generalized allegations" of discrimination with "facts particular to his case." *Id.* at 855.

There is no evidence by which a reasonable juror could infer that Doe was treated a certain way because of his gender, rather than because he was accused of raping someone. Absent some fact suggesting that the bias in Doe's investigation occurred "on the basis of sex," summary judgment must be granted in favor of Marian University. The Court declines to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3).

5.    **CONCLUSION**

For the reasons explained above, the gender discrimination claim must be denied. There is no evidence to support it. Doe may bring his state law claims for negligence, breach of contract, and declaratory relief before a state court.

Accordingly,

**IT IS ORDERED** that Defendant's motions to dismiss (Docket #11 and #21) and to stay discovery (Docket #14) be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment (Docket #29) be and the same is hereby **GRANTED in part**, as stated in the text of this order;

**IT IS FURTHER ORDERED** that Plaintiff's Title IX gender discrimination claim be and the same is hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over the state law

claims raised in Plaintiff's amended complaint and Plaintiff's state law claims be and the same are hereby **DISMISSED without prejudice**;

IT IS FURTHER ORDERED that the parties' motions to restrict documents (Docket #42, #46, #51) be and the same are hereby **GRANTED**;

IT IS FURTHER ORDERED that Defendant's motion to strike Plaintiff's responses (Docket #49) be and the same is hereby **GRANTED in part and DENIED in part**, as stated in the text of this order; and

IT IS FURTHER ORDERED that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of December, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge